Francis J. Manion
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax. 502-549-5252
fmanion@aclj.org

Mark R. Scirocco
Legal Center for Defense of Life, Inc.
Law Offices of Robert A. Scirocco
98 Route 46, Suite 6
Budd Lake, New Jersey 07828
Tel. 973-691-1188; Fax 973-691-3353
mark@sciroccoesq.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

JERYL TURCO,

               Plaintiff,

v.

CITY OF ENGLEWOOD,
NEW JERSEY,

               Defendant.

_____/

Case No. 2:15-cv-03008

Judge Susan D. Wigenton
Magistrate Judge Leda D. Wettre

Motion Day: June 19, 2017

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.  THE LEGAL STANDARD AFTER *MCCULLEN*
    AND *BRUNI* ............................................................................................. 2

II.  THE CITY FAILS TO CARRY ITS BURDEN
     UNDER *MCCULLEN* AND *BRUNI* ......................................................... 3

    A. Increased Police Presence ........................................................................ 5

    B. Increased parking enforcement ................................................................ 9

    C. The City's Alleged Inability to Prosecute Lawbreakers ......................... 10

    D. The City's Failure to Seek Injunctive Relief ......................................... 16

    E. The City's failure to enact less sweeping,
       targeted ordinances .............................................................................. 19

III.  THE CITY'S RED HERRINGS .................................................................. 22

    A. Whether or not the Ordinance was "effective" ...................................... 22

    B. Whether or not Plaintiff too was bothered and
       wanted action ....................................................................................... 23

    C. Whether the buffer-zone is 8-feet, 15-feet, 35-feet, or more ................. 24

IV.  PLAINTIFF'S OVERBREADTH CLAIM ................................................... 30

CONCLUSION .................................................................................................. 32

CERTIFICATE OF SERVICE ........................................................................... 34

i

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                          Page

*Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009) .............................. 26, 28

*Bruni v. City of Pittsburgh,* 91 F. Supp. 3d 658 (W.D. Pa. 2015) ......................... 26

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ........................... 2, *passim*

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) ...................................................................... 8

*Doe v. Gov. of New Jersey*, 783 F.3d 150 (3d Cir. Apr. 13, 2015) ....................... 29

*Frisby v. Schultz*, 487 U.S. 474 (1988) ................................................. 7, 32

*Hill v. Colorado*, 530 U.S. 703 (2000) ................................................ 28, 29

*In re Krebs*, 527 F.3d 82 (3d Cir. 2008) ................................................. 28

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ........................................... 1, *passim*

*Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015) ..................................... 3

*Schneider v. New Jersey,* 308 U.S. 147 (1939) ............................................ 8

*United States v. Kokinda*, 497 U.S. 720 (1990) .......................................... 8

*United States v. Marcavage*, 609 F.3d 264 (3d Cir. 2010) ................................ 3, 26

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) ......................... 26
26
*United States v. Stevens*, 559 U.S. 460 (2010) ......................................... 31

**CONSTITUTION AND STATUTES**

N.J.A.C 5:61-1.1 ................................................................................. 14

Englewood City Code § 307-3 ....................................................... *passim*

**OTHER**

"Abortion buffer zone laws begin falling after Supreme Court ruling,"
*L.A. Times* (July 7, 2014), http://www.latimes.com/nation/nationnow/la-na-nn-buffer-zone-laws-struck-down-20140707-story.html ............................................. 32

"Recommendation Regarding Sec. 23.01, MGO,
in Light of the U.S. Supreme Court's Decision in
McCullen v. Coakley" (July 10, 2014) (emphasis added),
 http://www. adfmedia.org/files/MadisonMayLetter.pdf ........................................ 32

**INTRODUCTION**

This should be an easy case. It is not often that the parties and the Court have the benefit of a unanimous Supreme Court decision on all fours construing a virtually identical law, adopted under virtually identical circumstances, with the parties making many of the identical arguments considered and disposed of by the High Court. But this is such a case. *See McCullen v. Coakley*, 134 S. Ct. 2518 (2014).

Englewood adopted its buffer zone Ordinance without waiting for the Supreme Court's guidance as to the constitutionality of the very law that Englewood used as its model.[1] The City now seeks summary judgment on Jeryl Turco's modest claim that the Massachusetts buffer zone law is just as unconstitutional in New Jersey as it was in Massachusetts. However, as the record is empty of credible evidence that the City somehow clairvoyantly anticipated *McCullen*'s requirement that a city defending such a law show that it "seriously undertook to address the problem with less intrusive tools readily available to it," *id.* at 2539, Englewood should be made to go back to square one, just as Massachusetts and other jurisdictions did after the *McCullen* decision was announced. As argued herein, there is certainly no basis in the City's motion,

---

[1] Englewood's Ordinance was adopted at the City Council Meeting of March 18, 2014, after *McCullen* had been argued at the Supreme Court. The Ordinance was effective as of March 31, 2014. The *McCullen* decision was announced on June 26, 2014.

1

which fails utterly to demonstrate that the City has carried its burden under *McCullen*, to justify granting summary judgment in Englewood's favor.

## ARGUMENT

## I.    THE LEGAL STANDARD AFTER *MCCULLEN* AND *BRUNI*

The parties appear to be in agreement on the correct legal standard for assessing Plaintiff's challenge to the Ordinance in the wake of the Supreme Court's decision in *McCullen* and the Third Circuit's explication of that holding in *Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016). To satisfy intermediate scrutiny in this context, *McCullen* requires that the City show that it "seriously undertook to address the problem with less intrusive tools readily available to it." 134 S. Ct. at 2539. As the Third Circuit explained in *Bruni*, *McCullen* requires that the "sovereign justify its regulation of political speech by describing the efforts it had made to address the government interests at stake by substantially less-restrictive methods or by showing that it seriously considered and reasonably rejected 'different methods that other jurisdictions have found effective.'" *Bruni*, 824 F.3d at 371 (quoting *McCullen*, 134 S. Ct. at 2539). And particularly *apropos* with regard to Englewood's summary judgment motion, is the Fourth Circuit's observation, applying *McCullen*:

> [I]ntermediate scrutiny does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument

2

> unsupported by the evidence will not suffice to carry the
> government's burden.

*Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015).

In short, Englewood, as the movant here, has the burden of proving the constitutionality of its actions, *see*, *e.g.*, *United States v. Marcavage*, 609 F.3d 264, 279 (3d Cir. 2010), and must come forward with *actual evidence*—not mere conclusions or disputed factual assertions—that demonstrates that "alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 134 S. Ct. at 2540.

## II.   THE CITY FAILS TO CARRY ITS BURDEN UNDER *MCCULLEN* AND *BRUNI*

The City seeks to avoid liability and escape a finding of unconstitutionality as a matter of law by invoking the very same defense used unsuccessfully by Massachusetts in *McCullen:* "We have tried other approaches, but they do not work." *Id.* at 2539. In fact, in rejecting the state's defense in *McCullen*, it is remarkable just how exactly on point are the Court's words when it comes to Englewood:

> Although respondents claim that Massachusetts "tried other laws
> already on the books," they identify not a single prosecution brought
> under those laws within at least the last 17 years. And while they
> claim that the Commonwealth "tried injunctions," the last injunctions
> they cite date to the 1990s."

*Id*. at 2539.

The Court made short work of this defense, holding that Massachusetts "has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it. Nor has it shown that it considered different methods that other jurisdictions have found effective." *Id.*

Englewood is in precisely the same posture here as was Massachusetts in *McCullen*: no prosecutions under a myriad of existing laws—including the one the Ordinance replaced—no new laws modeled on the federal Freedom of Access to Clinic Entrances statute ("FACE") or other laws targeting specific, non-expressive misconduct outside clinics, and no injunctions other than one dating to the 1990s.[2] Nothing. If this was enough to persuade all nine members of the U.S. Supreme Court to strike down the statute in *McCullen,* it is difficult to see how Englewood hopes to save its copycat Ordinance, let alone have summary judgment granted in its favor.

It is true that Englewood does add certain allegedly considered-and-rejected "alternative measures" not discussed in *McCullen*, but these add nothing to the argument.  In fact, if anything, one could say that Englewood places itself in an

---

[2] An injunction which, according to the former Police Chief, worked remarkably well in quelling disturbances caused by protestors outside the same clinic. [Pl. MSJ, Ex. F, O'Keefe Cert. at ¶¶ 5-6.] (Exhibits to Plaintiff's Statement of Material Facts Not in Dispute in Support of Plaintiff's Motion for Summary Judgment (ECF Doc. 43) are referred to as "Pl. MSJ, Ex. ____.")

even worse position than Massachusetts by identifying and then inadequately justifying its rejection of at least one *effective* measure that Massachusetts did not identify in its defense: increased police presence.

As for the City's other "alternative measures," and/or its reasons for rejecting the measures specified in *McCullen,* the City has not shown either that the measures themselves were reasonable (*e.g.*, parking tickets), or that its rejection of actual potentially effective measures was reasonable. Furthermore, the City does not even address one of the measures the *McCullen* Court deemed particularly likely to satisfy intermediate scrutiny: narrowly tailored laws targeting specific, non-expressive bad conduct.

### A.    Increased Police Presence

There is ample evidence in the record that increased police presence at 40 Engle Street, the site of Metropolitan Medical Associates ("MMA"), would have, if seriously pursued, succeeded in achieving the goal of reining in the reportedly unlawful conduct of the Bread of Life group. Both the former police chief and the City Council President at the time the Ordinance was adopted testified that, when police officers were present outside MMA, the alleged misconduct of the Bread of Life members *did not occur*. [Pl. MSJ, Ex. J, O'Keefe Dep., 35:18-25; Pl. MSJ, Ex. I, Algrant Dep., 47:14 to 48:5.] But the City goes on to say that it rejected the option of increased police presence, whether in the form of assigning an officer to

5

the clinic on a regular basis whenever trouble was expected (at most, three hours a week) or in some other form, because such allocation of resources would be "cost prohibitive." [Pl. MSJ, Ex. Q, Dacey Dep., 14:16-18.] This bald conclusion, however, is not supported by the production of *any* evidence of what such increased police presence would have cost, what the City's financial or personnel resources were in 2013-2014, or what the City's budgetary outlook was at the time. This is insufficient under *McCullen* and *Bruni.* It is not "actual evidence" of anything other than a conclusion—more like a hunch—arrived at with no serious study of the costs and benefits of the idea.

The same is true of the former Police Chief's conclusory statement about not having the manpower "to simply dedicate an officer four hours at a time every day." *See* Def. Brief at 10.[3] Not only does the City provide zero actual evidence of numbers regarding the City's available police personnel, it is also clear that the Chief—who retired within two months of the start of the trouble and three months before the Ordinance was passed—was grossly exaggerating (or simply misspoke about) the amount of time involved. Rather than "four hours at a time every day," the City's other witnesses and the Plaintiff agree that the Bread of Life contingent's *modus operandi* was to show up only for three hours one day a week—Saturday—and then, according to Council President, Algrant, only every

---

[3] Citations to Defendant's Memorandum of Law in Support of Summary Judgment, ECF Doc. 44-2, are abbreviated as "Def. Brief."

other Saturday. [*See* Pl. MSJ, Ex. D, Turco Dec. at ¶ 13; Pl. MSJ, Ex. I, Algrant Dep., 25:7-16; 60:17-18; 60:25 to 61:2 (Bread of Life only there "every other Saturday," "every other weekend").] Moreover, Chief O'Keefe testified that, regarding Saturdays, "we could afford one officer for a couple hours for a period of time," although, without explanation, he added "but it couldn't be an indefinite situation." [Pl. MSJ, Ex. J, O'Keefe Dep., 35:13-17.]

But one need not look far to discover why this one approach (increased police presence) was actually rejected out of hand without serious study. The City Administrator, when asked whether or not the City had ever undertaken a cost study of assigning a police officer to the scene for three hours every other Saturday, or even every Saturday morning, at first invoked the "too expensive" excuse, but then acknowledged that no actual cost study was ever undertaken, because "we generally do not provide individual police coverage to businesses in the City. I wouldn't consider doing that." [Pl. MSJ, Ex. Q, Dacey Dep., 14:11 to 15:20.]

Keeping the peace on a city owned, public sidewalk that serves as a traditional public forum for discussion and debate, is hardly the equivalent of providing private security service to a business. *See Frisby v. Schultz*, 487 U.S. 474, 480 (1988) (stating that "public streets and sidewalks have been used for

public assembly and debate, the hallmarks of a traditional public forum").[4] This is particularly so where, as the City Council President testified, many of the incidents of alleged aggressive, violent, intimidating, and harassing behavior that spurred the City to amend the ordinance took place, not in front of 40 Engle Street, but in the neighborhood generally. [Pl. MSJ, Ex. I, Algrant Dep., 49:14-23.] The City cannot avoid its responsibility to protect the rights of patients and employees of MMA, the clinic escorts, the sidewalk counselors, and, yes, even aggressive protestors in a traditional *public* forum, by claiming that this is a matter of purely *private* concern. Thus, whether the defense is premised on "prohibitive cost" (a conclusion for which no evidence is presented) or the alleged "private" nature of the problem (a conclusion which has no basis in law or common sense) the defense is certainly insufficient as a matter of law. Moreover, the City cannot say that it "seriously considered" something—increased police presence at the clinic—when the City Administrator says flat out, "I wouldn't consider doing that." [Pl. MSJ, Ex. Q, Dacey Dep., 14:11 to 15:20.]

---

[4] *See also*, *United States v. Kokinda*, 497 U.S. 720, 743 (1990) (public access to sidewalks "is not a matter of grace by government officials but rather is inherent in the open nature of the locations."); *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc*., 473 U.S. 788, 800 (1985) ("a principal purpose of traditional public fora is the free exchange of ideas"); *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939) (streets and sidewalks "are natural and proper places for the dissemination of ideas and opinion").

### B.    Increased parking enforcement

Another "alternative measure" reported by the City cannot be taken seriously. In response to an alleged invasion of "violent and aggressive" "harassing and intimidating" lawbreakers suddenly besetting innocent citizens on its streets, the City decided to give out parking tickets. Def. Brief at 11. All of the aforementioned conduct (violence, harassment, etc.) was, of course, already proscribed by law, and, if actually occurring, quite serious. Yet, rather than doing whatever it needed to do to gather direct evidence of such crimes—crimes which were allegedly being perpetrated at the same time, at the same place, by the same people, in plain view, on a weekly or bi-weekly basis—the City sought to address this crime wave by patrolling a parking lot where the perpetrators were thought to be parking their vehicles and issuing parking citations. This is unreasonable on its face as an "alternative measure" under *McCullen*.

How is it that the City could afford to assign police officers to patrol the library parking lot on a regular basis whenever trouble was brewing at MMA, but could not afford to assign officers to be on the actual scene of the alleged violence and harassment, especially when the City knows that police presence on the scene invariably prevented those things? The City does not tell us. Indeed, there are "alternative measures" that deserve to be considered under *McCullen* and *Bruni*,

and there are "alternative measures" that do not so deserve. Parking tickets fall within the latter category.

### C.   The City's Alleged Inability to Prosecute Lawbreakers

The City devotes much space in its Brief to what it apparently considers its best response to the admitted fact that, just like Massachusetts in *McCullen,* Englewood can point to not a single prosecution for the alleged violent, harassing, threatening, intimidating, assaulting, obstructing, and excessively loud behavior of the Bread of Life members under already existing state, federal, and local laws. The City claims that it would have been forced to rely on witnesses and victims who were unwilling to file complaints. The City argues that the "legitimate fear" of such people to have their names and other identifying information revealed publicly somehow excuses Englewood from enforcing the law. The City's argument fails for at least two reasons.

First, assuming *arguendo* that the unwillingness of witnesses to come forward with complaints about criminal behavior is a dispositive distinction between Englewood's position and that of the State of Massachusetts in *McCullen*—it is not—Englewood cannot possibly rely on it to obtain summary judgment because it is preeminently a matter of factual dispute. Yes, it would appear that on perhaps one or two occasions City police officers were told by clinic escorts that they were unwilling to file charges against Bread of Life protestors out

10

of fear of retaliation. And, yes, one would imagine that patients seeking services from MMA would also be reluctant to get involved for several reasons, mostly, one would think, from sheer privacy concerns.

But the discovery materials, all of them from the City's own records or witnesses, tell a different story. For example, Exhibit S of Plaintiff's Summary Judgment Motion contains a selection of six official Englewood police investigation reports from 2013 and 2014. [Pl. MSJ, Ex. S, Englewood Police Reports.] Those reports contain complaints about allegedly unlawful protestor behavior made by no fewer than five doctors employed by MMA, two other employees of MMA, and one volunteer clinic escort. Each of the reports contains what one presumes are the complainants' real names and—at least prior to redaction by the City—the victims' addresses. The records do not indicate why these particular complaints did not result in actual prosecutions, but they do indicate that the City's "nobody would complain" argument is highly questionable. Here were victims who *did* complain and *did* give their names and addresses.

The police investigation reports are not the only thing that contradicts this "fear factor" argument. The minutes of the City Council meetings from both October and November 2013, indicate that several doctors who worked for MMA addressed these very *public* gatherings and gave both their names and work addresses. [Pl. MSJ, Ex. K, L, and M.] In fact, the letter submitted by the clinic

doctors at the November 12, 2013 meeting is signed by no fewer than nine individual doctors who were apparently not afraid to publicly identify themselves in this fashion and give the address of their place of employment. (In the same letter, they also helpfully direct the City to some of the legal tools readily available to it to deal with the problems they describe, including the federal FACE statute.) [Pl. MSJ, Ex. M.] The City cannot plausibly contend that these doctors— presumably the people who actually perform the abortions at MMA—had *less* reason to fear "anti-choice extremists" than other clinic employees, the off-duty police officer who works as the MMA security guard, or the volunteer clinic escorts. Yet here they are, unafraid to show themselves and give their names and workplaces in a public meeting in which they demand that the City take action against the Bread of Life group.

As for the volunteer escorts who, we are told, were so fearful of revealing their identities that they could not possibly be expected to file charges against the individuals doing all the violence, harassing, assaulting, obstructing, etc. that they claimed to be witnessing on a weekly basis, it would seem that several of them had (and have) no hesitancy about sharing their names, their faces, their connections with the MMA clinic, and, in some cases, their places of employment with anyone who has access to the Internet. [Pl. MSJ, Ex. G, Gray Dep., 37:23 to 50:22.]

One of the escorts, Ms. Gray, who is the head of the volunteer clinic escort team and was the City Council's primary source of information about the activity outside MMA [Pl. MSJ, Ex. G, Gray Dep. 13:4-21], in addition to revealing her name, her picture, her clinic escort work and the identity of her employer on Twitter, Facebook, and in Internet articles, has voluntarily chosen to affix her real name to something as public as the detailed Certification filed on behalf of the City in this very lawsuit. [Pl. MSJ, Ex. T, Certification of Ashley Gray.] It is hard to accept that people who are unafraid to reveal their identities when complaining about the Bread of Life members in public meetings, on the Internet, at the police station, and in this very public lawsuit, could not even once have been persuaded to tell their stories in a municipal or other court proceeding.[5]

Moreover, the City, in describing what it calls the escorts' "legitimate fear" about using "their full name and address," Def. Brief at 12, fails to mention that these same escorts who, as has been shown above, have put their full names on the Internet for all to find, were assured by the City Council President that they *need not use their home addresses* but could, instead, simply use the clinic's address. [Pl. MSJ, Ex. G, Gray Dep., 55:16 to 56:3.]

---

[5] There is also the retired state trooper or off-duty police officer sitting just inside the door of MMA (though sometimes venturing outside) every time the Bread of Life "chaos" was supposedly happening on the sidewalk. [Pl. MSJ, Ex. E, Turco Dep. 71:18 to 72:19.] The City cannot plausibly maintain that he too was "legitimately afraid" to affix his name to even a single formal charge against the perpetrators who were allegedly wreaking havoc a few feet away.

At a minimum, to the extent that the City relies on the alleged unwillingness of witnesses to disclose their identities in public proceedings against the bad actors at 40 Engle Street as an excuse for not ever filing charges against them under any of a half dozen or more already existing laws, serious fact issues are present.

But even if Plaintiff were to accept as true the City's conclusory statements about fearful witnesses, that still would not explain, let alone excuse, Englewood's reluctance to pursue existing legal remedies against actual lawbreakers before resorting to "unnecessarily sweeping in innocent individuals [like Plaintiff] and their speech" in a speech-excluding Ordinance. *McCullen*, 134 S. Ct. at 2538.

To begin with, fearful witnesses are hardly something unique to matters arising in the crucible of controversies connected with abortion. Probably very few people are anxious to subject themselves to the criminal justice system, many—if not most—for probably the same reason that the Englewood witnesses supposedly were: fear of retaliation. Yet the criminal justice system has hardly gone out of business with prosecutors throwing up their hands in despair because witnesses would just as soon not take their calls. Witnesses can be, and routinely are, subpoenaed to testify. And while prosecutors would obviously prefer to always be dealing with enthusiastic, cooperative witnesses, they rarely are. Measures have been taken in many places to allay the concerns of victims and witnesses in some contexts, *see*, *e.g.*, N.J.A.C 5:61-1.1 ("Address Confidentiality Program"), but no

14

one would claim that the State would be justified in not pursuing entire classes of criminal offenses simply because victims and witnesses have a "legitimate fear" of the process. In the specific context of MMA, there is even the added help of a security guard *and a security camera* to assist the City in identifying perpetrators and providing evidence of whatever crimes may have been committed. [Pl. MSJ, Ex. G, Gray Dep., 53:6-13.]

Finally, as Bonnie Shapiro, President of Northern NJ NOW, suggested in an October 24, 2014 email to Lynne Algrant, it would be "logical" for the "clinic itself to file complaints." [Pl. Supp. Facts, Ex. A, Shapiro Email, ENGTUR 141.][6] Shapiro points out that the clinic has "security guards who are there the whole time and can inform the clinic administrator, who can file the complaint . . . on behalf of the clinic." [*Id.*] Even if patients and volunteer escorts are truly fearful of filing complaints against Bread of Life protestors, the City does not explain why, as Shapiro suggests, the clinic could not itself file complaints for violations of the law.

For these reasons, the City's claim of powerlessness to enforce already existing laws against harassment, disorderly conduct, simple and aggravated assault, obstructing public passages, terroristic threats, etc., simply does not ring true. As the Supreme Court put it in *McCullen*, "[i]f Commonwealth officials can

---

[6] Exhibits to Plaintiff's Supplemental Statement of Facts in Opposition to Summary Judgment are referred to as "Pl. Supp. Facts, Ex. ____."

compile an extensive record of obstruction and harassment to support their preferred legislation, we do not see why they cannot do the same to support injunctions and prosecutions against those who might deliberately flout the law." 134 S. Ct. at 2540. It is odd indeed that the City was able to obtain the complete, voluntary cooperation of Ashley Gray in serving as a key witness and giving sworn, detailed testimony about the alleged crimes and misdemeanors of the Bread of Life members in a lawsuit challenging Englewood's "preferred legislation"— *this lawsuit*—when, at the same time, Ashley Gray is supposed to have been too fearful to give similar testimony in other court venues in support of criminal prosecutions or applications for injunctive relief.

### D.    The City's Failure to Seek Injunctive Relief

Of course, what has been said about the insufficiency of the City's explanation of its failure to prosecute criminally those whose actions were causing such havoc at 40 Engle Street, applies with even greater force to its failure to pursue injunctive relief. This failure is all the more remarkable given the former Police Chief's testimony that it was precisely the injunction route that proved highly successful in quelling disturbances that occurred outside the same very abortion clinic in the 1990s. [Pl. MSJ, Ex. F, O'Keefe Cert. at ¶¶ 5-6.] The City offers its mere conclusion that an injunction would have been "difficult to frame and enforce." Def. MSJ Statement of Facts, ECF Doc. 44-1, at 28.

But that is not the approach the Supreme Court took in *McCullen*. On the contrary, the High Court, addressing virtually the same set of facts as in Englewood, indicated that in these situations the injunction remedy is possibly the best solution for all sides. *See McCullen,* 134 S. Ct. at 2538 (noting that the government could achieve a narrowly tailored solution, "through public and private civil actions for injunctions and other equitable relief," *id.*; that the Court had "previously noted the First Amendment virtues of targeted injunctions as alternatives to broad, prophylactic measures," *id.*; and that the virtue of injunctive relief is that it "focuses on the precise individuals and the precise conduct causing a particular problem," *id.*") (internal citations omitted).

So in Englewood, where the identities of the individuals causing the problems were well known [Pl. MSJ, Ex. G, Gray Dep., 50:23 to 51:6], and the effectiveness of injunctions to curb protestor excesses at this very same site was also well known [Pl. MSJ, Ex. F, O'Keefe Cert. at ¶¶ 5-6], the City's failure to pursue that route before settling for the Ordinance, which infringes on the First Amendment rights of people like Turco, is inexcusable.

The City claims that it urged MMA to seek an injunction—whether before or after the adoption of the Ordinance is a matter of factual dispute. But whenever it was, this merely proves that the City was familiar with the remedy and knew from experience that it was a highly effective way to control any excesses

connected with anti-abortion protests. Of course, nothing would have prevented the City itself from seeking injunctive relief as the problem sought to be alleviated, while occasioned by the activities of the MMA clinic, was not limited to the area in front of MMA according to the City's own witnesses.[7]  In any event, the allegedly unlawful conduct was taking place on the City's property—the public sidewalk— not the clinic's. The City's attempt to pass the buck for policing its streets and sidewalks to MMA simply does not fly under *McCullen*.

The Supreme Court could not be any clearer that adopting an Ordinance that carves up a traditional public forum into arcs and rectangles of free speech and no-free speech zones (and shifting ones at that[8]) is never to be preferred to injunctive relief in which "courts can tailor a remedy to ensure that it restricts no more speech

---

[7] *McCullen* envisions "public or private" injunctions, 134 S. Ct. at 2538, and the federal FACE Act expressly provides for injunction actions to be brought by attorneys for the federal or state governments in addition to remedies available to private parties.18 USCA § 248 (c)(2)(3).

[8] It is worth noting that the 40 Engle Street buffer zones were originally "inappropriately" delineated—not as the arcs described in the Ordinance—but as parallel white lines beginning 8 feet from each edge of the clinic's 8-foot wide door and each edge of the 8-foot wide driveway and running to the street. This created two 24 foot wide no-speech zones. Several months later, the arcs were added, but the white lines remain to this day. Sometime after that, the arc to the left of the clinic front door was covered up with decorative stones by the owners of the adjacent restaurant with the acquiescence of the City. [Pl. MSJ, Ex. I, Algrant Dep., 73:20 to 75:19; 80:4-22; *see also* photographs attached at Pl. MSJ, Ex. D, Turco Dec., at ¶¶ 14-19.] Apparently, in this case, the City's compelling interest in safeguarding women's right of access to reproductive health care yielded to the "right" of a private restaurateur to offer *al fresco* dining with suitable—to borrow Algrant's term—"atmosphere." [*Id.*]

than necessary." *McCullen*, 134 S. Ct. at 2538. In failing to show that it "reasonably rejected" this readily available "alternative measure" before adopting the Ordinance, Englewood has shown that it has not met its burden. *See Bruni*, 824 F.3d at 371.

### E.   The City's failure to enact less sweeping, targeted ordinances

In its Brief, the City does not address the one alternative that the *McCullen* Court devoted significant attention to: adopting narrowly tailored laws that target no more than the evil sought to be alleviated "without excluding individuals from areas historically open for speech and debate." *McCullen*, 134 S. Ct. at 2539. In fairness, this may be because such laws already existed, at the federal, state, and local level. Indeed, one of the ironies of this matter is that the law which was replaced by the Ordinance—a law which to Plaintiff's knowledge was never challenged on constitutional or other grounds—would appear to address *more* of the alleged Bread of Life misconduct than the challenged Ordinance does, and do so "without excluding individuals from areas historically open for speech and debate." *Id*.

For starters, the prior version of Englewood City Code § 307-3 [Pl. MSJ, Ex. U] not only prohibited blocking access to health care facilities, it also made it unlawful to "interfere with" or "impede" any person having a lawful right to enter or leave a health care facility. [*Id*.] Those terms could arguably encompass much of

the conduct of the Bread of Life members that was being complained of in late 2013. Moreover, the prior Ordinance was not limited to any particular areas of the sidewalk, or even the sidewalk at all. Algrant was receiving complaints about Bread of Life members harassing ("interfere with") and blocking or surrounding ("impeding") patients and others down the block from 40 Engle and even across the street. [Pl. MSJ, Ex. I, Algrant Dep. 33:23 to 34:10; 30:18 to 31:12.] Since not all the complained of conduct was taking place within what later became the buffer zones under the Ordinance, it seems clear that the prior version was potentially far more effective than the current Ordinance—if it had only been enforced—without suffering from its constitutional defects. The City's contention that the prior ordinance was inadequate because it only prohibited "intentionally blocking a doorway," Def. Brief at 15, is simply incorrect.

Nor can the City give a satisfactory explanation of how the Ordinance was supposed to be superior to its predecessor when the enforcement mechanism of the Ordinance is exactly the same as the enforcement mechanism of the law it replaced, and, indeed, every other law: a complaint brought by a victim or witness to its violation. Since all of the witnesses to violations of the new buffer zone law would presumably be the same people who, we are told, were in "legitimate fear" of coming forward about a whole host of violations of already existing laws, how does the Ordinance even begin to address the City's problem? The City has no

coherent response to this. Algrant's supposition that this group of "aggressive and violent" fanatics who had theretofore shown no respect for patients, doctors, pro-choice escorts, or even pro-life sidewalk counselors would suddenly be tamed by the mere existence of a buffer zone Ordinance is incredible on its face. [Pl. MSJ, Ex. I, Algrant Dep., 89:8-20.] It also contradicts the City's own Statement of Facts, describing patients being blocked from entering the clinic, and protestors respecting an informal "no-go zone" *only while police were physically present*. *See* Def. MSJ Statement of Facts, ECF Doc. 44-1, at ¶¶ 9, 21, and 22. Moreover, in an October 20, 2014, email from the MMA Escort Team to Lynne Algrant and others, it was reported that one of the Bread of Life leaders, Robert Parker, stopped in the middle of the buffer zone, slammed his sign to the ground, and would not leave until the security guard told him to do so. [Pl. Supp. Facts, Ex. B, Emails, ENGTUR 132.]

In sum, the City's failure to engage *McCullen*'s discussion of the preferability of enacting narrowly tailored measures that do not infringe free speech most likely has only one explanation: such measures already existed. The City simply failed to enforce them.

## III.   THE CITY'S RED HERRINGS

### A.   Whether or not the Ordinance was "effective"

The City makes much of what it claims is the effectiveness of the buffer zone Ordinance in dealing with the issues that arose in October 2013 on the city sidewalk at 40 Engle Street. But whether or not the Ordinance was effective is completely irrelevant to the question of whether or not it violates the First Amendment. While an ordinance banning all "controversial" speech on Englewood's sidewalks would likely have been even more effective, it would, undoubtedly, be also unconstitutional. It matters not whether the buffer zone Ordinance succeeded in attaining the City's goals in enacting it; the issue is whether or not it runs afoul of the First Amendment.

But even if effectiveness were in any way relevant—it is not—the City's claim that the Ordinance was a "success" is belied by the documents supplied by the City in discovery. As detailed in correspondence among Council President Algrant, the clinic escorts, and representatives of North Jersey NOW, the Ordinance seems to have been something of a flop. Not only did it fail to end the allegedly unlawful behavior of the Bread of Life group that had prompted the passage of the measure to begin with, the situation had actually deteriorated within a few months after the Ordinance's adoption to the point where NOW representatives and the escorts were urging the City to "enforce the law" or get an

22

injunction. [*See* Pl. Supp. Facts, Ex. B, Emails; Pl. MSJ, Ex. P, Def. Initial

Disclosures.] It is telling to read Algrant, the driving force behind the adoption of

the Ordinance, say about this measure that purported to be the culmination of a

deliberate, step-by-step process aimed at curbing aggressive and violent protests:

**"[T]he buffer zone doesn't have a lot of teeth as we knew**." [Pl. Supp. Facts, Ex.

C, Email of Lynne Algrant (emphasis added).] In other words, not only was the

Ordinance proving to be ineffective six months after its adoption, apparently the

City suspected all along that it would be. In short, to the extent that the

effectiveness *vel non* of the Ordinance could ever be relevant, it is sharply

disputed.[9]

### B.      Whether or not Plaintiff too was bothered and wanted action

It is also irrelevant that, as Defendants point out, Turco herself was troubled

by the behavior of the Bread of Life people and wished that something would be

done about their more excessive antics. Plaintiff readily admits this. [Pl. MSJ

Statement of Material Facts, ECF Doc. 43-3, at ¶ 8.] This case turns not on whether

some protestors were misbehaving, nor on whether people on both sides of the

underlying issue wished the bad actors could be brought to heel somehow, but,

---

[9] It is more than a bit of a stretch to contend, as the City does, that there is any cause and effect relationship between the adoption of the Ordinance in March 2014 and what appears to be the smaller number of Bread of Life protestors regularly showing up as of February 2017, especially in light of the well-documented worsening of the situation in October 2014 and Algrant's admission that the Ordinance lacked "teeth."

rather, on what means the City undertook to do it. Surely, the City cannot be suggesting that because Plaintiff thought *some* measures should be taken, that the City was justified in taking *any* measures whatsoever, no matter how restrictive of the constitutional liberties of Plaintiff and other law-abiding citizens.

### C.     Whether the buffer zone is 8-feet, 15-feet, 35-feet, or more

The City, throughout its Brief, refers to the "8-foot buffer zone" and hopes, by doing so, to minimize the potential burden on Plaintiff's exercise of her freedom of speech. But even leaving to one side the Third Circuit's utter rejection of this sort of numbers game in *Bruni,* 824 F.3d at 368—"smaller buffer zones are not always better"—the City's characterization is highly misleading and fails to take into account (1) that there actually two separate zones in front of the MMA clinic and that (2) taken together, and as described in the body of the Ordinance, their configuration renders impossible anything resembling normal communication between two individuals walking in front of 40 Engle Street when only one of them happens to fall within the exemptions to the Ordinance's speech ban. [Pl. MSJ, Ex. D, Turco Dec., at ¶¶ 14-19; *see also* photographs attached thereto.] Between the presence of two different zones that—at least alongside the building itself cover a width of 24 feet each—and the two 8 foot-wide rectangles that extend out to the street—requiring non-exempt speakers to walk into the street and around

24

parked cars—the Ordinance can hardly be fairly described as a mere "8 foot buffer zone." [*See* Pl. MSJ, Ex. D, Turco Dec., at ¶¶ 15-30.]



[PL. MSJ, EX. D, Turco Dec., attached Ex. A.]

The fact is that, under *McCullen* and *Bruni*, what matters is not the amount of real estate that falls within buffer zones, but, rather, the extent of the burden the zones impose on speech. And despite some jabs thrown in that direction, *see*, *e.g.*, Def. Brief at 33, the City never really refutes Plaintiff's testimony about how she has been forced by the Ordinance to alter her former method of close, personal, quiet conversation with individuals approaching the clinic from either side of the building. [Pl. MSJ, Ex. D, Turco Dec., at ¶¶ 12-30.]

The City does purport to give advice to Plaintiff about how she could still try to communicate with people in spite of what the City dares not dispute is *some* restriction on her ability to exercise her right of freedom of speech in a traditional public forum. But that has things exactly backwards. The burden is not on the Plaintiff to try to work around an unconstitutional restriction of her rights; the burden is on the City to demonstrate that it tried appropriate alternative measures to avoid restricting those rights in the first place. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *United States v. Marcavage*, 609 F.3d 264, 279 (3d Cir. 2010) ("The burden is on the government to justify a restriction on speech.").

By not directly rebutting Turco's description of the ways in which the Ordinance has limited her ability to effectively communicate with persons approaching the clinic, and by contenting itself merely with suggesting ways she might try to work around its proscriptions, the City has failed to refute Plaintiff's basic contention that the Ordinance imposes on her and other similarly situated persons "serious burdens" that "compromise [their] ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'" *McCullen*, 134 S. Ct. at 2534.

For these reasons, the City's reliance on *Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009) and the district court opinion in *Bruni v. City of Pittsburgh*, 91 F. Supp. 3d 658 (W.D. Pa. 2015), regarding the size and effect of buffer zones, is woefully misplaced. Def. Brief at 32-33. Not only did the Third Circuit *vacate* the district court's decision in *Bruni* on the plaintiffs' First Amendment claims, 824 F.3d at 375, thus undermining whatever persuasive authority that decision might have otherwise had, the City is *incorrect* that "the Third Circuit affirmed the dismissal of plaintiffs' preliminary injunction application" in that case. Def. Brief at 24. *Bruni* explicitly points out that the plaintiffs in that action did not appeal the denial of a preliminary injunction. 824 F.3d at 360 (noting that the plaintiffs "seek review only of the dismissal of their First Amendment and Due Process claims against the City *and not the denial of their preliminary injunction motion*") (emphasis added). A court of appeals cannot affirm a judgment that was not appealed.

Even if the *Bruni* district court did carry any persuasive authority or weight, the City's "*a fortiori*" argument based on that decision is an erroneous one in light of the Third Circuit's decision on appeal. Def. Brief at 33. *Bruni* could not have been plainer that such *a fortiori* arguments in the context of evaluating buffer zone restrictions and effects are invalid:

> *McCullen* employs a level of rigor that *Brown* did not approach. In fact, Brown engaged in no narrow-tailoring analysis of its own. It

27

instead incorporated the analyses of *Madsen* and *Schenck* by reference and concluded that Pittsburgh's buffer zone was "*a fortiori* constitutionally valid*" in light of those past cases. At the very least, *McCullen* has called that approach into question, clarifying that the particular facts of each case must be examined. No buffer zone can be upheld *a fortiori* simply because a similar one was deemed constitutional, since the background facts associated with the creation and enforcement of a zone cannot be assumed to be identical with those of an earlier case, even if the ordinances in the two cases happened to be the same.

824 F.3d at 360 (citation omitted).

The City's use of *Brown* therefore fares no better than its use of the *Bruni* district court opinion. Indeed, after a lengthy and detailed discussion of *Brown* and its antecedents, and *McCullen*'s clarification of the law, the Third Circuit in *Bruni* concluded that "*McCullen* represents an important clarification of the rigorous and fact-intensive nature of intermediate scrutiny's narrow-tailoring analysis, and the decision is sufficient to call into question our conclusion in *Brown*." 824 F.3d at 372-73 (citing *In re Krebs*, 527 F.3d 82, 84 (3d Cir. 2008) ("A panel of this Court may reevaluate the holding of a prior panel which conflicts with intervening Supreme Court precedent")).

Despite *McCullen*'s clear applicability to the facts of this case, the City spends no appreciable time explaining how the principles and rationale enunciated in that case vindicate the City's position and its Ordinance. Instead, it relies on a district court opinion reversed on appeal, and a court of appeals opinion superseded

by a Supreme Court decision. The weakness of the City's legal arguments is therefore all too apparent.

With respect to *Hill v. Colorado*, 530 U.S. 703 (2000), *see* Def. Brief at 34, this Court should place as much weight on that decision as the Supreme Court did in *McCullen*: *none*. Even though both *Hill* and *McCullen* dealt with legislation regarding buffer zones in both the abortion and free speech context, the *McCullen* Court nowhere relies upon, explains, or applies *Hill*. In fact, except to note that the prior Massachusetts abortion buffer zone law was modeled after the Colorado statute at issue in that case, 134 S. Ct. at 2525, *McCullen* does not even cite the decision.

Even still, the statute in *Hill* is different than the Ordinance here. In *Hill*, the Colorado law created an 8-foot restriction on an *unwanted* physical approach to a person accessing a health clinic. 530 U.S. at 707. The Ordinance, however, creates an *absolute* ban on non-exempt speech within the zones. Thus, in the context of the obstacle course of zones that have been created outside MMA, Turco cannot cross into a zone to continue speaking one-on-one with a patient, *even if the patient wishes to hear what Turco has to say*. *Cf. Doe v. Gov. of New Jersey*, 783 F.3d 150, 155 (3d Cir. 2015) ("the First Amendment protects both the speaker and the recipient of information. . . . The listener's right to receive information is reciprocal to the speaker's right to speak.").

Finally, while *McCullen* states that the Massachusetts buffer zones "clearly serve[d]" the interests of ensuring public safety and access to pregnancy-related services, 134 S. Ct. at 2535, as the City states, Def. Br. at 35, the whole point of *McCullen* is that Massachusetts could have, and should have, furthered these interests through *more narrowly tailored* efforts than blanket exclusions of speech in traditional public fora.   It is not enough to say that buffer zones serve government interests. The government must demonstrate that those zones are narrowly tailored to further those interests. The City has not done so here.

## IV.   PLAINTIFF'S OVERBREADTH CLAIM

Plaintiff's Complaint alleges that "[t]he Ordinance is significantly overbroad and burdens substantially more speech than is necessary to achieve the City's asserted interests." Complaint, ECF Doc. 1, ¶ 66. The City's motion for summary judgment is silent as to this allegation.

As argued in Plaintiff's own motion and memorandum for summary judgment, the Ordinance is vastly overbroad and therefore void. ECF Doc. 43-2, at 35-37. Though it is undisputed that the Ordinance was adopted in the wake of activities by Bread of Life members on the public sidewalk at 40 Engle Street, the Ordinance, by operation of its definitions of "health care facility" and "transitional facility," authorizes the creation of buffer zones at innumerable locations throughout Englewood. [Pl. SMJ, Ex. A, Text of Ordinance.]

This is not theoretical. In April 2014, the Englewood police marked off buffer zones at five medical facilities in Englewood, in addition to MMA, and indicated that they would continue to "identify the other medical facilities and mark out buffer zones." [Pl. Supp. Facts, Ex. D, Email of Chief of Police.]

It cannot seriously be denied that the creation of no-speech zones outside a plethora of facilities in Englewood is substantially overbroad when the record is crystal clear that the impetus behind the Ordinance was the alleged illegal activities outside only one facility. "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Bruni*, 824 F.3d at 374 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).

But this Court need not declare the Ordinance overbroad when these very same facts prove that the Ordinance is also not narrowly tailored. *See McCullen*, 134 S. Ct. at 2540, n. 9. After discussing more narrowly tailored laws that Massachusetts could have adopted to achieve its interests, the *McCullen* Court pointed out that

> [a]nd to the extent the Commonwealth argues that even these types of laws are ineffective, it has another problem. The portions of the record that respondents cite to support the anticongestion interests pertain mainly to one place at one time: the Boston Planned Parenthood clinic on Saturday mornings. Respondents point us to no evidence that individuals regularly gather at other clinics, or at other times in Boston, in sufficiently large groups to obstruct access. **For a problem shown to arise only once a week in one city at one clinic, creating**

> **35-foot buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution.**

134 S. Ct. at 2539 (emphasis added) (citations omitted).

This passage applies with full force here. Though the City intended to address concerns at only one location, its legislative solution creates buffer zones throughout Englewood where there is no evidence of any concerns whatsoever. A regulation of speech is narrowly tailored only "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). For this reason alone, the Ordinance is not narrowly tailored. *See* Pl. MSJ Br., ECF Doc. 43-2, at 18-20.[10]

Whether the Ordinance is adjudged to be overbroad or not narrowly tailored, the result is the same: it is unconstitutional.

---

[10] It is worth noting that after *McCullen*, Madison, Wisconsin, chose to no longer to enforce its abortion buffer zone ordinance modeled upon the Colorado statute at issue in *Hill*. *See* "Abortion buffer zone laws begin falling after Supreme Court ruling," *L.A. Times* (July 7, 2014), http://www.latimes.com/nation/nationnow/la-na-nn-buffer-zone-laws-struck-down-20140707-story.html. According to a memo-randum to city officials by the Madison city attorney:

> In the case of the Madison ordinance, the City did extend the buffer zone to other health facilities *even though the problems mostly developed at a clinic providing abortion services*. The City also has little evidence that it tried enforcing other ordinances or statutes before adopting the buffer zone law. Because of these differences between our ordinance and the new standards announced in *McCullen*, the City likely cannot enforce the ordinance as written.

"Recommendation Regarding Sec. 23.01, MGO, in Light of the U.S. Supreme Court's Decision in McCullen v. Coakley" (July 10, 2014) (emphasis added), http://www. adfmedia.org/files/MadisonMayLetter.pdf. *See also*, Pl. MSJ Brief at 15, n.2, ECF Doc. 43-2 (noting how Portland, Oregon did the same).

## CONCLUSION

Without waiting for the benefit of guidance from the U.S. Supreme Court, which was at the time considering a constitutional challenge to a virtually identical buffer zone law, in March 2014, Englewood adopted an Ordinance that suffers from the same flaws as the Massachusetts law struck down three months later by a unanimous Court. Englewood's motion fails to demonstrate the absence of fact questions and/or that, as a matter of law, in both its language and the circumstances of its adoption, the challenged Ordinance passes the Court's test of intermediate scrutiny as set forth in *McCullen*. The motion should be denied.

Respectfully submitted on this 21st day of May, 2017.

/s/ Francis J. Manion
Francis J. Manion
*Lead Attorney*
Geoffrey R. Surtees*
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax 502-549-5252
fmanion@aclj.org; gsurtees@aclj.org

Erik M. Zimmerman*
Edward L. White III*
American Center for Law & Justice
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel. 734-680-8007; Fax 734-680-8006
ewhite@aclj.org;
ezimmerman@aclj.org

Mark R. Scirocco
Legal Center for Defense of Life, Inc.
Law Offices of Robert A. Scirocco
98 Route 46, Suite 6
Budd Lake, New Jersey 07828
Tel. 973-691-1188; Fax 973-691-3353
mark@sciroccoesq.com

* Admitted pro hac vice

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants. I also caused to be sent by United States Mail, first class postage prepaid, a true and correct courtesy copy of the foregoing to the Chambers of the Honorable Susan D. Wigenton, United States District Court, District of New Jersey, 50 Walnut Street, Newark, New Jersey 07101.

/s/ Francis J. Manion
Francis J. Manion
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax. 502-549-5252
fmanion@aclj.org