Francis J. Manion
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax. 502-549-5252
fmanion@aclj.org

Mark R. Scirocco
Legal Center for Defense of Life, Inc.
Law Offices of Robert A. Scirocco
98 Route 46, Suite 6
Budd Lake, New Jersey 07828
Tel. 973-691-1188; Fax 973-691-3353
mark@sciroccoesq.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JERYL TURCO, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF ENGLEWOOD, <br> NEW JERSEY, <br><br> Defendant. <br> _____/ | Case No. 2:15-cv-03008 <br><br> Judge Susan D. Wigenton <br> Magistrate Judge Leda D. Wettre |

# PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

                                                                                                            **Page**

ARGUMENT ................................................................................................................. 1

I.     The City's Mischaracterization of the Buffer Zones and Misunderstanding of the Nature of Plaintiff's Sidewalk Counseling ............................................................................................... 1

II.    The City Cannot Compensate for its Failure to Meet the *McCullen* Standard with Bald Conclusory Statements Unsupported by Actual Proof. ................................................................ 7

III.   Plaintiff's Overbreadth Argument Is Neither "Belated" Nor An "Afterthought." ........................................................................... 12

IV.   The Englewood Ordinance and the *McCullen* Statute. ............................... 14

V.    The City's Partial Use of Rosemary Garrett's Testimony ............................ 14

CONCLUSION ........................................................................................................... 15

CERTIFICATE OF SERVICE ................................................................................... 17

# **TABLE OF AUTHORITIES**

**CASES**                                                                                                           **Page**

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ............................ 1, *passim*

*Hill v. Colorado*, 530 U.S. 703 (2000) ................................................................ 6

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ............................................... 2, *passim*

*Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015) ............................................... 7

*United States v. Kokinda*, 497 U.S. 720 (1990) ......................................................... 2

**CONSTITUTION AND STATUTES**

Englewood City Code § 307-4 ................................................................................. 2

# ARGUMENT

## I. The City's Mischaracterization of the Buffer Zones and Misunderstanding of the Nature of Plaintiff's Sidewalk Counseling.

Englewood cannot escape the reality that its Ordinance does much more than establish a single, 8-foot gap between Jeryl Turco and people she wishes to speak with. The pictures show this beyond any dispute. *See* Pl. MSJ, Ex. D, Turco Dec., Exs. 1, 2, and 3. They show that, in front of 40 Engle Street, there are *two* separate areas that are delineated by yellow paint. Each area, or buffer zone, consists of a rectangular section extending from the bricks of the building all the way to Engle Street,[1] and two arcs beginning 8 feet from each edge of each rectangle on either side and extending in an 8 foot radius to where the arcs intersect with the rectangle.[2] Thus, to whatever extent the mere footage of a buffer zone is relevant in this context, *see Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016), one must at least get right the actual amount of real estate involved.

Defendant chafes at Turco's description of this as amounting to an "obstacle course," but how better to describe it? The sidewalk in question, as a City-owned sidewalk, is, of course, a traditional public forum, the free access to which "is not a

---

[1] It is undisputed that each of these rectangular sections is approximately 8 feet wide.
[2] The disappearance of the painted arc to the left (as one looks at the picture) of the left-hand buffer zone, as well as the continued presence of the "inappropriately" delineated white lines has been noted previously. *See* Pl. Opp. MSJ, at 18, n. 8 (ECF Doc 45).

matter of grace by government officials but rather is inherent in the open nature" of city sidewalks. *United States v. Kokinda*, 497 U.S. 720, 743 (1990). In other words, the default position—prior to the Ordinance—was that people like Turco got to use the entire sidewalk, up to and including the threshold of the door and where the driveway crosses the sidewalk, to try and speak with other people walking or standing on the sidewalk. But under the terms of the Ordinance, people like Turco can no longer walk along the front of the building—either alongside a prospective clinic client or in order to reach someone approaching from the other side of one of the rectangles—without violating the Ordinance and, thus, risking a minimum *mandatory* fine of $1,000, plus a possible additional fine of $1,000 and three months in jail.[3] This is beyond dispute based on the plain words of the Ordinance.

But, the City argues, Turco can still talk to people; in fact she admits she still does so to some extent and, therefore, so the City contends, her First Amendment freedoms are not seriously impacted. This argument, however, is based on a gross decontextualizing of what Turco has actually said from the beginning of this case. It fails to understand the nature of "sidewalk counseling." And it was soundly rejected by the Supreme Court in *McCullen v. Coakley*, 134 S. Ct. 2518, 2536-37 (2014) (noting that Mrs. McCullen and others, following adoption of the challenged law, were still able to have a number of quiet conversations with people

---

[3] *See* Englewood Ordinance § 307-4, which sets forth the penalties for violation of the Ordinance. *Available at* http://ecode360.com/13859122.

outside the buffer zones, but holding that this in no way eliminated the burden imposed by the zones, because it was "no answer to say that petitioners can still be 'seen and heard' by women within the buffer zones.").[4]

Turco's description of the negative impact the various buffer lines have had on her ability to sidewalk counsel as she did prior to the Ordinance covers at least seven pages of deposition transcript. *See* Pl. MSJ, Ex. E, Turco Dep., 34:16 to 41:23. Yet the City tries to sum it all up with a "she can still communicate, therefore: no burden." But this greatly oversimplifies things. Yes, it is true that Turco, like the petitioners in *McCullen*, continues to *attempt* to engage in sidewalk counseling as she did prior to the Ordinance and that, *sometimes*, she is still able to do so in a limited way outside the buffer lines. But to dismiss as inconsequential, as the City does, her detailed description of the "obstacle course" the lines have created for her and how that has seriously compromised her ability to consistently do the kind of intimate, quiet, personal communicating that she was able to do pre-Ordinance, is to ignore the totality of the record.[5]

---

[4] This is, of course, the response to the City's argument, Dft. Opp. MSJ at 34 (ECF Doc. 46), that a photograph of Turco speaking with a patient after the adoption of the Ordinance somehow undermines her claim that she is burdened. *McCullen* says otherwise.

[5] The City's footnote alleging that Plaintiff's Declaration somehow contradicts her deposition testimony and, thus can be disregarded by the Court, is odd. Dft. Opp. MSJ at 4, n. 2. No specific "contradictions" are cited. In fact, there are none. If anything, Plaintiff's deposition testimony is far more extensive and detailed than is her Declaration about the degree to which the Ordinance compromises her efforts.

3

Defendant says, and Plaintiff acknowledges, that she could position herself at the left-hand side of the left-hand buffer zone[6] and try to call out to people from there as they near the clinic entrance. That is true enough, if all Plaintiff wished to do was yell at prospective patients and hope to get their attention that way. But Plaintiff's desired form of communication is not calling out to someone as they rush into a building; it is not showing signs or posters; it is not "protesting" abortion. Plaintiff wants to engage in "sidewalk counseling," which requires the ability to physically approach someone in a normal, nonthreatening fashion and attempting to engage them in quiet, personal conversation. This form of communication is described at length by the Supreme Court in *McCullen* and, most importantly, distinguished by the Court from other forms of communication: calling out, displaying signs, and protesting from across one side of a painted no-go zone. 134 S. Ct. at 2527, 2535-37. The City apparently thinks this ought to satisfy Turco, but the unanimous Court in *McCullen* deemed it a constitutionally inadequate alternative in this very context. *Id.*

As Plaintiff explains it, she never knows from which direction a prospective client may approach and, therefore, stationing herself at one spot is not consistent with her aims. Pl. MSJ, Ex. E, Turco Dec., 40:5-10. Turco, like Mrs. McCullen,

---

[6] Again, where that spot actually is nowadays is anybody's guess, what with the vanishing of the arc made necessary by the advent of the neighbor's *al fresco* dining. *See* n. 2, *supra*.

can never be sure a particular passerby is a patient until she is able to engage her in conversation. *See McCullen*, 134 S. Ct. at 2535 ("McCullen explained that she often cannot distinguish patients from passersby . . . in time to initiate a conversation before they enter the buffer zone."). Thus, should Turco be standing to the left of the left-hand arc/rectangle and see someone approaching from, say, a distance down the sidewalk to the right side of the building, she would have to walk out into the street (to avoid the first rectangle), and approach the person while avoiding the second, or right-hand, arc/rectangle, either by stopping short or, once again, going out into Engle Street, possibly walking around parked cars while watching for traffic. Should she succeed in beginning to speak with the person at a spot to the right side of the right-hand arc/rectangle and start walking next to that person as she approaches the clinic door, Turco would then have to abruptly stop walking next to that person, shift to the left of the right-hand arc and go out to the street, navigate parked cars and traffic, try to catch up with the person, walk a few steps in the middle, unlined, portion of the sidewalk and then—again—stop abruptly at the arc/rectangle in front of the door.

     This sort of maneuvering, stopping, shifting, hurrying catching up, etc. is hardly conducive to anything resembling normal communication, let alone "personal, caring, consensual conversations." *McCullen*, 134 S. Ct. at 2536. And try as it might, Englewood cannot escape the fact that this is precisely what the

5

Ordinance requires of someone like Turco. In sum, the City's attempt to wave away Turco's claim that the Ordinance compromises her "ability to initiate the close, personal conversations" that are the core of sidewalk counseling, *id*. at 2535, is simply unconvincing.[7]

In this regard, it must also be said that the City's reliance on dicta in *Hill v. Colorado,* 530 U.S. 703 (2000) and other pre-*McCullen* decisions regarding the ability of protestors to be heard at certain distances is unavailing. Not only did the *McCullen* Court appear to place no reliance on *Hill* in deciding the case before it, the statute in *Hill* is distinguishable from the Ordinance in that it permitted what Englewood's Ordinance would make punishable by a minimum $1,000 fine— consensual conversations within any part of the two arc/rectangle zones in front of 40 Engle Street. Nor did the Third Circuit in *Bruni* (contrary to Defendant's contention, Dft. Opp. MSJ at 22) in merely summarizing the case adopt as its own *Hill*'s dicta about "adverse impact" or "normal conversational distance." And, finally, as has been shown above (as well as in previous memoranda in connection with the pending motions), Englewood's Ordinance is not limited to creating an

---

[7] For whatever reason, in the course of this litigation the City has moved away from describing Plaintiff as "a quiet, respectful person." Pl. MSJ, Ex. T, Gray Cert., ¶ 7. She has now become, "The Runner," an apparently mocking gibe of the clinic escorts. But even this backfires on the City since it corroborates Turco's testimony that she has no interest in standing at the edge of a speech-free-zone and shouting to patients—as the City argues she should be happy to do—and underscores that her aim is to engage patients personally wherever they happen to be.

6

"8-foot gap" between Turco and her potential audience. The City's attempt to squeeze into an "8-foot gap" mold what photographs and the Ordinance itself show to be two different zones that together carve up a considerably larger portion of sidewalk must be rejected. That the buffer zones "impose serious burdens on [Plaintiff's] speech" at 40 Engle Street because they "carve out a significant portion of the adjacent public sidewalks" cannot be gainsaid in this case. *McCullen,* 134 S. Ct. at 2535.

## II. The City Cannot Compensate for its Failure to Meet the *McCullen* Standard with Bald Conclusory Statements Unsupported by Actual Proof.

Englewood has the burden here of "describing the efforts it had made to address the government interests at stake by substantially less-restrictive methods or by showing that it seriously considered and reasonably rejected 'different methods that other jurisdictions have found effective.'" *Bruni*, 824 F.3d at 371 (quoting *McCullen,* 134 S. Ct. at 2539).[8] Of particular pertinence here, given

---

[8] The City attempts to water down its burden by relying on an opinion of the District of South Carolina. Dft. Opp. MSJ at 25. Not only is that opinion not binding on this Court, it clearly misstates the burden set forth in *McCullen* and *Bruni*. In fact, that opinion plainly misstates controlling Fourth Circuit precedent, which holds that "intermediate scrutiny does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden." *Reynolds v. Middleton,* 779 F.3d 222, 229 (4th Cir. 2015).

Englewood's admission that it undertook *none* of the "substantially less-restrictive methods" that the Supreme Court described in *McCullen*—prosecutions under existing laws, public or private injunctions, new laws targeting the precise conduct causing the problem—is the *Bruni* court's requirement that rejected alternative measures have been "reasonably rejected." In other words, Englewood must do more than simply list approaches it allegedly considered, it must demonstrate how its rejection of them was "reasonable."

First, the City twice drops a footnote saying that adoption of local laws modeled on the federal Freedom of Access to Clinic Entrances Act of 1994 ("FACE") "would not have addressed, or resolved, this problem." Dft. Opp. MSJ at 34 at 27, n. 6, and 32, n. 8. But the City never explains why not. It is a mere conclusion with no explanation. This is insufficient to satisfy its burden that rejection of this particular alternative—one which the *McCullen* Court highlighted as apt to be particularly effective in these contexts—was reasonable. *McCullen*, 134 S. Ct. at 2537.

Related to the City's bald conclusory dismissal of a FACE-style law, is the City's failure to adequately address its failure to seek injunctive relief. The City, in 2013-14 and apparently even now, appears to think that this is something the MMA clinic, not the City itself should have done. But under FACE, and, indeed even without FACE, the City itself would have been a proper party plaintiff in an

8

injunction action. As for the City's excuse that the parties to be potentially enjoined in 2013-14 were not "identifiable," this is contradicted by the City's own witness, Ashley Gray, who testified that the opposite was true. In fact, according to documents provided by the City, the name of the ringleader of the Bread of Life group was published in the local paper at least as far back as early 2014. *See* Pl. MSJ, Ex. T, Gray Cert., ¶ 9. If a newspaper reporter was able to ascertain the name of this individual, presumably by simply asking him for his name, it is hard to see how it would have been difficult for the police to solve the alleged mystery of the Bread of Life group's members' identities.

The City also fails to adequately address why it could do nothing with its then-existing obstruction ordinance—the one the Ordinance replaced—or the half dozen laws against harassment, threatening, simple assault, disorderly conduct, etc. that would seem to have addressed the conduct of the Bread of Life members who were the source of the problem. The City hopes to explain all of its failure to enforce existing laws with one excuse: nobody would file complaints out of fear of revealing their names and addresses to the Bread of Life group.

The City incorrectly claims that the Plaintiff did not address the testimony of City witnesses Algrant and Gray concerning the bases for the fears expressed by some of revealing their identities. On the contrary, Plaintiff has addressed this every step of the way. *See, e.g.*, Pl. MSJ, SOF, ¶¶ 33-34; Pl. Resp. to Def. SOF, ¶

9

26. What Plaintiff has not done is either accept this (invariably hearsay) testimony uncritically, or, more importantly, accept that, even if it is all true, agree that it somehow excuses the City's failure to enforce existing laws. If anything, the more lurid a picture the City paints of anti-abortion extremism allegedly connected with the individuals who suddenly made their presence felt on Englewood's city sidewalks in late 2013, the more *unreasonable* must appear the City's rejection of any of the already existing tools available to any government facing what the City's witnesses describe as something approaching a sudden crime wave.

The City appears to have no real answers to the following points, among others, made by Plaintiff:

- Clinic employees, doctors, and at least one escort did, in fact, file formal complaints, using their names and addresses, about protestor alleged misconduct.[9]

- The supposedly fearful clinic escorts have not been afraid to publicize their names, faces, and clinic activities on the world wide web.

- Council President Algrant told clinic escorts that they did not have to use their home addresses when filing complaints against protestors.

- Clinic doctors repeatedly identified their names and employment addresses in public meetings complaining about protestors.

- The head of the clinic escort team has identified herself and continues to voluntarily participate as a prime witness in this lawsuit.

In short, based on the foregoing and other evidence detailed previously in

---

[9] The City says "only six" complaints have been found. But "only six" is certainly a lot more than the "none" the City would have this Court believe was the case.

filings with the pending motions, it is by no means clear how the City can plausibly maintain the position that witnesses and victims were too fearful to get involved with criminal or injunction actions. Even if some or most witnesses were reluctant to participate in the criminal or civil processes necessary to bring order outside of 40 Engle Street, this would not distinguish them from most witnesses in most places in most cases. It is not an adequate explanation for the City's failure to enforce the law and amounts to little more than another conclusory position adopted by Englewood that fails to sustain its burden in this case.

Regarding the failure of the City to provide adequate increased police presence despite the fact that the City itself says that this is one alternative that actually worked, Englewood again provides nothing more than unsupported conclusions about an "already taxed police force" not being able to provide an officer "full time" to protect a private business. Dft. Opp. MSJ at 32. The City has yet to come forward with any dollars and cents evidence of what it would actually have cost for a police officer to have been on hand during the—at most—three to four hours a week the Bread of Life group was present. It may be that providing the kind of increased police presence to deal with the 40 Engle Street problem would, indeed, have been cost prohibitive, but the burden of proving it to be so is on the City, not Turco. The record is devoid of actual evidence to support this

11

conclusion.[10]

In sum, the City's Response Brief fails to meet its burden of demonstrating, with actual evidence as opposed to mere conclusory argument, that it "seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen*, 134 S. Ct. at 2539.

### III. Plaintiff's Overbreadth Argument Is Neither "Belated" Nor An "Afterthought."

Defendant states that Plaintiff failed to state an overbreadth claim in her Complaint and that Plaintiff "neither pleaded or even alluded to such overbreadth claim in her Complaint or in nearly two years thereafter . . ." Dft. Opp. MSJ at 36. Defendant is incorrect. Paragraph 66 of Plaintiff's Complaint (ECF Doc. 1) reads as follows:

> 66. The Ordinance is significantly overbroad and burdens substantially more speech than is necessary to achieve the City's asserted interests.

Plaintiff incorporated that paragraph into her free speech claim. *Id*. at ¶ 69.

In addition, Plaintiff raised overbreadth in her Motion for a Preliminary Injunction. ECF Doc. 15-2 at 16. The next opportunity Plaintiff had to present any

---

[10] Publicly available information on the City's website shows that, in 2014, Englewood's budget for its police department was approximately 13 million dollars. Perhaps this was not enough to cover the cost of paying one officer three-four hours weekly to keep the peace on the public sidewalk in front of 40 Engle. But, if so, the City must explain how so. It does not even make the attempt. *See* http://www.cityofenglewood.org/filestorage/9306/9308/9407/9409/2014_Adopted _Budget.pdf (last visited June 7, 2017).

legal argument of any kind in this case was the instant Motion for Summary Judgment. The City's protestations about "belatedness" are thus unfounded. Moreover, Plaintiff is not aware of any rule or even custom requiring a party to bring up all of its possible claims or arguments in every conceivable setting that presents itself during the course of a lawsuit. Plaintiff plead it in her Complaint, she raised it in support of her Preliminary Injunction Motion, she now argues it as part of her Summary Judgment Motion.

However, even aside from the fact that the Defendant is simply wrong about whether and when Turco raised the issue as a claim in this case, there is no basis whatsoever for the argument that Plaintiff's use of the Ordinance's breadth in the context of her narrow tailoring argument is somehow "undermined." *McCullen* held that the Massachusetts law was not narrowly tailored based, in part, on the breadth of the statute, without having to decide whether the law failed under the overbreadth doctrine. *McCullen*, 134 S. Ct. at 2539; 2540, n. 9.

The fact is that the City has not responded to the substance of Turco's claim that the Ordinance is overly broad, whether in the context of narrow tailoring or the overbreadth. Indeed, it is hard to imagine how it could. There is absolutely zero evidence that the Ordinance in question was adopted to address anything other than problems arising at a single location in the City: 40 Engle Street. Yet, on its face, the Ordinance sweeps within its ambit, and carves out "no speech zones," in front

13

of a whole host of other locations that have nothing at all to do with 40 Engle Street. Whether considered as a separate claim or part of the narrow tailoring argument, the contention that the Ordinance is overbroad is essentially unanswerable. It is certain that the City has not answered it.

### IV. The Englewood Ordinance and the *McCullen* Statute.

The City denies that the challenged Ordinance was modeled after the Massachusetts law at issue in *McCullen*. Dft. Opp. MSJ at 1, 18. Yet a side-by-side comparison of the two laws suggests that, if not, it is indeed a remarkable coincidence. *See* Addendum, attached hereto. The fact that the text of the Massachusetts law was emailed to Council President Algrant by an attorney who also happened to be a clinic escort shortly before a draft of the Ordinance appeared, only adds to the coincidence. Pl. MSJ, SOF, ¶¶ 25-6. For whatever it is worth, it can hardly be denied that—but for the amount of feet set forth therein and the places where the zones apply—the Ordinance is the same law as the Massachusetts law struck down in *McCullen*.

### V. The City's Partial Use of Rosemary Garrett's Testimony.

The City uses excerpts from the deposition of Rosemary Garrett to attack Turco's claim of burden. Pursuant to Fed. R. Civ. P. 32(a)(6), the complete transcript of Garrett's deposition is attached hereto as Ex. W. Of course, Garrett's experience may be different from Turco's without in any way undermining Turco's

basic claims. For one thing, Garrett does not even try to counsel in front of 40 Engle Street, but rather, as she described it, "I'm down on the corner far away from the building, abortion clinic." Ex. W, Garrett Dep. 31:19-25. And it is noteworthy that the City's excerpt cuts off in mid-response where Garrett was responding to a question about the alleged effectiveness of the buffer zone in curbing the excesses of the Bread of Life protestors. Garrett was clear that—contrary to one of the City's main (though Plaintiff believes irrelevant) arguments—the Ordinance has failed to "lessen that type of behavior by the Bread of Life people," and that, if anything, things are even worse at present. *Id*. at 38:17 to 39:9.

## CONCLUSION

The City's opposition to Plaintiff's Motion for Summary Judgment fails to rebut Plaintiff's arguments supporting her entitlement to summary judgment in this case. Plaintiff's motion should be granted.

Respectfully submitted on this 12th day of June, 2017.

/s/ Francis J. Manion
Francis J. Manion
*Lead Attorney*
Geoffrey R. Surtees*
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax 502-549-5252
fmanion@aclj.org; gsurtees@aclj.org

Mark R. Scirocco
Legal Center for Defense of Life, Inc.
Law Offices of Robert A. Scirocco
98 Route 46, Suite 6
Budd Lake, New Jersey 07828
Tel. 973-691-1188; Fax 973-691-3353
mark@sciroccoesq.com

* Admitted pro hac vice

*Counsel for Plaintiff*

Erik M. Zimmerman*
Edward L. White III*
American Center for Law & Justice
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel. 734-680-8007; Fax 734-680-8006
ewhite@aclj.org;
ezimmerman@aclj.org

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants. I also caused to be sent by United States Mail, first class postage prepaid, a true and correct courtesy copy of the foregoing to the Chambers of the Honorable Susan D. Wigenton, United States District Court, District of New Jersey, 50 Walnut Street, Newark, New Jersey 07101.

    /s/ Francis J. Manion
    Francis J. Manion
    American Center for Law & Justice
    Post Office Box 60
    New Hope, Kentucky 40052
    Tel. 502-549-7020; Fax. 502-549-5252
    fmanion@aclj.org