Francis J. Manion
Geoffrey R. Surtees
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax 502-549-5252
fmanion@aclj.org
gsurtees@aclj.org
*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JERYL TURCO, | Case No. 2:15-cv-03008 |
| Plaintiff, | |
| | Judge Susan D. Wigenton |
| v. | Magistrate Judge Leda D. Wettre |
| CITY OF ENGLEWOOD, NEW JERSEY, | |
| Defendant. | |

## PLAINTIFF'S TRIAL BRIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMEMT .......................................................................... 1

  1. *Bruni II* and *Reilly* ................................................................................ 2

  2. Englewood's Changing Interpretation of the Ordinance's Scope ..................... 4

  3. Changes to the Layout of the Sidewalk at 40 Engle Street ............................ 5

  4. The Parties' Expanded Stipulated Facts ..................................................... 6

  5. Post-remand Depositions ......................................................................... 6

STATEMENT OF FACTS PLAINTIFF INTENDS TO PROVE ......................... 7

  A. The Burden Imposed on Turco's Speech ...................................................... 7

  B. The City's Burden of Proof ........................................................................ 10

LEGAL ARGUMENT ........................................................................................ 12

I.    The Ordinance, on its face and as-applied, violates the free
      speech and assembly rights of Plaintiff, Jeryl Turco, as protected
      by the Free Speech Clause of the First Amendment to the U.S.
      Constitution and Art. I, ¶ 6 of the New Jersey State Constitution .............. 12

      A.    The Ordinance, on its face and as-applied, impermissibly
          burdens Plaintiff's ability to communicate to patients
          of the abortion clinic located at 40 Engle Street
          ("Metropolitan Medical Associates") through her chosen
          means of sharing her constitutionally protected message. ............... 12

      B.    The City cannot meet its burden of proving the constitutionality
          of the Ordinance by showing that it is narrowly tailored to
          serve a significant government interest ............................................ 21

II.    The Ordinance is Overbroad ..................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Bruni v. City of Pittsburgh*,
    824 F.3d 353 (3d Cir. 2016) ....................................................................*passim*

*Bruni v. City of Pittsburgh*,
    941 F.3d 73 (3d Cir. 2019) .....................................................................*passim*

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
    657 F.3d 936 (9th Cir. 2011) ............................................................... 25

*Cutting v. City of Portland*,
    802 F.3d 79 (1st Cir. 2015) .................................................................. 25

*Free Speech Coal., Inc. v. AG United States*,
    787 F.3d 142 (3d Cir. 2015) ................................................................ 26

*Frisby v. Schultz*,
    487 U.S. 474 (1988) ............................................................................. 24

*Hill v. Colorado*,
    530 U.S. 703 (2000) .......................................................................*passim*

*McCullen v. Coakley*,
    134 S. Ct. 2518 (2014) ................................................................... 14, 21

*McCullen v. Coakley*,
    573 U.S. 464 (2014) .......................................................................*passim*

*N.J. Citizen Action v. Edison Twp.*,
    797 F.2d 1250 (3d Cir. 1986) .............................................................. 21

*NAACP v. Alabama*,
    377 U.S. 288 (1964) ............................................................................. 30

*Petrello v. City of Manchester*,
  2017 U.S. Dist. LEXIS 144793 (D.N.H. Sep. 7, 2017) ..................................... 26

*Reilly v. City of Harrisburg*,
  790 F. App'x 468 (3d Cir. 2019) ............................................................... 2, 3, 4

*Reynolds v. Middleton*,
  779 F.3d 222 (4th Cir. 2015) ............................................................................ 24

*Riley v. National Fed'n of Blind*,
  487 U.S. 781 (1988) .......................................................................................... 27

*Rode v. Dellarciprete*
  845 F.2d 1195 (3d Cir. 1988) ........................................................................... 30

*Schneider v. State*,
  308 U.S. 147 (1939) .......................................................................................... 27

*Thornhill v. Alabama*,
  310 U.S. 88 (1940) ............................................................................................ 30

*Turco v. City of Englewood*,
  2017 U.S. Dist. LEXIS 189042 (D.N.J. Nov. 14, 2017) ...................... 1, 8, 16, 23

*Turco v. City of Englewood*,
  935 F.3d 155 (3d Cir. 2019) ...................................................................*passim*

*United States v. Playboy Entm't Grp., Inc.*,
  529 U.S. 803 (2000) .......................................................................................... 22

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ........................................................................................... 21

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) .......................................................................................... 30

**Statutes**

N.J.S.A. § 39:4-34 ........................................................................................ 17

N.J.S.A. § 40:55D-66.2(a) ........................................................................... 31

## PRELIMINARY STATEMENT

For the second time, this Court is called upon to adjudicate the constitutionality of the City of Englewood's ("Englewood" or "the City") Ordinance No. 14-11 (the "Ordinance) against a First Amendment and state constitutional challenge brought by Jeryl Turco. In 2017, this Court held that the Ordinance violated Turco's rights under the First Amendment and the New Jersey Constitution and granted summary judgment to Plaintiff. *Turco v. City of Englewood*, No. 2:15-cv-03008, 2017 U.S. Dist. LEXIS 189042 (D.N.J. Nov. 14, 2017).

On appeal by the City, the Third Circuit reversed, holding that the record showed genuine issues of fact precluding the entry of summary judgment on two issues. *Turco v. City of Englewood*, 935 F.3d 155 (3d Cir. 2019). Those issues were: (1) whether or not the buffer zones created by the Ordinance imposed "a significant restraint" on Turco's ability to engage in constitutionally-protected speech, *id.* at 170; and (2) whether or not the City met its burden under the Supreme Court's decision in *McCullen v. Coakley*, 573 U.S. 464 (2014) of demonstrating that it had tried or seriously considered and reasonably rejected less restrictive alternatives before enacting the Ordinance. *Turco*, 935 F.3d at 170.

The Third Circuit also reversed this Court's holding on overbreadth, suggesting that this Court conflated narrow-tailoring with overbreadth. *Id*. at 170–

71. And while the Third Circuit chided this Court for failing to apply or "even cite" *Hill v. Colorado,* 530 U.S. 703(2000) in its opinion, *id.* at 167, in fact, this Court placed as much reliance on *Hill* as the Supreme Court did in *McCullen*: *none*.[1]

Since the remand of this matter in September of 2019, several legal and factual developments have taken place which bear directly upon trial of the issues designated by the Third Circuit:

1.  ***Bruni II and Reilly.*** The Third Circuit has further elucidated the law in this area in companion decisions involving buffer zone laws in Pittsburgh and Harrisburg respectively. In *Bruni v. City of Pittsburgh*, 941 F.3d 73 (3d Cir. 2019) ("*Bruni II*") and *Reilly v. City of Harrisburg*, 790 F. App'x 468 (3d Cir. 2019), the Third Circuit upheld abortion clinic buffer zones (15 and 20 feet respectively), *but only after* using the doctrine of constitutional avoidance to impose narrowing constructions on both ordinances that *neither ordinance applied to sidewalk counseling "or any other calm and peaceful one-on-one conversations*," i.e., the very kind of speech engaged in by Turco. *Bruni II*, 941 F.3d at 87–88.[2] In other

---

[1] Except to note that the prior Massachusetts law in *McCullen* was modeled after the Colorado statute at issue in *Hill*, 573 U.S. at 471, the Supreme Court in *McCullen* likewise "did not even cite *Hill*." *Turco*, 935 F.3d at 167.

[2] *Query*: could this Court, following *Bruni II* and *Reilly*, impose a narrowing construction on Englewood's Ordinance that would, in effect, resolve this case by leaving the Ordinance intact while excluding from its scope the kind of individual, one-on-one peaceful conversation and literature distribution engaged in by Turco? A close reading of *Bruni II* and *Reilly* suggests that it could. Arguably, the Ordinance is "readily susceptible" of a narrowing construction because, *inter alia*,

words, in Pittsburgh and Harrisburg the buffer zones remain in place, but the activities of sidewalk counselors such as Bruni, Reilly, and others who seek to engage in peaceful, one-on-one conversations on public sidewalks, do not fall within the ordinances' prohibitions. Thus, the governmental interest asserted in those cases of protecting access, eliminating obstructions, harassment, etc.—the same asserted here by Englewood—was upheld, while at the same time fully recognizing and protecting the crucial First Amendment rights of sidewalk

---

(1) the undisputed history of the Ordinance's adoption shows that it was directed at aggressive, allegedly violent conduct of groups which the police chief and others specifically distinguished from individual communications by people like Turco; (2) on the face of the Ordinance, in Section D, the City expressly acknowledges the importance of the rights of persons "to express their views, assemble or pray near a health care facility" and suggests an awareness by Englewood of an important distinction between such protected activity and the conduct sought to be regulated by the Ordinance; (3) the terms "enter or remain"—the operative terms which both Plaintiff and Englewood's Council President agree require Turco to navigate around the buffer zone lines—are terms of art taken from criminal trespass laws and, arguably, should not apply to very brief, quiet, one-on-one conversations on public sidewalks; (4) the Supreme Court's recognition of sidewalk counseling outside of abortion clinics as enjoying "maximum" First Amendment protection in a unanimous decision rendered mere months after the adoption of the Ordinance may be seen as clarifying the limits of laws such as Englewood's in a way that may have been less obvious at the time the Ordinance was under consideration.

Although neither party in this case listed this as an issue in the Joint Pretrial Order, respectfully, it may be of benefit for the Court to order supplemental briefing on this question. "Plaintiffs avoided the buffer zone based on an assumption, shared by the City, about the scope of the ordinance . . . however, it does not preclude us under the doctrine of constitutional avoidance from adopting a narrowing construction of the Ordinance." *Bruni II*, 941 F.3d at 84–5 n.12.

3

counselors—such as Jeryl Turco—as affirmed by the unanimous Supreme Court in *McCullen*.[3]

**2.    *Englewood's Changing Interpretation of the Ordinance's Scope*.** For the better part of a decade now, the parties have litigated this case under the assumption that the Ordinance means that Turco (and other non-exempt persons) may not "enter or remain" within the painted lines of the buffer zones, at least the buffer zones in front of the entrance to 40 Engle Street.[4] But in the issues the City lists as part of "Defendant's Legal Issues" in the Joint Pretrial Order, the City includes:

> (4) Whether the Buffer Zone Ordinance, by its express terms, permits persons, including plaintiff, to walk through the Buffer Zone on the public sidewalk or street right of way adjacent to the MMA facility "solely for the purpose of reaching a destination other than such a facility."

---

[3] Of course, the analysis in *Bruni II* and *Reilly* of what does or does not constitute a constitutionally significant or serious burden on speech can only be understood in light of those courts' exclusion of sidewalk counseling from the scope of the ordinances under review in those cases. *See infra.*

[4] It is true that in a letter submitted to this Court at the Preliminary Injunction stage of the case, counsel for Englewood proffered a "stipulation" that Turco could walk through the driveway buffer zones, i.e., the zones at the far end of the building from the entrance door buffer zones. [Doc. 18.] Yet, despite Plaintiff's consistently arguing that the Ordinance excludes her from both zones, that stipulation was never mentioned again by the City in summary judgment briefing at the District Court or the City's principal brief at the Court of Appeals (although it appeared in the City's Circuit reply brief). Nor was it proposed by Englewood as a Stipulated Fact for inclusion in Exhibit A of the Joint Pretrial Order. [Doc. 81.] At her 30(b)(6) deposition, the City's designated representative testified that Turco was not permitted within either set of buffer zones and, further, the 30(b)(6) representative was not aware of any contrary official interpretations.

[Doc. 81] (quoting one of the four exemptions set forth in the Section B of the Ordinance.) The potential significance of this apparent modification of Englewood's position for the analysis and outcome of this case cannot be overstressed. If the City *now* takes the position that while Turco is on the sidewalk in front of the MMA clinic her destination is "other than such facility," then she comes within exemption (4) of the Ordinance, and, thus, *the Ordinance does not apply to Turco at all.*

      **3.**     ***Changes to the Layout of the Sidewalk at 40 Engle Street.*** Since the last time this case was before the Court, several changes have occurred which have altered the landscape, both literally and, to some degree, legally. As compared with the clear, uncluttered sidewalk shown in the photograph in the Third Circuit's opinion, 935 F.3d at 160, the ensuing years have seen a proliferation of fixed planters, some containing small trees, and restaurant tables and chairs in front of 40 Engle Street, in both the buffer zone and non-buffer zone areas. These objects seem to be the property of the restaurant next door and have been placed—some permanently, others temporarily—in response to such things as expanded outdoor dining due to Covid, and a presumed desire to enhance the ambience of the restaurant's operations. While Plaintiff has eschewed the idea that these additions give rise to any distinct legal claims, the increased flotsam and jetsam in the non-buffer zone areas has certainly decreased the square footage of the traditional

public forum available to non-exempt people like Turco and, if anything, increased the burden on her ability to communicate with her intended audience.

**4.** ***The Parties' Expanded Stipulated Facts.*** Along with the Joint Final Pretrial Order, the parties have submitted an Exhibit containing some 78 stipulated undisputed facts. [Doc. 81, Ex. A.] These include 19 facts taken from the Third Circuit's opinion and an additional 59 facts subsequently agreed to by the parties. Of course, by stipulating to certain facts, neither party necessarily accepts the other side's inferences or legal conclusions to be drawn therefrom.

**5.** ***Post-remand Depositions.*** Since the remand, the parties have taken four additional depositions so that the record might better reflect the current state of affairs regarding Turco's activities vis-à-vis the buffer zones at 40 Engle Street. The following depositions took place in April of 2021: Plaintiff, Jeryl Turco (supplemental); Christine Taylor (MMA volunteer escort); Andrea Long (MMA volunteer escort); and James Roman (architectural designer). Mr. Roman, at Plaintiff's counsel's request, prepared a diagram of the layout of the sidewalk at 40 Engle Street which shows the location, boundaries, dimensions, etc. of the buffer zones, adjacent buildings, and street. (See attached diagram). The parties have agreed that the diagram is an accurate representation of the sidewalk in front of 40 Engle Street and that the dimensions are correct as shown. (Mr. Roman will not be called as a witness at trial.)

## STATEMENT OF FACTS PLAINTIFF INTENDS TO PROVE

As noted, *supra*, the Third Circuit identified two issues requiring resolution on remand:  (1) whether or not the buffer zones created by the Ordinance imposed "a significant restraint" on Turco's ability to engage in constitutionally-protected speech, *Id.* and 170; and (2) whether or not the City met its burden under the Supreme Court's decision in *McCullen v. Coakley*, 573 U.S. 464 (2014) of demonstrating that it had tried or seriously considered and reasonably rejected less restrictive alternatives before enacting the Ordinance. *Turco*, 935 F.3d at 170.

### A.     The Burden Imposed on Turco's Speech

The facts regarding what the Ordinance says and means, what Turco does, and how the Ordinance's restrictions place limits on her ability to use the public sidewalk in front 40 Engle Street have never been in serious dispute.[5] Plaintiff, through her own testimony, along with the parties' stipulated undisputed facts, and documents supplied by the Defendant in discovery, intends to prove:

1.      that the Ordinance creates a series of what the Third Circuit described as "three overlapping buffer zones," *id.* at 159, at either end of the sidewalk adjacent to 40 Engle Street;

---

[5] Except, perhaps, insofar as the City's quite recent suggestion that, while Turco is walking on the sidewalk in front of 40 Engle Street, she is permitted to walk through the buffer zones as a "person[s] using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility." Ordinance, Section B(4). As noted above, if Section B(4) applies to Turco, she is exempt from the Ordinance.

2.      that, as this Court found, the buffer zones extend eight feet to the left and eight feet to the right of the clinic's (8 foot) door and driveway, and, as a result, "Plaintiff and others similarly situated are excluded from approximately twenty-four feet on either end of the Clinic, or forty-eight feet in total of the public sidewalk outside the Clinic."[6] *Turco*, 2017 U.S. Dist. LEXIS 189042, at *3–4;

3.      that Turco's objective is not to protest, demonstrate, or picket, but, rather, to try to engage the clinic's clients in sidewalk counseling, i.e., quiet, friendly, non-confrontational, one-on-one conversation, and leafletting, with a view toward offering them alternatives to abortion;

4.       that the presence of the overlapping zones from which she is excluded by the Ordinance significantly restricts and seriously diminishes Turco's ability to reach her intended audience because she is required to navigate a virtual obstacle course of lines and arcs delineating the "no-speech zones," must enter Engle Street itself to avoid the buffer zones and must occasionally maneuver around parked cars and piles of snow to get from one side of the zones to the other in order to attempt to communicate with prospective clients of the clinic;

5.      that as difficult as the Ordinance's buffer zones make Turco's attempts at verbal communication, if anything, they make her attempts at

---

[6] This description perfectly illustrates why it is highly misleading to refer to this as a mere "8-foot buffer zone."

pamphleteering even more difficult, since handing a pamphlet to a client who is eight, sixteen, twenty-four or more feet away is a physical impossibility.

5.     that, in more recent years, the proliferation of planters, trees, tables and chairs which the City has permitted to be placed on and remain on the public sidewalk has only exacerbated the difficulty Turco has in trying to communicate by further complicating the obstacle course, reducing the amount of public sidewalk open to her, and, thus, has increased the burden on her ability to engage in one-on-one communication.

In addition to the foregoing, it is perhaps important to set forth some things Turco does *not* contend. Turco does not contend that the Ordinance has *entirely* prevented her from communicating with any prospective clients. (She need not so prove.) Nor does she contend that she is unable to communicate with clients on either end of the buffer zones, at least not until they arrive at the buffer zone lines where Turco—but not the client—must stop. Nor does Turco contend that she can't communicate with clients who may be across the street, or any other place where the buffer zone lines are not nearby. Turco's proofs will show, however, that despite retaining some ability to communicate some of the time, the restrictions of the Ordinance have imposed and continue to impose, a substantial, serious, and significant burden on her ability to engage in sidewalk counseling at 40 Engle Street. This is all she need show to shift the burden to Defendants under *McCullen*.

**B.      The City's Burden of Proof**

Regarding the second question—whether or not Englewood can show that it tried or seriously considered and reasonably rejected less restrictive alternatives to the Ordinance—this is the Defendant's burden once Plaintiff demonstrates that the Ordinance imposes a significant restriction on her freedom of speech. Of course, based on the prior history of the case and the undisputed stipulated facts, Plaintiff understands that the City will attempt to answer that question in the affirmative.

In response to Defendant's expected proofs, however, Plaintiff anticipates demonstrating at least the following:

1.      that the City first became aware of an increase in hostile, aggressive, and allegedly lawbreaking anti-abortion actors (the Bread of Life group) at MMA in October of 2013, a group that did not exclude Turco and whose tactics Turco vehemently rejects;

2.      that from the outset of the issue being raised before the City Council, the police chief recommended the enactment of a buffer zone ordinance, in large part, because such an ordinance would be easier to enforce than existing laws;

3.      that the City failed to attempt to address the situation by prosecutions and arrests under existing laws or targeted injunctive relief, or adoption of new laws that did not exclude peaceful sidewalk counselors;

4.      that the filing of complaints by clinic counselors using their home addresses was never necessary for the City to enforce existing laws or obtain targeted injunctive relief;

5.      that the City, in December of 2013, was made aware of a Massachusetts buffer zone statute addressing a similar situation, and that the constitutionality of that statute had been upheld by the First Circuit Court of Appeals (the statute was later struck down by the Supreme Court in *McCullen*);

6.      that, shortly after becoming aware of the Massachusetts statute, the City decided to adopt a practically *verbatim* version of it for Englewood;

7.      that the City at no time conducted a study of any kind of what it would have cost to provide police presence at MMA during the few hours every other week that the Bread of Life group typically was present;

8.      that the City Council president (and the City's 30(b)(6) designee) interpreted the Ordinance as prohibiting Turco and other non-exempt persons from entering the buffer zones and requiring them to navigate around them including walking into the street, at least along the curb line;

9.      that, despite the complete absence of evidence of problems similar to those at MMA occurring at any other Englewood health care or transitional facility, the Ordinance creates speech-excluding buffer zones at all such facilities

in Englewood, and that the City actually undertook to paint buffer zones at some half dozen or more facilities in 2014.

In sum, Plaintiff anticipates that the proofs offered by the City will be insufficient to sustain its burden of proof, under *McCullen*, that the Ordinance is sufficiently narrowly tailored to withstand intermediate scrutiny.

## LEGAL ARGUMENT

I.   **The Ordinance, on its face and as-applied, violates the free speech and assembly rights of Plaintiff, Jeryl Turco, as protected by the Free Speech Clause of the First Amendment to the U.S. Constitution and Art. I, ¶ 6 of the New Jersey State Constitution.**

A.   **The Ordinance, on its face and as-applied, impermissibly burdens Plaintiff's ability to communicate to patients of the abortion clinic located at 40 Engle Street ("Metropolitan Medical Associates") through her chosen means of sharing her constitutionally protected message.**

The Third Circuit held that "the extent to which the buffer zone prevented Turco from communicating her message as she wanted" was a genuine issue of material fact that precluded entry of summary judgment. *Turco v. City of Englewood*, 935 F.3d 155, 165 (3d Cir. 2019). The court noted that "[s]ome facts suggest that the buffer zones imposed a significant restraint on the plaintiff's ability to engage in constitutionally-protected communication. Others support Englewood's position that the buffer zones hardly affected plaintiff's ability to reach her intended audience." *Id*. at 170.

At trial, Plaintiff will demonstrate that the buffer zones created by the Ordinance on the public sidewalk at 40 Engle Street do indeed significantly burden her constitutionally protected speech activities as exercised in a traditional public forum.

As an initial matter, and as the Third Circuit correctly noted, two legal propositions are not in dispute: (1) Plaintiff's speech activities outside MMA, i.e., engaging in one-on-one communication with patients and distributing pamphlets to the same, are constitutionally protected activities, and (2) the public sidewalk outside MMA is a traditional public forum. *Turco*, 935 F.3d at 162 ("The City concedes that the First Amendment fully protects the speech at issue here and that the Ordinance clearly regulates speech in a traditional public forum (i.e., the sidewalk)").

The Supreme Court in *McCullen* spoke clearly as to what constitutes a burden in the free speech context: "while the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms—such as **normal conversation** and **leafletting on a public sidewalk**—have historically been more closely associated with the transmission of ideas than others." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 366-67 (3d Cir. 2016) (*Bruni I*) (quoting *McCullen v. Coakley*, 134 S. Ct. 2518, 2536 (2014)) (emphasis added). *McCullen* continues: "[w]hen the government makes it **more difficult** to engage in these

modes of communication, it imposes an especially significant First Amendment burden." *Bruni I*, 824 F.3d at 367 (quoting *McCullen*, 134 S. Ct. at 2536) (emphasis added). *See also Turco*, 935 F.3d at 172 (same).

According to the Third Circuit, measuring a burden on speech requires a consideration of the scope and size of the speech restriction. *Bruni v. City of Pittsburgh*, 941 F.3d 73, 95 (3d Cir. 2019) (*Bruni II*). As to *scope*, i.e., "the type of speech" the Ordinance prohibits, *id*., the Ordinance does not just ban conduct such as patrolling, demonstrating, and picketing within the zones it creates, as it did in *Bruni II*. The Ordinance also bans the two speech activities involved with "sidewalk counseling," i.e., "one-on-one normal conversation and leafletting," which *McCullen* and the Third Circuit have observed are "entitled to the maximum protection afforded by the First Amendment." *Id*. at 85 (cleaned up).

Indeed, unlike the Bread of Life group, whose activities gave rise to the Ordinance, sidewalk counselors, such as Turco, "are not protestors." *McCullen v. Coakley*, 573 U.S. 464, 489 (2014). As described by the Court in *McCullen*, sidewalk counselors

> seek not merely to express their opposition to abortion, but to inform women of various alternatives and to provide help in pursuing them. [They] believe that they can accomplish this objective only through personal, caring, consensual conversations. And for good reason: It is easier to ignore a strained voice or a waving hand than a direct greeting or an outstretched arm.

*Id.*

For well over a decade, Turco has been counseling on the public sidewalk outside of 40 Engle Street on Saturday mornings. When counseling women, she does so in a friendly, peaceful, conversational, and non-confrontational manner.

Like the sidewalk counselors in *McCullen*, Turco believes that the most effective way to interact with women approaching an abortion clinic is "to maintain a caring demeanor, a calm tone of voice, and direct eye contact." *Id.* at 473. Sidewalk counselors, like Turco, believe that "confrontational methods such as shouting or brandishing signs . . . tend only serve to antagonize their intended audience." *Id.*

The *Bruni II* court held that Pittsburgh's buffer zone ordinance was narrower in scope than the Massachusetts law unanimously struck down in *McCullen* because "it limits only congregating, patrolling, picketing, and demonstrating within a fifteen-foot buffer zone"— activities the court construed as **not** including sidewalk counseling. *Bruni II*, 941 F.3d at 90. In other words, the Pittsburgh ordinance, unlike Englewood's, did not "sweep in the 'one-on-one communication,' including 'normal conversation and leafletting,' that *McCullen* emphasized 'have historically been more closely associated with the transmission of ideas.'" *Id.* (quoting *McCullen*, 573 U.S. at 488). In fact, the *Bruni II* Court specifically noted that if Pittsburgh wanted to amend its ordinance to restrict "one-on-one conversations," it would have to satisfy the narrow tailoring demands as

articulated in "*McCullen* and *Bruni I*." *Bruni II*, 941 F.3d at 95 n.22. (Those demands are discussed *infra* at Sec. I.B.)

With respect to the *size* of the zones, the Ordinance creates "three overlapping buffer zones at any qualifying facility." *Turco*, 935 F.3d at 159. In the case of 40 Engle Street, where Turco engages in sidewalk counseling, there are **six** overlapping zones because of MMA's entrance and driveway. As this Court has described the lay of the land, a factual finding not disturbed on appeal:

> The buffer zone extends eight feet to the left and eight feet to the right of the Clinic's doorway or driveway down to the street. As a result, Plaintiff and others similarly situated are excluded from approximately twenty-four feet on either end of the Clinic, or forty-eight feet in total of the public sidewalk outside the Clinic.

*Turco v. City of Englewood*, No. 2:15-cv-03008, 2017 U.S. Dist. LEXIS 189042, at *3–4 (D.N.J. Nov. 14, 2017).

These permanent, overlapping zones that divvy up the sidewalk at 40 Engle Street create a veritable "obstacle course" Turco is forced to navigate when sidewalk counseling. Instead of being able to walk in a normal fashion alongside women she tries to speak with, from the beginning of that conversation to the entrance of the clinic (as she was able to do before adoption of Ordinance, and while it was invalidated by this Court), the zones require that Turco—who usually only has seconds to reach her intended audience—repeatedly interrupt her close

conversations to navigate the multitudinous do-not-cross lines painted on the public sidewalk.

Moreover, when Turco walks out into the street, in order to attempt to keep conversing with a woman walking towards the clinic entrance, she does so at her physical and legal peril. The one-way street in front of the clinic is often a busy road and according to New Jersey law, "[w]here sidewalks are provided," as is the case at 40 Engle Street, "it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway." N.J.S.A. § 39:4-34.

In addition, cars are often parked along the street outside the clinic, and during the winter months, piles of snow alongside the street make it burdensome, if not impossible, for her to walk around the zones. Turco must navigate all these barriers, and more, simply to engage in peaceful and otherwise fully-protected constitutional speech in a traditional public forum during the very brief window of time that she has to communicate with her intended audience.

The net impact of the Ordinance on Turco's speech at 40 Engle Street is that her counseling efforts have been considerably hampered, and her ability to engage in peaceful conversations, and to offer literature and/or a rosary to interested individuals passing by on the public sidewalk, has been severely restricted. The Ordinance, and the zones created under it, hinder her ability to initiate the close, personal conversations that she views as essential to sidewalk counseling and also

significantly hampers her ability to offer literature and rosaries to individuals on the public sidewalk.

While Plaintiff is able to still communicate with some patients with the buffer zones in place, as the Third Circuit noted, so too were the successful plaintiffs in *McCullen*:

> Although they have managed to conduct some counseling and to distribute some literature outside the buffer zones—particularly at the Boston clinic—they say they have had many fewer conversations and distributed many fewer leaflets since the zones went into effect.

*McCullen*, 573 U.S. at 474.

The same holds true with respect to Turco. The issue is not whether the Ordinance prohibits Turco from speaking with, and handing literature to, *all patients* entering MMA, but whether the buffer zones created by the Ordinance makes it "more difficult" for her to engage in these core protected speech activities. *McCullen*, 573 U.S. at 489; *Bruni I*, 824 F.3d at 367.

Finally, the Third Circuit's discussion of *Hill v. Colorado* vis-à-vis the burden on Plaintiff's speech does not support the City's position that its Ordinance does not burden Turco's speech. If *Hill*, standing alone, dictates that the Ordinance does not burden Plaintiff's speech as a matter of law, the Third Circuit would have held that and conclusively resolved this issue for future proceedings. It did not do so.

The fundamental reason *Hill* does not address the burden the Ordinance imposes on Turco is because the *fixed buffer zone* created by the Ordinance, which imposes a flat ban on speech for all non-exempt speakers, is different in kind than the *floating bubble zone* in *Hill*, which allowed speakers to approach listeners who consented. Indeed, *Hill* did not involve an eight-foot buffer zone at all. *Hill*, rather, involved an eight-foot *bubble zone*—within a 100-foot buffer zone—that prohibited individuals from knowingly approaching another person within eight feet of that person to pass a leaflet, counsel, or hold a sign unless that person consents. 530 U.S. at 707–8. The Colorado law created an 8-foot restriction on an unwanted physical approach to a person accessing a health clinic. *Id.* at 707. The Ordinance, however, creates an *absolute ban* on non-exempt speech within the boundaries of buffer zones. In other words, and unlike the buffer zones created by the Ordinance, Colorado's bubble zone could be "pierced," as it were, when the listener consented, or the speaker stood in one place and was approached by the listener. *Id.* at 708 (noting that the Colorado bubble zone did "not require a standing speaker to move away from anyone passing by."). *Hill* repeatedly emphasizes that the Colorado statute only prohibited approaches to unwilling listeners, allowing communications with willing listeners to proceed. *See, e.g.*, *id.* at 715–16, 718.

In contrast to the operation of the law in *Hill*, Turco cannot cross into a buffer zone imposed by the Ordinance to continue speaking one-on-one with a patient, **even if the patient wishes to hear what Turco has to say**. Moreover, though the *Hill* Court suggested that sidewalk counselors "might easily stand on the sidewalk at entrances" to hand out literature, 530 U.S. at 730, Turco is not permitted to do that under the Ordinance, as entrances, including the one at MMA, are at the core of the no-speech zones.

In sum, the distance in *Hill* is always—and never more than—8 feet, and, if consent given, *no feet at all*. Here, the distance is always *at least* 8 feet, and more often than not, 16 feet, or 24 feet, depending on where on the sidewalk Turco and the client happen to be standing in relation to the building.[7]

In light of the scope and size of the buffer zones created on the public sidewalk at and around 40 Engle Street, the Ordinance has placed, and continues to place, a significant burden on Turco's core free speech activities. It has made it

---

[7] The Third Circuit remarked that this Court "did not even cite *Hill*," in its opinion granting Plaintiff summary judgment. *Turco*, 935 F.3d at 167. But this Court was simply (and correctly) following the Supreme Court's analysis in *McCullen*, which nowhere cites or relies upon *Hill*. Given the fact, as the Third Circuit observed, "[i]n nearly all material respects, the amended Act was identical to the Ordinance before us, except the Massachusetts law established a thirty-five foot buffer zone and the Ordinance establishes an eight-foot buffer zone," the Third Circuit's remark is curious. *Id*. at 163. To the extent the Third Circuit has mandated that this Court take into consideration the Supreme Court's decision in *Hill*, it should do so and readily conclude, in light of *McCullen*, that *Hill* is ultimately irrelevant as to whether the Ordinance imposes a significant burden on Turco's core protected speech.

"more difficult" for her to engage in two activities that that are afforded maximum constitutional protection: one-on-one communication and distributing literature. *McCullen*, 573 U.S. at 489; *Bruni I*, 824 F.3d at 367.

> **B.    The City cannot meet its burden of proving the constitutionality of the Ordinance by showing that it is narrowly tailored to serve a significant government interest.**

The City bears the burden of proving that the Ordinance passes constitutional muster. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc*., 529 U.S. 803, 816 (2000) (citations omitted). *See also N.J. Citizen Action v. Edison Twp*., 797 F.2d 1250, 1255 (3d Cir. 1986) ("[W]hen a statute or other government action is alleged to infringe on the exercise of First Amendment rights, the state or municipality bears the burden of demonstrating the constitutionality of the action.").

The standard the City must satisfy is intermediate scrutiny. *Turco*, 935 F.3d at 162. The decisive question under that standard is whether the City can prove that the Ordinance is "narrowly tailored to serve a significant governmental interest." *Bruni I*, 824 F.3d at 365 (quoting *McCullen*, 134 S. Ct. at 2534). Such narrow tailoring requires that the government not "burden substantially more speech than necessary to achieve the [government's] asserted interests." *McCullen*, 573 U.S. at 486 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

Where the speech restriction impacts core protected speech, as here, the narrow tailoring requirement is "rigorous and fact-intensive." *Bruni I*, 824 F.3d at 372. To meet that requirement, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495. "[T]he City cannot burden [speech] without first trying, or at least demonstrating that it has seriously considered, substantially less restrictive alternatives that would achieve the City's legitimate, substantial, and content-neutral interests." *Bruni I*, 824 F.3d at 357.

As the Third Circuit in *Turco* summarized the standard:

> This "tailoring requirement does not simply guard against an impermissible desire to censor." Rather, "by demanding a close fit between ends and means," the narrow tailoring requirement prevents the suppression of speech "for mere convenience." . . . . Unlike a content-based speech restriction, the Ordinance "need not be the least restrictive or least intrusive means of serving the government's interests." Rather, the First Amendment prohibits the government from regulating speech in a way that would allow a substantial burden on speech to fall in an area that "does not serve to advance its goals."

*Turco*, 935 F.3d at 162 (citations omitted).

*McCullen*, as the Third Circuit correctly (and obviously) pointed out, is "a useful starting point."[8] *Id*. at 163. The law challenged in that case, adopted to serve

---

[8] Indeed, one would think that a unanimous Supreme Court decision construing what is effectively the exact same statute as the one at issue in this case would be,

similar governmental interests asserted in this case, failed the Supreme Court's narrow tailoring analysis. The Court held that Massachusetts could have pursued multiple alternatives that would amply serve the government's interests without suppressing leafletting and one-on-one communication, including: (1) using an unchallenged subsection of that act which prohibited blocking doors and driveways, without banning speech; (2) enacting a local version of the federal Freedom of Access to Clinic Entrances Act (FACE Act); (3) enacting an ordinance specifically prohibiting harassment, if drafted within First Amendment parameters; (4) using existing ordinances against obstruction of doors and driveways; (5) using "generic criminal statutes"; and (6) seeking injunctive relief as necessary against specific persons with a history of obstructing access. *McCullen*, 573 U.S. at 490–93.

Englewood's Ordinance fails for similar reasons. First, this Court "was clearly correct when it found that the City had not 'prosecute[d] any protestors for activities taking place on the sidewalk' and 'did not seek injunctive relief against individuals whose conduct was the impetus for the Ordinance.'" *Turco*, 935 F.3d at 167 (quoting *Turco*, 2017 U.S. Dist. LEXIS 189042, at *5). Second, there is no evidence that the City "considered different methods that other jurisdictions . . .

---

perhaps, something more than "useful." "Controlling" might be a more apt description.

found effective"—other than the very law the Supreme Court struck down as unconstitutional. *Bruni II*, 941 F.3d at 81 (quoting *McCullen*, 573 U.S. at 494).

Third, even though the issues giving rise to the Ordinance were at one location, on one day of the week, the City used a cudgel, instead of a scalpel, in addressing that problem. *See Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy"). The Ordinance applies to *all* health care and transitional facilities in the City. And shortly after the Ordinance was adopted, city officials began marking out buffer zones at such facilities in the City, including on the public sidewalk at 40 Engle Street.

The City's sweeping, far-ranging, legislative approach flies in the face of *McCullen*, which held that the Massachusetts law failed narrow tailoring precisely on these very grounds. "For a problem shown to arise only once a week in one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth is **hardly a narrowly tailored solution**." 573 U.S. at 493 (emphasis added). *See also Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015) ("Given the absence of evidence of a county-wide problem, the county-wide sweep of the Amended Ordinance [banning solicitation within all county roadways] burdens more speech than necessary, just as the statute in *McCullen*—a statewide statute aimed at a problem in one location—burdened more speech than

necessary."); *Cutting v. City of Portland*, 802 F.3d 79, 89 (1st Cir. 2015) (citing *McCullen*, 573 U.S. at 493) (holding that a city-wide ban on lingering on median strips was "geographically over-inclusive" because of a lack of evidence of a city-wide problem); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) ("The Ordinance is also geographically overinclusive. The Ordinance applies citywide to all streets and sidewalks in the City, yet the City has introduced evidence of traffic problems only with respect to a small number of major streets and medians.").[9]

As in *Bruni I*, Englewood had "the same obligation to use less restrictive alternatives to its buffer zone as the Commonwealth of Massachusetts had with respect to the buffer zone at issue in *McCullen*." 824 F.3d at 369. It did not do so.[10]

With respect to the two issues identified by the Third Circuit as creating a genuine issue of material fact with respect to narrow tailoring ("financial

---

[9] The Third Circuit in *Turco* says nothing about the Ordinance's overinclusiveness, or *McCullen*'s discussion of the challenged law failing narrow tailoring on these grounds.

[10] *Bruni II* clarifies this statement from *Bruni I*, holding that, "where the burden imposed by a restriction on speech is not significant, the government need demonstrate neither that 'it has tried or considered every less burdensome alternative,' nor that it tried or considered every less burdensome alternative discussed in *McCullen*." *Bruni II*, 941 F.3d at 91 (quoting *Bruni I*, 824 F.3d at 370). In this case, however, as discussed *supra*, and to be proven at trial, the burden the Ordinances imposes on Turco's speech is significant. The burden analysis in *Bruni II* must be understood against the background of the Court's narrowing construction that exempted sidewalk counselors from the ordinance's reach.

restraints" on the City and victims' "fear of reprisal" for filing complaints, *Turco*, 935 F.3d at 169), neither of these issues will ultimately weigh in favor of the City.

As an initial matter, the governmental interests in adopting the Ordinance was to deal with allegations of blockading, violence, and assaults outside the entrance of MMA, not to preserve financial resources and protect the privacy of victims. Moreover, if financial restraints did not allow for Englewood police to patrol 40 Engle Street one day of the week at one location, that does not explain how the buffer zones, which are in place every moment a facility is open for business, are themselves supposed to be enforced. Just as laws against harassment, blocking, and assault, do not enforce themselves, neither do buffer zones painted on a sidewalk. If the City's excuse is that buffer zones are easier to enforce, the Supreme Court shut that very argument down in *McCullen*: "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." 573 U.S. at 495. *See also Free Speech Coal., Inc. v. AG United States*, 787 F.3d 142, 156 (3d Cir. 2015) ("ease of enforcement is not the touchstone for narrow tailoring") (citing *McCullen*); *Petrello v. City of Manchester*, No. 16-cv-008-LM, 2017 U.S. Dist. LEXIS 144793, at *34 (D.N.H. Sep. 7, 2017) ("the City may not use convenience or efficiency as a proxy for the narrow tailoring test") (citing *McCullen*).

The fact of the matter is, the City not only failed to undertake a cost-analysis of what it would have cost to provide police presence at MMA during the few hours every other week that the Bread of Life group typically was present, the city manager went so far as to say he wouldn't even consider providing individual police coverage to a business. If a lack of finances were an excuse to create prophylactic bans on leafletting and one-on-one communications, a municipality's inability to deal with litter involving pamphlets and newspapers would give it the excuse to ban carrying literature in public. *But see Schneider v. State*, 308 U.S. 147, 162 (1939) ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets."); *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 795 (1988) ("North Carolina has an antifraud law, and we presume that law enforcement officers are ready and able to enforce it."). Moreover, if the City could not afford to patrol 40 Engle Street for violent and other crimes, how can it afford to patrol that very same location for violations of its buffer zone ordinance?

Regarding victims, the Third Circuit opinion does not mention that City Council President Algrant assured the clinic volunteer escorts that they need not use their home addresses when filing a complaint but could, instead, simply use the clinic's address. In fact, two of the police investigation reports, both dated prior to

the passage of the Ordinance, identify the "Victim's Home Address" as "40 Engle St."

In addition, if existing ordinances could not be enforced for lack of complaints, how then could an *additional* ordinance (creating buffer zones) be enforced? Why would an individual (patient, escort, doctor, etc.) be more willing to file a complaint with the police about someone crossing a painted line on a sidewalk than about being assaulted? The enforcement mechanism of the Ordinance is *exactly the same*: a complaint brought by a victim or witness to its violation.

Finally, *Bruni II*'s application of intermediate scrutiny in that case, holding that Pittsburgh's buffer zone ordinance "easily" survived that standard, even though the record did "not reflect that the City tried or seriously considered arrests, prosecutions, or targeted injunctions," was undertaken in light of the Court's holding that the ordinance did not apply to the activities of sidewalk counselors. 941 F.3d at 88, 91. As mentioned *supra*, the *Bruni II* Court specifically noted that if Pittsburgh amended its ordinance to restrict "one-on-one conversations," it would have to satisfy the narrow tailoring demands as articulated in "*McCullen* and *Bruni I*." *Bruni II*, 941 F.3d at 95 n.22.

In sum, the City had ample alternatives to deal with the protests and demonstrations outside MMA without suppressing the sidewalk counseling

activities of Jeryl Turco. Restricting one-on-one communications and leafletting throughout the City, in an effort to address the bad conduct of protestors at one location, impermissibly creates a substantial burden on speech that "does not serve to advance [the City's] goals." *Turco*, 935 F.3d at 162 (quoting *McCullen*, 573 U.S. at 486.)

## II.    The Ordinance is Overbroad

As with the issues of burden and narrow tailoring, the Third Circuit in *Turco* did not hold, as a matter of law, that the Ordinance failed on overbreadth grounds. Like the other issues, it held that that the record precluded summary judgment as to either party. *Turco*, 935 F.3d at 172.

At the outset it must be noted that there is a difference between a law that fails narrow tailoring because it is overinclusive, and one that fails to satisfy constitutional scrutiny under the overbreadth doctrine. In *McCullen*, as discussed, the law's scope—applying to all reproductive facilities in the state even though problems were to be had at only one location—was overinclusive and therefore "hardly a narrowly tailored solution." 573 U.S. at 493. Because the *McCullen* Court found that the law was not narrowly tailored on these grounds, it did not need to consider the petitioners' overbreadth challenge. *See Turco*, 935 F.3d at 170 (citing *McCullen*, 573 U.S. at 496 n.9). Similarly, here, this Court can find that the

Ordinance fails narrow tailoring because of its overinclusiveness without reaching the question of whether it is overbroad.

The Ordinance is unconstitutionally overbroad because it authorizes the creation of zones at non-abortion locations where the City does not even claim there has been a justification for banning speech. A law is overbroad when "a substantial number of its applications are unconstitutional, judged in relation to the [law's] plainly legitimate sweep." *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (citations omitted). The overbreadth doctrine prohibits laws that "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964) (internal citations omitted). Accordingly, a law is void for overbreadth where it "does not aim specifically at evils within the allowable area of [government] control but . . . sweeps within its ambit other activities that in ordinary circumstances constitute an exercise" of protected rights. *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).[11]

---

[11] In *Turco*, the Third Circuit states that "the Supreme Court has rejected the District Court's assertion that an Ordinance must precisely target the acts it was passed to remedy," *Turco*, 935 F.3d at 171, but that's exactly what the Supreme Court said in *Thornhill*. *See also Rode v. Dellarciprete*, 845 F.2d 1195, 1200 (3d Cir. 1988) (legislation "is overbroad if it 'does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech.'") (quoting *Thornhill*, 310 U.S. at 97).

Trial testimony will show that the law fails not only on narrow tailoring grounds, but on the separate issue of overbreadth grounds as well. Shortly after the Ordinance was adopted, city officials began marking buffer zones at other facilities in the City, despite the fact there is zero evidence, when the Ordinance was adopted, of any disturbances at any facility in Englewood other than MMA.

*Hill*'s remark that "the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive," does not apply here. *Turco*, 935 F.3d at 171 (quoting *Hill*, 530 U.S. at 731). The statute in *Hill* applied to health care facilities, while the Ordinance applies to *both* health care facilities *and transitional facilities*—a fact not noted by the Third Circuit in *Turco* in its overbreadth discussion. But the City provides no reason, let alone evidence, why buffer zones at transitional facilities, such as "halfway houses" for "mentally ill persons," *see* N.J.S.A. 40:55D-66.2(a), are necessary. Taken to its logical extreme, *Hill*'s observation would encompass a municipal law imposing buffer zones on all places of businesses with front doors that adjoin a public sidewalk. While "comprehensive," that would hardly be a legislative "virtue."

Respectfully submitted on this 31st day of January 2022.

/s/ Francis J. Manion                          Mark R. Scirocco
Francis J. Manion                              Legal Center for Defense of Life, Inc.
*Lead Attorney*                                Law Offices of Robert A. Scirocco
Geoffrey R. Surtees*                           98 Route 46, Suite 6
American Center for Law & Justice              Budd Lake, New Jersey 07828
Post Office Box 60                             Tel. 973-691-1188; Fax 973-691-3353
New Hope, Kentucky 40052                       mark@sciroccoesq.com
Tel. 502-549-7020; Fax 502-549-5252
fmanion@aclj.org; gsurtees@aclj.org            * Admitted pro hac vice

Erik M. Zimmerman*                             *Counsel for Plaintiff*
Edward L. White III*
American Center for Law & Justice
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel. 734-680-8007; Fax 734-680-8006
ewhite@aclj.org;
ezimmerman@aclj.org

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants.

/s/ Francis J. Manion
Francis J. Manion
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax. 502-549-5252
fmanion@aclj.org

**ATTACHMENT**

