Francis J. Manion
Geoffrey R. Surtees
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax 502-549-5252
fmanion@aclj.org
gsurtees@aclj.org
*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JERYL TURCO, | Case No. 2:15-cv-03008 |
| Plaintiff, | |
| | Judge Susan D. Wigenton |
| v. | Magistrate Judge Leda D. Wettre |
| CITY OF ENGLEWOOD, NEW JERSEY, | |
| Defendant. | |
| _____/ | |

## PLAINTIFF JERYL TURCO'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## TABLE OF CONTENTS

Page

**INTRODUCTION** ................................................................................................. 1

**PLAINTIFF'S PROPOSED FINDINGS OF FACT** ......................................... 3

A.   Jeryl Turco's Sidewalk Counseling ................................................. 4

B.   Impact of Buffer Zones on Turco's Ability to Sidewalk Counsel ................. 6

C.   The Arrival of the "Problem Group" in Late 2013 ....................................... 10

D.   Englewood's Response to the "Problem Group" ......................................... 14

E.   Testimony Regarding Cost Irrelevant Due to City Policy ............................ 16

F.   Evidence Refuted City's "Nobody Would File Complaints" Argument ...... 17

G.   The Chronology of Englewood's Enactment of the Ordinance ................... 19

H.   Evidence Refutes Contention that the Ordinance Solved
     "The Problem" ................................................................................................ 20

**PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW** ................................. 21

A.   Meaning and Application of the Ordinance ................................................ 22

B.   Applicable Constitutional Standard............................................................ 24

C.   The Buffer Zones Substantially Burden Turco's Free
     Speech Activities ........................................................................................... 25

D.   The City Failed to Pursue Less Restrictive Alternatives ............................ 31

E.   The Ordinance Fails Under the Overbreadth Doctrine................................ 38

F.   Remaining Constitutional Claims................................................................ 40

**CONCLUSION** ............................................................... 40

**CERTIFICATE OF SERVICE** ........................................ 42

## <u>TABLE OF AUTHORITIES</u>

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987)........ 39

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) (*Bruni I*)........... 21, *passim*

*Bruni v. City of Pittsburgh*, 941 F.3d 73 (3d Cir. 2019) (*Bruni II*) ........... 24, *passim*

*Cutting v. City of Portland*, 802 F.3d 79 (1st Cir. 2015) ........................................ 37

*Fed. Election Com. v. Mass. Citizens for Life, Inc.*, 479 U.S. 238 (1986) ............. 36

*Free Speech Coal., Inc. v. AG United States*, 787 F.3d 142 (3d Cir. 2015) ........... 35

*Frisby v. Schultz*, 487 U.S. 474 (1988)..................................................................... 37

*Hill v. Colorado*, 530 U.S. 703 (2000) ...................................................... 29, *passim*

*Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525 (2001) ............................................. 3

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ............................................. 2, *passim*

*NAACP v. Alabama*, 377 U.S. 288, 307 (1964)........................................................ 38

*Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015) ............................................. 36

*Schneider v. State,* 308 U.S. 147 (1939)............................................................. 34, 35

*Thornhill v. Alabama*, 310 U.S. 88, 97 (1940) ........................................................ 38

*Turco v. City of Englewood*, 935 F.3d 155 (3d Cir. 2019) ........................... 3, *passim*

*Turco v. City of Englewood*, No. 2:15-cv-03008,
2017 U.S. Dist. LEXIS 189042 (D.N.J. Nov. 14, 2017) .................................... 3, 40

*U.S. v. Gregg,* 32 F. Supp. 2d 151 (D.N.J. 1998) ............................................. 10, 15

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) ......................... 25

*United States v. Stevens*, 559 U.S. 460 (2010) ................................................. 22, 24

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ......... 38

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................................. 24

**STATUTES**

Federal Access to Clinic Entrances Act, 18 U.S.C. § 248 ......................... 10, *passim*

Mass. Gen. Laws, ch. 266, § 120E½ ...................................................................... 32

N.J.S.A. § 2C:12-1 ................................................................................................. 32

N.J.S.A. § 2C:33-2 ................................................................................................. 32

N.J.S.A. § 2C:33-4 ................................................................................................. 32

N.J.S.A. 40:55D-66.2 ............................................................................................ 40

Englewood City Code § 307-3 ....................................................................*passim*

Englewood City Code § 307-4 ................................................................................ 7

**INTRODUCTION**

In late 2013, the City of Englewood was faced with a problem. A new and readily identifiable group of anti-abortion protestors had begun appearing on the public sidewalks and streets outside of a local abortion clinic. This new group threatened the peaceful coexistence between clinic supporters and opponents that had prevailed at the site at least since the issuance of an injunction by this Court in the late 1990s following a series of sit-ins and blockades of the clinic. The tactics of the new group—described variously as "harassing," "confrontational," "threatening," and "potentially violent"—contrasted markedly with the approach of long-time sidewalk counselors like Plaintiff, Jeryl Turco, who, by all accounts, sought merely to speak with clinic patients in a calm, quiet, personal manner and give them pamphlets about alternatives to abortion.

Both clinic supporters and opponents, including Plaintiff, agreed that the new group posed a problem that needed to be addressed.  But instead of addressing the problem by enforcing existing laws, enacting new laws modeled on the federal Freedom of Access to Clinic Entrances Act ("FACE"), or, best of all, pursuing injunctive relief targeting the specific individuals and groups that were causing the problem—an approach that the City knew from recent experience actually worked— Englewood chose an "easier" solution. It enacted a "buffer zone law" that carved up the traditional public forum at 40 Engle Street into a series of six "no-speech"

1

rectangles and arcs that force people like Jeryl Turco to navigate an obstacle course to engage in what the Supreme Court has held are "classic forms of speech that lie at the heart of the First Amendment." *McCullen v. Coakley*, 573 U.S. 464, 489 (2014).

The two-day trial of this case showed that, if anything, Plaintiff's case is stronger now than it was the first time this Court addressed it in 2017. That Englewood's defense was and is taken from the same discredited playbook that Massachusetts used in *McCullen* was made clearer than ever. The trial demonstrated that Englewood had a problem; that the cause of the problem was readily identifiable. It was not Jeryl Turco. The more the City's witnesses poured on the testimony about the obstructive and violent tactics of the Bread of Life group—a group that one witness claimed had ties to "domestic terrorists"—the more misguided appeared Englewood's feeble attempts to deal with that problem. Governments don't deal with domestic terrorism through parking tickets or painted lines on sidewalks. Instead, they use monitoring, surveillance, and prosecutions of bad actors, and when dealing with ongoing, recurring activity, targeted injunctions. Englewood forsook all these readily available tools and chose instead to enact a law virtually identical to one struck down by a unanimous Supreme Court just a few months later.

Jeryl Turco's testimony that her ability to sidewalk counsel in front of 40

Engle Street is reduced by 50% due to the buffer zone/obstacle course was unrefuted.

Englewood's attempts to downplay or minimize the burden come up against the clear

teaching of the Supreme Court that "there is no 'de minimis' exception for a speech

restriction that lacks narrow tailoring." *Lorillard Tobacco Co. v. Reilly,* 533 U.S.

525, 567 (2001). While the activities of the Bread of Life group—the actual source

of the problem—continue relatively unabated, the burden on Turco's speech is

undeniably real and substantial.

## PROPOSED FINDINGS OF FACT

**1.** The Ordinance, which creates buffer zones at all Englewood health care and

transitional facilities, was adopted in response to the activities of certain readily

identifiable individuals associated with the Bread of Life group who had begun

protesting in late 2013 in the vicinity of the Metropolitan Medical Associates

(MMA), a clinic where abortions are performed, located at 40 Engle Street. [J-4, at

##1-5.]

**2.** Regarding the MMA location, the Ordinance excludes Plaintiff and others

similarly situated from approximately twenty-four feet on either end of the clinic, or

forty-eight feet in total of the public sidewalk outside the clinic by virtue of two

different sets of three overlapping arcs and rectangles painted on the public sidewalk.

Hence, the MMA location has six separate (while overlapping) "eight-foot buffer

zones," not one. [*Turco v. City of Englewood*, 935 F.3d 155, 159 (3d Cir. 2019);

3

*Turco v. City of Englewood*, No. 2:15-cv-03008, 2017 U.S. Dist. LEXIS 189042, at
*3–4 (D.N.J. Nov. 14, 2017); Ex. J-1.]

**3.**   Despite the absence of evidence of problems at any location other than 40
Engle Street [Dacey, T1 at 186:18–21], the Ordinance also sets up buffer zones at
every other health care and transitional facility in Englewood. Shortly after its
adoption, the city began marking out buffer zones at these facilities, including six
referred to in an email from the police chief to city administrator, Timothy Dacey.
[J-4 at p. 3, #8; Dacey, T1 at 186:13 to 187:1.]

**A.   Jeryl Turco's Sidewalk Counseling**

**4.**   Plaintiff, Jeryl Turco, is an individual who has engaged in sidewalk
counseling since 2007 outside MMA. [Turco, T1 at 9:17 to 10:2.]

**5.**   Turco is a retired nursing home administrator who, since retiring in 2014,
devotes most of her time to her work with the Dolores Turco Foundation, a charitable
foundation whose mission is to serve abused and neglected children. The Foundation
also assists homeless and mentally ill women in India, medical missions in Nigeria,
and an anti-poverty initiative in Newark. [Turco, T1 at 8:16 to 9:16.]

**6.**   Motivated by her religious belief that "all human beings are created in the
image and likeness of God and worthy of great reverence," Turco sidewalk counsels
outside MMA to "defend the defenseless" and "mostly offer the women support and
help." [Turco, T1 at 10:14–21.]

7.      Although Turco counseled outside MMA virtually every Saturday morning beginning in 2007, since the onset of the Covid pandemic and her own subsequent move to Monmouth County, she intends to come to the MMA site around once a month. [J-4 at ##17–18.]

8.      When sidewalk counseling, Turco's practice is to calmly approach women entering the clinic and attempt to engage in peaceful, nonconfrontational communications. [J-4 at #15.]

9.      MMA clinic escort group co-founder, Ashley Gray, described Turco as "a quiet, respectful person in contrast to . . . the Bread of Life" people. [Gray, T2 at 255:6–9.]

10.     Gray described her relationship with Turco as "cordial, friendly for the most part." [Gray, T2 at 232:15–17.] Gray further testified she "has referred patients to Jeryl," including an incident in which a patient was unsure about whether she wanted to have an abortion. Gray says she "essentially delivered the patient to Jeryl Turco." [Gray, T2 at 233:16 to 234:1.]

11.     While clinic escort Christina Taylor's characterization of Turco was less positive than Gray's, Taylor's bias was evident, especially in her published writings in which she wrote that she would "rather have the screamers" than Jeryl Turco ("the screamers" being a reference to the people she describes "as saying horrible things to black people and to gay people, to Jewish people"). [Taylor, T2 at 305:4-7.]

5

Moreover, Taylor was forced to acknowledge that, when deposed in April 2021, she testified that Turco "uses a very soft voice and very nonimposing demeanor to engage with patients," [Taylor, T2 at 303:14 to 304:19], and that her issue with Turco is neither her conduct nor her manner of speaking, but rather "the content of her words." [Taylor, T2 at 304:21 to 305:3.]

**B.**    **Impact of Buffer Zones on Turco's Ability to Sidewalk Counsel**

**12.**    Prior to the enactment of the Ordinance, Turco was free to approach women on the public sidewalk in front of MMA and accompany them all the way to the clinic door without being hindered by the three no-speech buffer zones in front of the clinic entrance—the "doorway area"—or the three similar zones at the other end of the building—the "driveway area."  [Turco, T1 at 13:22 to 15:23.]

**13.**    If, for example, Turco was standing to the left of the clinic doorway area and saw a potential client approaching from beyond the driveway, she was free to walk down the sidewalk in a straight line, try to engage in conversation, and quietly converse with and hand literature to the client all the way to the clinic door. [*Id.*]

**14.**    Once Turco read and understood the terms of the Ordinance, she was forced to change her approach since, by its terms, she could not "enter or remain" within any of the areas demarcated by the buffer zone lines without risking a fine of up to $1,000, up to 90 days in jail, or both, plus a minimum mandatory fine of $1,000.

[Turco, T1 at 21:12 to 23:2.][1]

15.     Turco's understanding of the restrictions imposed by the Ordinance is consistent with the plain language of its text as well as the understanding of Lynn Algrant, Englewood's City Council President, at the time the Ordinance was adopted. [Algrant, T1 at 158:12–19; 129:22 to 133:15.]

16.     Because Turco is not permitted to enter or remain within the buffer zones, she must navigate what she describes as an "obstacle course" to be able to reach and communicate with many patients of MMA. [Turco, T1 at 26:14 to 27:15.]

17.     For example, now if Turco is standing to the left of the doorway area and sees a patient approaching from beyond the driveway, Turco must first walk around the radius arc to the left, then sidestep to the street to avoid the rectangular zone, then hurry to the next rectangular zone by the driveway, sidestep that zone by going into the street, before she can try to engage the patient. While conversing, or trying to converse with that patient, Turco—on the way back toward the clinic door—must now sidestep to avoid the driveway radius arcs and rectangular area, try to then reconnect with the patient (who likely has continued walking in a straight line), and if successful, must then stop abruptly at either the radius arc to the right of the door, or the doorway rectangular zone. [Turco, T1 at 24:25 to 25:14; Ex. J-1.]

---

[1] Englewood City Code § 307-4 specifies the penalties for a violation of the Ordinance. Available at https://ecode360.com/13859122?highlight=&searchId= 7349748274429223#13859122.

**18.**    As to literature distribution, for example, should Turco be positioned at the edge of the left doorway area buffer zone's radius arc, it is physically impossible for her to reach across the approximately 24 feet of space between her and a patient approaching the edge of the right radius arc to hand her a pamphlet. [Turco, T1 at 33:12–16.]

**19.**    Turco testified that the obstacle course created by the Ordinance has resulted in "obstruction" and "difficulty" in her ability to sidewalk counsel and distribute pamphlets **"at least 50 percent of the time."** [Turco, T1 at 28:7–11.]

**20.**    The difficulty involved with navigating the buffer zones, and being forced to go out into the street, is compounded by the presence of cars, delivery trucks, and, depending on the weather, snow. [Turco, T1 at 63:22 to 64:4.]

**21.**    Regarding media reports written immediately after the buffer zones went into place at MMA, Turco nowhere expresses support for the Ordinance. [Turco, T1 at 20:9–17; 55:3–10.]

**22.**    Turco testified that she did not fully understand the parameters of the Ordinance until sometime after she had read it and consulted with counsel. [Turco, T1 at 20:18 to 21:18.]

**23.**    After this Court invalidated the Ordinance in 2017, Turco's ability to sidewalk counsel in the way she had done before the buffer zones appeared was restored:

> I was able to walk down the sidewalk, I did not have an obstacle course,
> I can go right to the door and talk to the girls as they were going in. And

I can go either way – instead of – it takes me less time to go straight down the sidewalk if I am on one side of the door and someone is coming from the other.

With the buffer zone, I'd have to go into the street and back and then into the street. So now [referring to the time during which the Ordinance was invalidated] I can go straight down the sidewalk which is less time, because time is critical. We have very little time to communicate. And I have more time to be able to – those extra precious 10 or 15 or 20 seconds to be able to talk with the girls. [Turco, T1 at 28:12 to 29:5.]

24.     Once the Ordinance was reinstated by the Third Circuit in 2019, however, the obstacle course that previously made Turco's speech efforts more difficult by "at least 50 percent," was back. [Turco, T1 at 28:7–11; T1 at 29:6–13.]

25.     In fact, upon reinstatement of the buffer zones, the obstacle course was "even worse" than before because of the proliferation on the sidewalk in front of 40 Engle St. of various objects such as planters, a decorative rock structure, tables, chairs, and a valet station. [Turco, T1 at 29:14 to 33:17; 35:23 to 38:15.]

26.     These objects, which Turco testified were present as recently as February 12, 2022, add to the difficulty of trying to communicate with patients, both verbally and by offering literature. She estimates that these objects—the property of the restaurant next to MMA, but present with City approval—take up "probably half the sidewalk you could use." [Turco, T1 at 39:17–24.]

27.     Even one of Englewood's witnesses, Andrea Long, admitted testifying under oath in April 2021 that the restaurant's objects occupied "maybe half" of the available sidewalk in front of MMA. [Long, T2 at 342:1–8.]

**28.**     Rosemary Garrett's testimony regarding the effect of the Ordinance on her sidewalk counseling is of little value since, as Ms. Garrett testified, she typically stationed herself a considerable distance away from the MMA clinic, "down on the corner, far away from the building, abortion clinic." [J-2, Garrett, at 31:19 to 32:2.]

## C.     The Arrival of the "Problem Group" in Late 2013

**29.**     The MMA clinic had been the focus of anti-abortion protests since it first opened. In 1974, an injunction was issued by the Superior Court of New Jersey restricting the location of protests. *U.S. v. Gregg,* 32 F. Supp. 2d 151, 153 (D.N.J. 1998), *aff'd* 226 F. 3d (3d Cir. 2000), *cert. den.* 532 U.S. 1071 (2001).

**30.**     Thereafter, Englewood enacted a 1990 Ordinance, entitled "Obstruction of Health Care Facilities and Transitional Facilities," which prohibited blocking doors or driveways of health care or transitional facilities, as well as making it unlawful to "interfere with, obstruct, impede, block or prevent" any person seeking access to such facilities. [J-4 at # 41.]

**31.**     Following a series of blockades of the clinic's entrance in 1996–97, the court in *Gregg,* pursuant to 18 U.S.C. § 248 of the Freedom of Access to Clinic Entrances Act ("FACE"), issued a permanent injunction against 30 individuals and all those "acting in concert" with them, prohibiting them from physically "blocking, impeding, inhibiting, interfering with, or obstructing access to" MMA, and from "intimidating or attempting to intimidate anyone seeking access" to MMA. *Gregg,*

10

32 F. Supp. 2d. at 161–162.

**32.**     The *U.S. v. Gregg* injunction has never been modified or vacated.  [*See* docket, *U.S. v. Gregg*, 2:97-cv-02020-JCL (D.N.J.).]

**33.**     The activities of the Bread of Life group were first brought to the attention of the city council at its meeting on October 8, 2013. Dr. Bruce Tisch, a physician at MMA, identified himself and read a prepared statement to the Council regarding "escalating incidents" at 40 Engle Street. The letter was signed by Tisch and other physicians on behalf of "a large group consisting of business owners, employees and permanent residents of the city of Englewood."  [J-4 at p. 1, # 6; Ex. Pl. N.]

**34.**     The October 8, 2013, letter also informed the city that the new group was using sound amplification devices, verbal abuse, and threatening actions to impede access to the clinic. The group was also intimidating and harassing "uninvolved citizens . . . on their way to their local synagogue" and was causing fear among children at the public library, across the street from MMA. [Ex. Pl. N.]

**35.**     According to Defendant's Chief of Police, Arthur O'Keefe, these activities included such things as "physically confronting, screaming at, and intimidating young, vulnerable females . . ." According to O'Keefe, there were confrontations with others as well, including employees from neighboring businesses, and he feared "more people would start to get hurt." [J-3, O'Keefe at 21:12 to 22:2.]

**36.**     These activities were markedly different from what O'Keefe says had been

typical of pro-life actions at the clinic—praying, quiet communication and literature distribution—following what he described as "the demonstration in 1989, following the injunction put in place . . ." [J-3, O'Keefe, at 10:20 to 11:6.]

37.     Responding to news reports about the Bread of Life group's aggressive tactics, Ashley Gray, co-founded a volunteer clinic escort team to help women access the MMA clinic. [Gray, T2 at 224:15 to 225:20.]

38.     Beginning in December of 2013, Gray, either as head of the "MMA escort team" or on her own behalf, sent weekly "escort reports" to, among others, Council President, Lynn Algrant, about the activities of the Bread of Life group, which Gray dubbed "our problem group." [Gray, T2 at 235:15–20; Pl. Ex. CC.]

39.     These reports contained detailed descriptions of, among other things, the following conduct: "Blocking access to the clinic door"; "Blocking patients and escorts on the sidewalk"; "Shouting into the clinic when the door is opened"; and "Creating tripping hazards" [Pl. Ex. X], as well as, "Repeated physical assault of escorts"; "Screaming directly into [patients'] faces"; and "Videotaping [patients]," making them "hysterical." [Pl. Ex. BB.]

40.     In addition to written reports, Gray was also sending to Algrant photo and video evidence of the "physical intimidation and interference," "tremendous chaos," and "repeated physical assaults" being committed by the "problem group." [Algrant, T1 at 138:20 to 140:8.]

**41.**     Algrant herself had witnessed and been the target of some of the Bread of Life

group's harassing behavior on at least one occasion, much of it taking place at a

distance of at least 100 feet from the clinic entrance. [Algrant, T1 at 141:4–10.]

**42.**     The MMA clinic itself maintained security cameras that monitored and

recorded at least some of the activity taking place on the sidewalk in front of 40

Engle Street. [Gray, T2 at 256:17–22.] The city manager, Tim Dacey, was aware of

this as well as the existence of the escorts' video evidence of "offensive, outrageous

and, in some cases, unlawful" activity of the Bread of Life group. [Dacey, T1 at

187:9–18.]

**43.**     The Bread of Life group itself was recording its activities and posting videos

of those activities on YouTube. [Algrant, T1 at 96:24 to 97:11; Gray, T2 at 258:19

to 259:3.]

**44.**     Not all the offensive and illegal behavior was taking place in the area that was

later covered by the buffer zones. Some of it was even occurring across the street

from 40 Engle Street. [Algrant, T1 at 140:1 to 141:10; Gray, T2 at 264:14–21.]

**45.**     Using basic internet research tools (Google), Ashley Gray was able to learn

the names of six of the members of the Bread of Life group, as well as the location

of their church, which she forwarded to Algrant. [Gray, T2 at 266:8–14.]

**46.**     Gray also monitored the group's YouTube account and Facebook pages

"where they blatantly advertise their aggressive tactics." She informed Algrant of

this in December 2013, offered to share with her photos and videos of the group's activities. [Gray, T2 at 266:24 to 267:13; Pl. Ex. DD.]

47.     Algrant acknowledged that she did in fact receive from Gray photos and videos of the conduct Gray and the escorts were complaining about. [Algrant, T1 at 139:5–20.]

48.     Gray also was able to learn and share with city officials information showing that the Bread of Life group was "associated with lots of other dangerous antiabortion actors around the country," specifically "really notoriously known domestic terrorist groups like Operation Rescue." [Gray, T2 at 243:14–25.]

D.     **Englewood's Response to the "Problem Group"**

49.     In response to these well-documented instances (including photo/video evidence) of "repeated physical assaults," "physical intimidation and interference," "screaming," "obstruction and blocking" occurring both in front of 40 Engle Street and even across the street, the City undertook no prosecutions or citations of anyone under existing ordinances, statutes, regulations, or any other legal enactments. [J-4 at # 60; Algrant, T1 at 149:1–15.]

50.     The City undertook no civil actions for injunctive or other relief against the Bread of Life group and/or its individual members despite being aware of their names, the identity of their organization, their association with "notoriously known domestic terrorist groups like Operation Rescue," and despite having video and

14

photographic evidence of their actions. [Algrant, T1 at 149:1–15; Pl. Ex. 3, Def. Answers to Interrogatories ("DATI") at pp. 18–9.]

51.     The City presented no evidence that it considered or researched whether any Bread of Life members might be covered as "individuals acting in concert with" those named in the injunction issued by Judge Lifland in 1998 in *U.S. v. Gregg.*

52.     The City presented no evidence that it seriously considered seeking injunctive relief on its own under FACE or any other federal or state cause of action. The City's Answers to Interrogatories, answered in 2016, contain no reference to even the possibility of seeking injunctive relief. [Ex. Pl. 3, ATI at pp. 14–16.]

53.     While former city manager Dacey did refer at trial to talking to MMA personnel about MMA seeking its own private injunction, no such discussion is suggested in the interrogatories answered six years ago. [Dacey, T1 at 175:1–4.] Nor did Dacey nor any other defense witness express any awareness, let alone consideration given, to either enforcing the existing, public, *Gregg* injunction, or having the City seek its own new injunction. [Dacey, T1 at 188:5–9.]

54.     The City presented no evidence that it considered contacting the U.S. Attorney's Office for the District of New Jersey, even though it was aware that the same U.S. Attorney's Office had successfully litigated and obtained injunctive relief under FACE some fifteen years previously against aggressive anti-abortion protestors at the MMA clinic, and despite Chief O'Keefe's testimony that said

15

injunction had resolved the problems associated with such protestors until the advent of the Bread of Life group. [Pl. Ex. 3, DATI, at pp. 14–16; J-3, O'Keefe, 10:20 to 11:22.]

55.     The City presented no evidence that it ever considered enacting its own local version of the federal FACE statute. [Pl. Ex. 3, DATI, at pp. 14–16.]

56.     On the contrary, and inexplicably, the city *repealed*—as part of the enactment of the Ordinance —the part of a previous ordinance that was, in many respects, the equivalent of a local FACE ordinance. [Pl. Ex. B; Algrant T1 at 146:16 to 147:2.]

E.     **Testimony Regarding Cost Irrelevant Due to City Policy**

57.     In 2016, when answering interrogatories that asked the City to "describe every measure or action of any kind that you considered or undertook prior to enacting the Ordinance, Dacey, on behalf of the City, listed the following: 1) more frequent police patrols; 2) enforcing parking regulations at the library across the street; 3) police making it clear to protestors that they couldn't block the door; 4) police driving by the site more frequently and stopping to get out and talk to people; 5) police trying to take information from people who complained; 5) stopping the Bread of Life Group with noise violations. [Pl. Ex. 3, DATI, at pp. 14–16; J-4 at ## 53–59.]

58.     Although the City claims that increasing police patrols at 40 Engle Street, or stationing an officer at the site when the Bread of Life group was present, would have been cost-prohibitive, its attempt to rely on this is undermined by Dacey's

testimony that—as a matter of policy, *not cost*—the City would never station a police officer at MMA because he believed that doing so contravened the City's policy against having "taxpayers or police officers to protect a private business." [Dacey, T1 at 183:14 to 185:21.]

59.     Dacey admitted at trial that he had previously testified that, from the time the issue first arose up to the date of his 2017 deposition, he never did a dollars and cents calculation of what it would have cost to station an officer at MMA every other Saturday morning *because of the City's policy*. [*Id*.]

60.     Despite Dacey's trial testimony in which, for the first time in this litigation, he provided an actual dollar figure for a police officer's time—"about $100 an hour"—he provided no budget figures or other data upon which to assess whether or not spending about $400 every other week to control the violent and obstructive acts of "domestic terrorists" on Englewood's public sidewalks should, reasonably, be considered "cost-prohibitive." [Dacey, T1 at 169:12 to 170:9.]

F.     **Evidence Refuted City's "Nobody Would File Complaints" Argument**

61.     The trial record contains evidence that, in fact, prior to the enactment of the Ordinance, at least four individuals filed complaints with the police about the actions of the Bread of Life group: (1) Pl. Ex. BB (2/24/2014 email): "This resulted in one escort calling the police and signing a formal complaint"; (2) Pl. Ex. CC (12/22/2013 email): "Two women from NJNOW . . . stopped by and filed a complaint with the

police about what they saw the protestors doing . . .”; and (3) An escort in “early February” filed a complaint using the clinic address after being informed by Algrant that it was permissible to do so. [Algrant, T1 at 109:5 to 110:19.]

62.     Since the enactment of the Ordinance, clinic escorts Christine Taylor and Andrea Long have filed numerous complaints against protestors, including members of the Bread of Life group. [Taylor, T2 at 292:17 to 293:6 (three complaints filed); Long, T2 at 325:3–12 (called police 20 times and filed five complaints).]

63.     Despite trial testimony about victims’ fear of complaining about the Bread of Life group out of concern for retaliation, the record contains abundant evidence that clinic escorts and others—including the physicians actually performing abortions at MMA—were *not* reluctant to identify themselves publicly using their real names and, in some cases, places of employment. Ashley Gray, for example, admitted having a Facebook page, using her likeness, and giving her place of employment, and detailing her work as a volunteer clinic escort at MMA. [Gray, T2 at 260:11 to 261:1.]

64.     Some other clinic escorts also had internet postings displaying their names and activities at MMA. [Gray, T2 at 261:2–9.]

65.     Both Christine Taylor and Andrea Long have published writings identifying themselves and talking about their activities outside MMA. [Taylor, T2 at 297:4 to 301:10; Long, T2 at 332:7 to 333:11.]

66.     Eight doctors affiliated with MMA submitted a letter which was entered into the minutes of the Englewood City Council in October 2013, giving their names and address of employment, complaining about the Bread of Life group [Pl. Ex. N]; and three MMA physicians submitted separate signed statements to the council on November 12, 2013, complaining of the group's activities. [J-4 at p. 2, # 7.]

**G.     The Chronology of Englewood's Enactment of the Ordinance**

67.     On October 8, 2013, the issue of the Bread of Life group's activities at MMA was first brought to the Englewood Council's attention. [J-4 at p. 1, # 6.]

68.     On November 12, 2013, Chief O'Keefe addressed the City Council on the matter for the first time on November 12, 2013, opining that current city ordinances needed revision. [J-4 at p. 2, # 8.] O'Keefe believes that he was the one who "came up with the idea of a buffer zone." [Ex. J-3, O'Keefe, at 25:18–12.]

69.     In December 2013, Council President Algrant received from an attorney with the City of New York a copy of the First Circuit's decision in *McCullen v. Coakley* affirming the validity of Massachusetts' buffer zone law. [J-4 at p. 2, # 9.] Algrant replied, "that is a great idea." [Algrant, T1 at 144:1–3; Pl. Ex. P.]

70.     On January 31, 2014, Algrant wrote to the MMA clinic escort team informing them that Englewood would be adopting a buffer zone ordinance. [Algrant, T1 at 144:8–19; Pl. Ex. Q.]

71.     The City produced no evidence that *any* ordinance or regulation—other than

the buffer zone ordinance—was considered for adoption from the time the issue was first brought to its attention in October 2013, up to the adoption of the challenged Ordinance in March 2014.

**72.**    Lynn Algrant admitted that the City did not want to limit the Ordinance to addressing problems at MMA, testifying that it would "seem[] very narrowly focused," if the Ordinance "singl[ed] out an abortion clinic and the protestors that it would attract."  [Algrant, T1 at 124:1-7.]

**73.**    Dacey, who could "not recall" reports of any problems at any other facility other than 40 Engle Street [Dacey, T1 at 186:18–21], testified that the Ordinance was intended to reach all health care and transitional facilities because "protests can pop up any day for any reason anywhere." [Dacey, T1 at 179:5-6.]

**H.    Evidence Refutes Contention that the Ordinance Solved "The Problem"**

**74.**    To the extent it is relevant, trial evidence showed that the adoption of the buffer zone ordinance did not curtail some of the more extreme actions of the Bread of Life group. For example: (1) in both August and October 2014, months after the Ordinance had been in effect, Algrant was receiving reports of Bread of Life's "aggressive" actions becoming "louder and more numerous than in a long time," and "this most intimidating group seems to be growing" [Algrant, T1 at 144:20 to 145:16]; (2) In January 2016, Rosemary Garrett testified that the existence of the buffer zones had not in any way lessened the obnoxious behavior of the Bread of

Life group [J-2, Garrett, at 38:17 to 39:9]; and (3) Andrea Long testified that, since

the buffer zones were reinstated in 2019, the Bread of Life people continue to stand

within an area no more than eight feet from the clinic doors and, using a microphone,

are still screaming intimidating and threatening things at patients. [Long, T2 at

339:12–19.]

## PROPOSED CONCLUSIONS OF LAW

**1.**      This Court previously granted Turco summary judgment as to all her legal

claims against the City. (Doc. 50.) The Third Circuit reversed, holding that disputes

of material fact precluded summary judgment as to (1) whether the buffer zones

created outside 40 Engle Street significantly burdened Turco's speech activities and

(2) whether the City pursued less restrictive alternatives. *Turco v. City of Englewood*,

935 F.3d 155, 170 (3d Cir. 2019). The Third Circuit also held that Turco's

overbreadth claim could not be properly evaluated without first resolving the merits

of Plaintiff's free speech claim. *Id*. at 172 (quoting *Bruni v. City of Pittsburgh*, 824

F.3d 353, 374 (3d Cir. 2016) (*Bruni I*)).

**2.**      Pursuant to the Third Circuit's remand of the case, a bench trial to resolve

these issues was held on February 23 and 24, 2022. In light of the testimony and

exhibits propounded at that trial, the Court now has ample evidence to support what

it previously held on November 17, 2017: the Ordinance, on its face, and as applied,

violates the First Amendment to the U.S. Constitution and N.J. Const. art. I, para. 6

of the New Jersey Constitution.

## A.   <u>Meaning and Application of the Ordinance</u>

**3.**     Federal courts should "not rewrite a . . . law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain, and sharply diminish [the government's] incentive to draft a narrowly tailored law in the first place." *United States v. Stevens*, 559 U.S. 460, 481 (2010) (cleaned up).

**4.**     In its Trial Brief, the City, invoking Sec. B(4) of the Ordinance (exempting "persons using the public sidewalk or street right of way adjacent to such facility solely for the purpose of reaching a destination other than such facility") [Pl. Ex. A], states that, "Turco can walk through the buffer zone as long as she does not stop in the buffer zone or attempt to talk to patients while she is in the buffer zone." [Doc. 85 at 30.] Lynn Algrant, present at trial as the representative of the City, offered no testimony in support of that assertion. On the contrary, and in line with the plain text of the Ordinance, Algrant testified that a non-exempt person cannot walk through the buffer zones but must go out into the street. [Algrant, T1 at 158:12–19; 129:22 to 133:15.][2]

_____

[2] In its August 28, 2015, letter to the Court, counsel for the City represented that while Plaintiff and similarly situated persons could "quietly traverse (but not loiter in) the driveway buffer zone for the sole purpose of reaching the area adjacent to the buffer zone north of the entrance to the clinic," they could not "traverse the buffer zone in front of the clinic entrance." [Doc. 18 at 1.] Counsel's stipulation that Turco

**5.**     Algrant further testified, however, that if one's destination is not the interior of the facility, then that person is exempt. [Algrant, T1 at 159:3–16.]

**6.**     The City cannot have it both ways. Either Turco is exempt from the Ordinance, in which case she is free to engage in sidewalk counseling even within the buffer zones, or she is not exempt, in which case she cannot enter the zones or remain within them while trying to counsel women on the public sidewalk outside MMA.

**7.**     This Court must therefore decline to adopt the narrowing construction proposed by the City in its Trial Brief that Turco can walk through the buffer zones so long as she does so silently. [Doc. 85 at 30.]

**8.**     Such a construction would not narrow the scope of the Ordinance, but *broaden* it, imposing a restriction on speech nowhere set forth in the text of the Ordinance. *See McCullen v. Coakley*, 573 U.S. 464, 512 n.3 (2014). Persons falling within one of the three other exemptions (those entering/leaving the facility, first responders, and agents of the facility) are not required to remain silent while in a buffer zone, and this Court has no authority to rewrite the Ordinance to impose a speech restriction on those who fall within the fourth exemption, whether that includes one

_____

may "traverse (but not loiter in) the driveway buffer zone," of course, assumes that without this stipulation—offered merely as an accommodation—the Ordinance does not in fact permit such traversing. Nonetheless, counsel was clear that Turco could not cross the buffer zones in front of MMA's entrance.

person (Turco), a class of persons (sidewalk counselors), or all persons who cross through a buffer zone seeking to reach a destination other than the facility covered by such a zone. For these reasons, the Ordinance is far from susceptible to the narrowing construction the City proposes; nor does it demand that construction on its face. *See Bruni v. City of Pittsburgh*, 941 F.3d 73, 87–88 (3d Cir. 2019) (*Bruni II*). What the City "desires requires rewriting, not just reinterpretation," *Stevens*, 559 U.S. at 481, and construing the Ordinance in a manner proposed by the City would not avoid constitutional problems, it would compound them.[3]

### B.    Applicable Constitutional Standard

9.     The Third Circuit has set forth the applicable standard to adjudge Plaintiff's First Amendment free speech claim: intermediate scrutiny. *Turco*, 935 F.3d at 162. The decisive question under that standard is whether the City can prove that the Ordinance is "narrowly tailored to serve a significant governmental interest." *Bruni I*, 824 F.3d at 365 (quoting *McCullen*, 134 S. Ct. at 2534). Such narrow tailoring requires that the government not "burden substantially more speech than necessary to achieve the [government's] asserted interests." *McCullen*, 573 U.S. at 486 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

10.     The City bears the burden of proving that the Ordinance passes constitutional

---

[3] The query in Plaintiff's Trial Brief was just that, a question. (Doc. 84 at 2, n.2.) Plaintiff flagged that issue as only one *potential* way of resolving this case as suggested by *Bruni II,* in case the Court wished supplemental briefing on that issue.

muster. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) (citations omitted).

**11.**     Where the speech restriction impacts core protected speech, as here, the narrow tailoring requirement is "rigorous and fact-intensive." *Bruni I*, 824 F.3d at 372. To meet that requirement, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495. "[T]he City cannot burden [speech] without first trying, or at least demonstrating that it has seriously considered, substantially less restrictive alternatives that would achieve the City's legitimate, substantial, and content-neutral interests." *Bruni I*, 824 F.3d at 357.

**12.**     In sum, the First Amendment "prohibits the government from regulating speech in a way that would allow a substantial burden on speech to fall in an area that 'does not serve to advance its goals.'" *Turco*, 935 F.3d at 162 (citation omitted).

**C.     The Buffer Zones Substantially Burden Turco's Free Speech Activities**

**13.**     The Third Circuit, relying on *McCullen*, has spoken clearly as to what constitutes a burden in the free speech context: "while the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms— such as **normal conversation** and **leafletting on a public sidewalk**—have

historically been more closely associated with the transmission of ideas than others." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 366–67 (3d Cir. 2016) (*Bruni I*) (quoting *McCullen v. Coakley*, 134 S. Ct. 2518, 2536 (2014)) (emphasis added). *McCullen* continues: "[w]hen the government makes it **more difficult** to engage in these modes of communication, it imposes an **especially significant First Amendment burden**." *Bruni I*, 824 F.3d at 367 (quoting *McCullen*, 134 S. Ct. at 2536) (emphasis added). *See also Turco*, 935 F.3d at 172 (same).

14.    According to the Third Circuit, measuring a burden on speech requires a consideration of the scope and size of the speech restriction. *Bruni II*, 941 F.3d at 95. As to *scope*, i.e., "the type of speech" the Ordinance prohibits, *id*., the Ordinance does not just ban conduct such as patrolling, demonstrating, and picketing within the zones it creates, as did Pittsburgh's ordinance in *Bruni II*. It also bans the two speech activities involved with "sidewalk counseling," i.e., "one-on-one normal conversation and leafletting," that *McCullen* and the Third Circuit have held are "entitled to the maximum protection afforded by the First Amendment." *Id*. at 85 (cleaned up).

15.    Indeed, unlike the Bread of Life group, whose activities gave rise to the Ordinance, sidewalk counselors, such as Turco, "are not protestors." *McCullen v. Coakley*, 573 U.S. 464, 489 (2014). As described by the Court in *McCullen*, *id*., sidewalk counselors

believe that they can accomplish [their] objective only through personal, caring, consensual conversations. And for good reason: It is easier to ignore a strained voice or a waving hand than a direct greeting or an outstretched arm.

16.    Like the sidewalk counselors in *McCullen*, Turco believes that the most effective way to interact with women approaching an abortion clinic is "to maintain a caring demeanor, a calm tone of voice, and direct eye contact." *Id*. at 473. Sidewalk counselors, like Turco, believe that "confrontational methods such as shouting or brandishing signs . . . tend only to antagonize their intended audience." *Id*.

17.    The *Bruni II* court held that Pittsburgh's buffer zone ordinance was narrower in scope than the Massachusetts law unanimously struck down in *McCullen* because it limited only activities the court construed as *not* including sidewalk counseling. *Bruni II*, 941 F.3d at 90. In other words, the Pittsburgh ordinance, unlike Englewood's, did not "sweep in the 'one-on-one communication,' including 'normal conversation and leafletting,' that *McCullen* emphasized 'have historically been more closely associated with the transmission of ideas.'" *Id.* (quoting *McCullen*, 573 U.S. at 488). In fact, *Bruni II* specifically noted that if Pittsburgh wanted to amend its ordinance to restrict "one-on-one conversations," it would have to satisfy the narrow tailoring demands as articulated in "*McCullen* and *Bruni I*." *Bruni II*, 941 F.3d at 95 n.22. (Those demands are discussed *infra* at Sec. D.)

18.    With respect to the *size* of the zones, and as discussed *supra*, the Ordinance creates "three overlapping buffer zones at any qualifying facility," *Turco*, 935 F.3d

at 159, and in the case of 40 Engle Street, **six** overlapping zones because of MMA's entrance and driveway. Those six zones carve out forty-eight feet of the public sidewalk—a traditional public forum—where Turco is forbidden to engage in close, interpersonal conversations and hand out literature.

19.    At trial, Turco described in detail how the "obstacle course" created by the six buffer zones makes it more difficult for her to engage in sidewalk counseling. [*See* Pl. Proposed Findings of Fact, *supra*, at ## 14–30.]

20.    The net impact of the Ordinance on Turco's speech at 40 Engle Street is that her counseling efforts have been considerably hampered, and her ability to engage in peaceful conversations, and to offer literature to interested individuals passing by on the public sidewalk, has been severely restricted. The Ordinance, and the zones created under it, hinder her ability to initiate the close, personal conversations that she views as essential to sidewalk counseling, and also significantly hampers her ability to offer literature to individuals on the public sidewalk.

21.    While Plaintiff is still able to have some type of communication with some patients with the buffer zones in place, so too were the successful plaintiffs in *McCullen*, 573 U.S. at 474:

> Although they have managed to conduct some counseling and to distribute some literature outside the buffer zones—particularly at the Boston clinic—they say they have had many fewer conversations and distributed many fewer leaflets since the zones went into effect.

22.    The same holds true with respect to Turco. The legal issue is not whether the

28

Ordinance prohibits Turco from speaking with, and handing literature to, **all patients** entering MMA, but whether the buffer zones created by the Ordinance make it "more difficult" for her to engage in these core protected speech activities. *McCullen*, 573 U.S. at 489; *Bruni I*, 824 F.3d at 367. Turco testified that her ability to reach patients, when the zones are in place, is **reduced by 50%**. [Turco, T1 at 28:7–11.] The Ordinance has substantially burdened Turco's speech activities.

23.    A finding that the buffer zones created by the Ordinance substantially burden Turco's speech would only "be directly at odds with the Supreme Court's decision in *Hill v. Colorado*," if the Ordinance operated in the same (or similar) way as did the law in *Hill*. *Turco*, 935 F.3d at 165 (citing 530 U.S. 703 (2000)). It does not.

24.    The numerous *fixed buffer zones* created by the Ordinance, which imposes a flat ban on speech for all non-exempt speakers, is different in kind than the single *floating bubble zone* surrounding a patient in *Hill*, which allowed speakers to approach listeners who consented. Indeed, *Hill* did not involve an eight-foot *buffer* zone at all. *Hill*, rather, involved an eight-foot *bubble* zone—within a 100-foot buffer zone—that prohibited individuals from knowingly approaching another person within eight feet of that person to pass a leaflet, counsel, or hold a sign *unless that person consents*. 530 U.S. at 707–8. The Colorado law created an 8-foot restriction on an unwanted physical approach to a person accessing a health clinic. *Id*. at 707. The Ordinance, however, creates an *absolute ban* on non-exempt speech within the

boundaries of buffer zones. In other words, and unlike the buffer zones created by the Ordinance, Colorado's bubble zone could be "pierced," as it were, when the listener consented, or the speaker stood in one place and was approached by the listener. *Id*. at 708 (noting that the Colorado bubble zone did "not require a standing speaker to move away from anyone passing by").

25.     In contrast to the operation of the law in *Hill*, Turco cannot cross into a buffer zone imposed by the Ordinance to continue speaking one-on-one with a patient, **even if the patient wishes to hear what Turco has to say**. Moreover, though *Hill* suggested that sidewalk counselors "might easily stand on the sidewalk at entrances" to hand out literature, 530 U.S. at 730, Turco is not permitted to do that, as entrances, including the one at MMA, are at the core of the no-speech zones.

26.     Importantly, the distance in *Hill* is always—and never more than—8 feet, and, if consent given, **no feet at all**. Here, the distance is always *at least* 8 feet, and more often than not, 16 feet, or 24 feet, depending on where on the sidewalk Turco and the client happen to be standing in relation to the building. The close and intimate way Turco wishes to speak with MMA clients is captured at Def. Ex. P.

27.     In light of the scope and size of the buffer zones created on the public sidewalk at and around 40 Engle Street, the Ordinance has placed, and continues to place, a substantial burden on Turco's core free speech activities. It has made it "more difficult" for her to engage in two activities that that are afforded maximum

constitutional protection: one-on-one communication and distributing literature. *McCullen*, 573 U.S. at 489; *Bruni I*, 824 F.3d at 367.

**D.     The City Failed to Pursue Less Restrictive Alternatives**

**28.**     Englewood had "the same obligation to use less restrictive alternatives to its buffer zone as the Commonwealth of Massachusetts had with respect to the buffer zone at issue in *McCullen*." *Bruni I*, 824 F.3d at 369. It did not do so.

**29.**     The law challenged in *McCullen*, which the Third Circuit observed is in "nearly all material respects" (except for the size of the zone) identical to the Ordinance, *Turco*, 935 F.3d at 163, failed the Court's narrow tailoring analysis—and unanimously so. The Court held that Massachusetts could have pursued multiple alternatives that would amply serve the government's interests without suppressing leafletting and one-on-one communication in a traditional public forum, including: (1) using an unchallenged subsection of that act which prohibited blocking doors and driveways, without banning speech; (2) enacting a local version of FACE; (3) enacting an ordinance specifically prohibiting harassment, if drafted within First Amendment parameters; (4) using existing ordinances against obstruction of doors and driveways; (5) using "generic criminal statutes"; and (6) seeking injunctive relief as necessary against specific persons with a history of obstructing access. *McCullen*, 573 U.S. at 490–93.

**30.**     Among the numerous alternatives **not** suggested by *McCullen* is a smaller

buffer zone. After *McCullen* was decided, Massachusetts did not amend its law to reduce the size of the zone, but adopted a law modeled on FACE—one of *McCullen*'s very suggestions. *See* Mass. Gen. Laws, ch. 266, § 120E½(d) ("Impeding Access to or Departure from Reproductive Health Care Facility").

**31.**    Except for adopting a law modeled on the very one unanimously held to be unconstitutional in *McCullen*, the City did not avail itself of **any** of *McCullen*'s proposed less restrictive alternatives.

**32.**    Instead of using the part of the former Ordinance that would have addressed blockading, obstructing, and impeding access to health care and transitional facilities, the City—without explanation—**removed** those provisions in amending its Ordinance. [J-4 at # 41; Pl. Ex. B.]

**33.**    The City did not consider enacting a local version of FACE; nor did it consider a buffer zone law like Pittsburgh's, which (as eventually interpreted by the Third Circuit) would have addressed the patrolling, picketing and demonstrating of the Bread of Life group, but allow sidewalk counselors to engage in one-on-one communications. *See Bruni II*.

**34.**    The City did not prosecute lawbreakers for violating laws already on the books, such as those prohibiting harassment, N.J.S.A. § 2C:33-4; disorderly conduct, N.J.S.A. § 2C:33-2; and simple and aggravated assault, N.J.S.A. § 2C:12-1.

**35.**    While the City had ample records, by way of the "escort reports" as well as

actual video and photo evidence, to pursue bad actors for engaging in allegedly illegal conduct, the City did not pursue injunctive relief against any of those persons. *See McCullen*, 573 U.S. at 495 ("if Commonwealth officials can compile an extensive record of obstruction and harassment to support their preferred legislation, we do not see why they cannot do the same to support injunctions and prosecutions against those who might deliberately flout the law"). Such a remedy "focuses on the precise individuals and the precise conduct causing a particular problem." *McCullen*, 573 U.S. at 464.

36.     In fact, no evidence was adduced at trial that the City ever attempted ascertain whether any of the protestors were **already** subject to an injunction issued by this very court in *U.S. v. Gregg,* 32 F. Supp. 2d 151, 161–162 (D.N.J. 1998). [Dacey, T1 at 188:5–9.]

37.     Instead of doing any of these things, the City chose to take the "path of least resistance" by "silencing speech." *McCullen*, 573 U.S. at 486.[4]

38.     With respect to the two issues identified by the Third Circuit as creating a genuine issue of material fact with respect to narrow tailoring ("financial restraints" on the City and victims' "fear of reprisal" for filing complaints, *Turco*, 935 F.3d at 169), trial testimony from the City's witnesses does not support, but in fact

---

[4] *Bruni II*'s application of intermediate scrutiny can only be properly understood in light of the Court's holding that the ordinance did not apply to the activities of sidewalk counselors. 941 F.3d at 88, 91.

undermines, the City's case.

39.    The City cannot be said to have "seriously considered," *Bruni I*, 824 F.3d at 357, ramping up police presence at MMA and quelling the conduct of bad actors, when Dacey who "prepares or is charged with budgets for the City of Englewood," **never** "figure[d] out [in] dollars and cents what it would cost to have a police officer stationed" at 40 Engle Street for "three hours on a Saturday morning." [Dacey, T1 at 184:11–21.]

40.    In fact, the City did not consider such police presence as a matter of policy because Dacey was under the impression that keeping the peace on the public sidewalk at 40 Engle Street was tantamount to providing private security to MMA. [Dacey, T1 at 183:14 to 185:21.] It is not the duty of MMA or any other private entity or person to see that public sidewalks are safe for pedestrians, patients, or even protestors. It is the City's. *See Schneider v. State*, 308 U.S. 147, 160 (1939) ("Municipal authorities . . . have the duty to keep their communities' streets open . . . . [s]o long as legislation to this end does not abridge the constitutional liberty . . .  to impart information through speech or the distribution of literature").

41.    Moreover, even if financial restraints did not allow for Englewood police to patrol 40 Engle Street at one location for a few hours one day of the week (or every other week), that does not explain how the buffer zones, which are in place every moment a facility is open for business, are themselves supposed to be enforced. Just

as laws against harassment, blocking, and assault, do not enforce themselves, neither do buffer zones painted on a sidewalk. If the City's excuse is that buffer zones are easier to enforce, the Supreme Court shut down that very argument in *McCullen*: "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." 573 U.S. at 495. *See also Free Speech Coal., Inc. v. AG United States*, 787 F.3d 142, 156 (3d Cir. 2015) ("ease of enforcement is not the touchstone for narrow tailoring") (citing *McCullen*).

**42.**     If a lack of finances were an excuse to create prophylactic bans on leafletting and one-on-one communications, a municipality's inability to deal with litter involving pamphlets and newspapers would give it the excuse to ban carrying literature in public. *But see Schneider*, 308 U.S. at 162 ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets.")

**43.**     Regarding the fear of reprisal for filing complaints, trial testimony, *see supra*, made it clear that (1) persons did indeed file complaints prior to the enactment of the Ordinance, (2) clinic escorts have filed complaints with the City, including against members of the Bread of Life group, (3) Ashley Gray, Christina Taylor, and Andrea Long, and others,  have been public about their identities and activities at MMA, and (4) it was Ashley Gray's eventual understanding that escorts did not have to provide their home address when filing a complaint.

44. Because the City can pursue bad actors based on complaints (or evidence taken from the MMA security cameras or clinic escorts' videos), that, on its face, is a more narrowly tailored approach to addressing its "problem group." *See Fed. Election Com. v. Mass. Citizens for Life, Inc*., 479 U.S. 238, 265 (1986) ("government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation.").

45. In sum, the City "has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which [Turco] wish[es] to engage." *McCullen*, 573 U.S. at 490.

46. **Even if** *McCullen*'s laundry list of less restrictive alternatives could be deemed ineffective in this case, the City "has another problem." 573 U.S. at 493. The Ordinance applies to *all* health care and transitional facilities in the City, despite problems only arising at one location for a few hours on one day of the week. That flies in the face of *McCullen*, which held that the Massachusetts law failed narrow tailoring, in part, on these very grounds. "For a problem shown to arise only once a week in one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth is **hardly a narrowly tailored solution**." *Id*. (emphasis added). *See also Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015) ("Given the absence of evidence of a county-wide problem, the county-wide sweep of the

Amended Ordinance [banning solicitation within all county roadways] burdens more speech than necessary, just as the statute in *McCullen*—a statewide statute aimed at a problem in one location—burdened more speech than necessary."); *Cutting v. City of Portland*, 802 F.3d 79, 89 (1st Cir. 2015) (citing *McCullen*, 573 U.S. at 493) (holding that a city-wide ban on lingering on median strips was "geographically over-inclusive" because of a lack of evidence of a city-wide problem).

47.    Lynn Algrant admitted that the City did not want to narrowly tailor the Ordinance to address problems at MMA, testifying that it would "seem[] very narrowly focused," if the Ordinance "singl[ed] out an abortion clinic and the protestors that it would attract." [Algrant, T1 at 124:1–7.] In other words, the City specifically considered whether to address problems only at MMA, but rejected doing so because that would have been too narrow a focus. *But see Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy").

48.    The City had ample alternatives to deal with the protests and demonstrations outside MMA without suppressing the sidewalk counseling activities of Jeryl Turco, whose conduct caused no problems for the City. Restricting one-on-one communications and leafletting at numerous locales within the City, in an effort to address the bad conduct of protestors at one location during a short window of time, impermissibly creates a substantial burden on speech that "does not serve to advance

[the City's] goals." *Turco*, 935 F.3d at 162 (quoting *McCullen*, 573 U.S. at 486).

**E.**     **The Ordinance Fails Under the Overbreadth Doctrine**

**49.**     Because *McCullen* held that the law was not narrowly tailored, it did not need

to consider the petitioners' overbreadth challenge. *See Turco*, 935 F.3d at 170 (citing

*McCullen*, 573 U.S. at 496 n.9). Similarly, because this Court can (and should) hold

that the Ordinance fails intermediate scrutiny, it need not reach the overbreadth

issue.

**50.**     Should the Court reach the issue, the Ordinance fails overbreadth because it

creates buffer zones at **all** health care **and** transitional facilities without any legal

justification to apply such a sweeping remedy to address problems at one location.

**51.**     A law is overbroad when "a substantial number of its applications are

unconstitutional, judged in relation to the [law's] plainly legitimate sweep." *See*

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)

(citations omitted). The overbreadth doctrine prohibits laws that "sweep

unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP*

*v. Alabama*, 377 U.S. 288, 307 (1964) (internal citations omitted). Accordingly, a

law is void for overbreadth where it "does not aim specifically at evils within the

allowable area of [government] control but . . . sweeps within its ambit other

activities that in ordinary circumstances constitute an exercise" of protected rights.

*Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).

52.     In addition to admitting that creating buffer zones only at MMA and its protestors would "seem[] very narrowly focused" [Algrant, T1 at 124:1–7], Algrant testified that the City did not want protestors making it difficult for people to get in and out of transitional facilities. [Algrant, T1 at 125:13–17.] Algrant did not identify a history, or even an example, of such protests taking place outside transitional facilities in the City (not to mention, a health care facility other than MMA).

53.     Similarly, Dacey testified that the Ordinance was intended to reach all health care and transitional facilities based on the hypothetical that "protests can pop up any day for any reason anywhere." [Dacey, T1 at 179:5–6.]

54.     Restricting First Amendment activities in buffer zones outside each and every health care and transitional facility in the City, goes far beyond any justification the City has for attempting to regulate a readily identifiable group of protestors at one location.

55.     The Ordinance "create[s] a virtual 'First Amendment Free Zone'" on public sidewalks outside all health care and transitional facilities in the City. *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc*., 482 U.S. 569, 574 (1987). Even in a *non-*public forum, "no conceivable governmental interest would justify such an absolute prohibition of speech." *Id*. at 575.

56.     *Hill*'s remark that "the comprehensiveness of the [Colorado] statute is a virtue, not a vice, because it is evidence against there being a discriminatory

governmental motive," cannot be said of the Ordinance and the evidence proffered by the City in support. *Turco*, 935 F.3d at 171 (quoting *Hill*, 530 U.S. at 731). The statute in *Hill* applied **only** to health care facilities, while the Ordinance applies to both health care facilities **and** transitional facilities. But the City has provided no serious justification, let alone evidence, why buffer zones at transitional facilities, such as "halfway houses" for "mentally ill persons," *see* N.J.S.A. 40:55D-66.2(a), are needed. *Hill*'s reasoning should not be stretched to an illogical extreme that would allow the government to ban First Amendment activities wherever they might "pop up." [Dacey, T1 at 179:5–6.] While such legislation might be "comprehensive," that would not constitute a First Amendment "virtue."

**F.**     **Remaining Constitutional Claims**

**57.**     Because the Ordinance fails narrow tailoring on First Amendment free speech grounds it also violates Turco's First Amendment right to freedom of assembly and her right of free speech under the New Jersey Constitution. N.J. Const. art. I, para. 6. *See Turco*, 2017 U.S. Dist. LEXIS 189042, at *14–15 (D.N.J. Nov. 14, 2017) (citing cases).

## CONCLUSION

Judgment should be entered in favor of Plaintiff Jeryl Turco as to all counts set forth in her Verified Complaint. The Court should enter a permanent injunction against Englewood, prohibiting the City from enforcing Ordinance #14-11.

Respectfully submitted on this 25th day of March 2022.


/s/ Francis J. Manion                      Mark R. Scirocco
Francis J. Manion                          Legal Center for Defense of Life, Inc.
*Lead Attorney*                            Law Offices of Robert A. Scirocco
Geoffrey R. Surtees*                       98 Route 46, Suite 6
American Center for Law & Justice          Budd Lake, New Jersey 07828
Post Office Box 60                         Tel. 973-691-1188; Fax 973-691-3353
New Hope, Kentucky 40052                   mark@sciroccoesq.com
Tel. 502-549-7020; Fax 502-549-5252
fmanion@aclj.org; gsurtees@aclj.org        * Admitted pro hac vice

Erik M. Zimmerman*                         *Counsel for Plaintiff*
Edward L. White III*
American Center for Law & Justice
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel. 734-680-8007; Fax 734-680-8006
ewhite@aclj.org;
ezimmerman@aclj.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants.

/s/ Francis J. Manion
Francis J. Manion
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax. 502-549-5252
fmanion@aclj.org