### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JERYL TURCO,**<br><br>    **Plaintiff,**<br><br>  v.<br><br>**CITY OF ENGLEWOOD, NEW JERSEY,**<br><br>    **Defendant.** | **Case No. 2:15-cv-03008 (SDW/LDW)**<br><br><br><br><br><br>**Civil Action** |

## POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW BY DEFENDANT, CITY OF ENGLEWOOD

**WEINER LAW GROUP LLP**
**629 Parsippany Road**
**P.O. Box 438**
**Parsippany, New Jersey 07054-0438**
**Phone: (973) 403-1100**
**Fax: (973) 403-0010**
**Attorneys for Defendant,**
**City of Englewood**

Defendant, City of Englewood, submits post-trial the following Proposed Findings of Fact and Conclusions of Law:

## PROPOSED FINDINGS OF FACT

### The Situation in Front of the MMA Clinic in Late 2013/Early 2014

1.   This dispute arises against a background that included "militant activists and aggressive protestors" beginning to gather outside the MMA facility in late 2013. Many of these protestors were associated with an evangelical ministry called the Bread of Life. The Bread of Life had ties to other radical antiabortion organizations including those which support violent reprisal against abortion providers. The Bread of Life protestors engaged in extremely aggressive, loud, intimidating, and harassing behavior towards patients, their companions, and even other groups whose views generally aligned with the Bread of Life's antiabortion position. *Turco v. City of Englewood*, 935 F.3d 155, 158 (3d Cir. 2019) [Undisputed Facts] [1]

2.   The Englewood City Council first learned of this situation during the public session of a Council meeting in October 2013. A lawyer representing the MMA Clinic said that a new group of particularly aggressive protestors had begun showing up on Saturday mornings, and an MMA physician read a statement to the Council regarding "escalating incidents" at 40 Engle Street. [T86:6-20 (Algrant);

---

[1] The Third Circuit determined that these facts, and other facts so noted below, were undisputed by the parties. *Turco*, 935 F.3d at n.1.

Def. Ex. C (October 8, 2013 Council Meeting Minutes) at 7].

3.   Following the October Council meeting, a reporter who had been at the meeting wrote a front-page story in the Bergen Record about the situation. Thereafter, a group of volunteer escorts who had read the article began to appear at the Clinic.  [T89:13-24 (Algrant); *see also* T225:6-20 (Gray)]

4.   Lynne Algrant was a member of the Englewood City Council in 2010 and was President of the Council from early January 2014 until December 31, 2015. [Parties' Joint Stipulated Fact No. 20][2]

5.   Algrant visited the site on a Saturday following the October Council meeting. After observing a young woman who was coming onto Engle Street being surrounded by men yelling and screaming in her face (and ultimately extricated with the help of a volunteer escort), and after being surrounded herself by men yelling at her and women trying to push things into her hands, Algrant reached the Clinic. She spoke with the escorts who were there and told them that the Council was looking into what they could do.  [T89:25-5 to 90:5, 92:23 to 93:14, 93:23 to 95:3, 95:7-21 (Algrant)]

6.   After her experience at the Clinic site, Algrant spoke with other City officials, including Business Manager Tim Dacey, Police Chief Arthur O'Keefe, and Counsel William Bailey about what needed to be done. [T96:3-20 (Algrant)]

---

[2] Per attachment to December 8, 2021 Joint Final Pretrial Order  (dkt. #82).

7.   Algrant received copies of reports that the escorts prepared on a regular basis ("MMA Reports").  [T95:22 to 96:2 (Algrant); T235:13-24 (Gray)]

8.   The MMA Reports that were written prior to adoption of the Buffer Zone Ordinance confirmed the urgency of the situation and the chaos which existed at the site.  [*E.g.*, December 22, 2013 (Pl. Ex. CC); January 13, 2014 (Pl. Ex. X); February 2, 2014 ([Pl. Ex. AA); February 24, 2014 (Pl. Ex. BB)] The escorts pleaded: "There is a **desperate** need for a buffer zone. *** It is clear this situation will only get worse until something is implemented."  [January 19, 2014 (Pl. Ex. EE at 2 (emphasis in the original); *see also* T249:4-22 (Gray) (it was apparent that the patients needed a safe entryway into the Clinic, free of congestion and loud screaming men in their faces)]

9.   Plaintiff, Jeryl Turco, was not one of the hostile or aggressive anti-abortion protestors. Rather, she refers to herself as a "sidewalk counselor". Her practice was to calmly approach women entering the Clinic and attempt to engage in peaceful, nonconfrontational communication. She believes that such conversational interaction is far more effective than the tactics favored by the aggressive protestors. *Turco*, 935 F.3d at 160 [Undisputed Facts]

10. Although plaintiff finds the Bread of Life group's manner of protest abhorrent and counterproductive to what she is trying to do, plaintiff never complained to the police or filed a complaint with respect to the Bread of Life members' conduct.  [Parties' Joint Stipulated Facts Nos. 19, 48]

3

## Measures Undertaken Prior to Adoption of the Buffer Zone Ordinance

11. Algrant spoke to Chief O'Keefe about hiring off-duty Englewood police officers to be present at the Clinic on Saturday mornings (which the Clinic agreed to pay for in accordance with City policy). However, Chief O'Keefe advised that City police officers did not want the work, since there was a big difference between being in a squad car while somebody paves a street and having to confront people in these protests. Algrant then asked Chief O'Keefe to list the opportunity with the Teaneck and Tenafly Police Departments but that did not work either.  [T97:18 to 98:25 (Algrant); *see also* T166:13 to 167:2 (Dacey)]

12. Police patrols were increased on mornings when the City anticipated Bread of Life protestors would be present. *Turco*, 935 F.3d at 160 and n.3. [Undisputed Fact] Algrant asked Chief O'Keefe to arrange that patrol cars go by the Clinic more often on Saturday mornings between 8:00 and 12:00 when the Bread of Life protestors would be there and either change or speed up the route to create more of a presence on Saturday mornings. Also, Algrant would reach out to Deputy Police Chief Larry Suffern on Wednesday of a week that she knew was probably going to be a Bread of Life weekend to create a greater visibility on the part of the police that Saturday morning. [T99:1-18, T99:23 to 100:6 (Algrant); *see also* T236:23 to 237:-2 (Gray) (would give a heads-up to Algrant when an uptick was expected); J-3 (O'Keefe Deposition Excerpt) at 14:13-15 (officers were initially assigned to make

4

more frequent patrols);[3] T167:12-20 (Dacey) (same)]

13. However, since Engle Street was a one-way street, there was plenty of warning time to see the police coming, so typically whatever was going on would die down as the police car drove by and then heat up again after the police car passed. [T100:7-17 (Algrant); T167:22 to 168:3 (Dacey)]

14. Algrant told Deputy Police Chief Suffern that the police needed to stop and get out of their cars, talk to the protestors, and make their presence known more assertively. The police would remind everyone early in the morning what the rules were -- *e.g.*, you can't stand on a stool and scream through a bullhorn, you can't block the door, you have to let people pass through. [T100:18 to 101:3, T101:8-12 (Algrant)]. Police officers present on the scene imposed informal "no go zones" where protestors could not stand. Those zones were similar to the buffer zones that were part of the Buffer Zone Ordinance. *Turco*, 935 F.3d at 160. [Undisputed Fact]

15. Although the police presence temporarily eased tensions at MMA, the hostile protests and resulting problems resumed immediately after officers left the Clinic. *Turco,* 935 F.3d at 158. [Undisputed Fact]  *See also* T101:16-24 (Algrant); J-3 (O'Keefe Deposition Excerpt) at 14:16-21; T168:4-8 (Dacey)]

## Financial Resources and City Policy re Off-Duty Policy

16. Algrant talked with Police Chief O'Keefe and Dacey about having a

---

[3] The parties agreed that this and other excerpts from O'Keefe's January 30, 2017 deposition testimony could be presented a trial.

regular police presence on Saturday mornings at the Clinic site, but such proposal was financially prohibitive and contrary to City policy. [T101:25 to 102:9, T104:6-20] (Algrant)]

17. There were significant financial constraints on the City of Englewood in 2013-2014. The City was coming out of the recession, state aid had been frozen in 2008, and the City was hit very hard by Hurricane Sandy. Among other damage, the City's ice rink (a community center) had been totally destroyed. At the time, the City was also in the process of building a new firehouse.  [T168:14-21, T171:21 to T172:19 (Dacey); *see also* T102:18 to 103:7 (Algrant)]

18. There were also significant financial constraints on the City of Englewood's Police Department in 2013-2014. Vacancies existed in the Police Department as a result of economic conditions, at a time when the City had one of the highest crime rates in Bergen County. The City had problems with drive-by shootings, drug crime, and gang issues, and the Bergen County Sheriff's Department and Prosecutor's Office put the City in its Task Force to help address such problems. The rule of thumb was that a police officer was making about $100 per hour, and more for overtime depending on his/her grade.  [T168:24 to 169:9, T169:20-24, T170:6-11, T170:23-25 (Dacey); *see also* J-3 (O'Keefe Deposition Excerpt) at T34:11-14 (we had finite resources because of the crime in the City)]

19. A further difficulty was that the City did not know how long a need for

6

stationary police officers would be required. It was already five months into the problem and it was believed that it could go on for years.  [T120:2-13 (Algrant)]

20. The City of Englewood also has a policy of not providing police officers to private businesses. The City would offer off-duty police officers but would be reimbursed by the private business -- a practice common in municipalities in New Jersey. ShopRite and synagogues in the City availed themselves of the opportunity to hire off-duty police officers, as did other local businesses. [T166:25 to 167:11, T172:20 to 173:16, T185:22 to 186:1 (Dacey); T104:6 to 105:2 (Algrant) (other companies that have paid off-duty police officers include SUEZ (the water company), PSE&G, and Dwight Englewood School (following Sandy Hook)]

21. Taking police off other functions to do this type of work would negatively impact the City's ability to address crime in the City. Police "can't be answering calls, they can't [be] doing investigations, they can't [be] riding around on patrol." [T173:17-25 (Dacey)]

## The Volunteer Escorts

22. Ashley Gray was a co-founder of the volunteer escort program at the MMA Clinic who escorted at the site and trained other volunteer escorts.  [Parties' Joint Stipulated Fact No. 24]

23. The role of the escorts is to accompany patients who want to be escorted to the MMA Clinic when they are coming for services. [T227:2-7 (Gray)]

24. Escorts sign a document entitled "Terms of Employment of Clinic Escorts", which states that escorts are unpaid agents of MMA, must wear clear identification indicating that they are MMA Clinic escorts, and must follow the policies and procedures set forth in a document entitled "Escorting for the MMA Clinic in Englewood NJ", which contains written training materials for escorts. Among other things, escorts do not make political statements; do not respond to protestors in any way ("NO eye contact, NO verbal conduct, and absolutely NO physical contact"); and never call out another escort's name because if protestors learn someone's name, they risk direct verbal harassment and intimidation and may also be identified by name on anti-abortion websites.  [Parties' Joint Stipulated Facts Nos. 51, 52; *see also* Def. Exs. T, U; T227:8 to 228:12, T228:20 to 230:1 (Gray); T311:11 to 312:9 (Long)]

25. Escorts are trained what to say to patients: The number one thing that they need to do is to identify themselves as a volunteer with the Clinic and ask the patient if she wants to be escorted to the Clinic. If the patient says yes, then they should walk alongside the patient. If the patient does not want to be escorted, they should stand back and not interfere with the patient's wishes. [T230:2-12 (Gray); T312:21 to 313:5 (Long)]

26. Most of the patients of the MMA Clinic are vulnerable young women. [T50:25 to 51-4 (Turco); T230:17-18 (Gray)]

27. Very often a patient says that she wants her privacy, does not want to talk to anyone, and just wants to get into the Clinic. Generally, if a patient tells plaintiff that she does not want to engage with her, plaintiff persists anyway.  [T231:24 to 232-14 (Gray); T296:18-24 (Taylor)]

28. Gray has never observed an escort behaving inappropriately towards plaintiff, would take action if she was advised that this had occurred, and would terminate the escort if there was such intentional misconduct on the part of an escort. [T234:16 to 235:12 (Gray); *see also* T295:25 to 296:8, T296:14-17 (Taylor)]

## Fear of Reprisal

29. There were people at the scene who complained to police officers. However, complaining and signing a complaint are two different matters. [J-3 (O'Keefe Deposition Excerpt) at 17:15-18]

30. In New Jersey you cannot file an anonymous complaint. [T175:17-18 (Dacey)]

31. Protestors were taking pictures of the escorts, of their cars, and of their license plates. [175:11-4 (Dacey)]

32. Algrant talked to the escorts about filing complaints. For their own safety, they felt very strongly that they could not, and would not, do so. [T112:14-17, T118:12-13 (Algrant)]

33. The City considered other possibilities but concluded that anyone who

filed a complaint would be in danger of reprisal. According to Algrant: I felt that we were in a race to the bottom. I was concerned that on any given Saturday morning something could erupt and turn violent. There was definitely a degree of urgency. It was critical that we deescalate the situation because every potential encounter between a protestor and a patient, between a protestor and a companion, or between a protestor and an escort had the potential to flare into violence. Patients and their companions were fearful of filing complaints: "They want to get in, they want to get out." [T112:19 to T113:4, T113:10 to 114:3, T117:17 to 118:1 (Algrant); *see also* T175:1-6 (Dacey) (physicians and staff were very reluctant to file complaints because of fear of retribution)]

34. A defining moment came when a young woman escort became hysterical when a police officer insisted that she give her home address (even though she had not filed a complaint). She was ultimately permitted to use the Clinic's address. [T109:5 to 110:14 (Algrant); T242:3-25 (Gray) (overheard the protestor say that he was going to file a false complaint and call the police)]

35. Not having to give your home address was insufficient to encourage escorts to file complaints against protestors. There was still a lot of risk. An escort still would be giving his or her full name, which could be easily searched. This would open the escort up to more interactions with the protestor. Antiabortion protestors around the country show up at people's workplaces, their children's schools, their

homes, and their neighborhoods; send threatening e-mails; put personal information of escorts on their websites; post phone numbers and addresses encouraging other antiabortion groups and actors to harass escorts, abortion doctors, and clinic staff; and put photos of escorts with bull's-eyes on wanted posters on the internet.  [T243:3 to 244:22 (Gray)]

36. When the Bread of Life protestors learned Ashley Gray's name, they targeted her personally. They showed pictures of her that they had found on the internet, and they played a video at the Clinic site of Gray speaking about the work she does. It was "[v]ery intimidating."  [T244:23 to 245:11 (Gray)]

37. The volunteer escorts take special precautions at the Clinic site – *e.g.*, they are trained not to wear any clothing that would identify them and not to use their real names but to use nicknames or the term "escort".   [T245:16 to 246:11 (Gray)]

38. In the seven years that she escorted at the Clinic, Gray never filed a complaint against a protestor. The fear was that if she filed a complaint, they would retaliate. Gray stopped escorting at the Clinic in 2020, in part because of her fear that the protestors would find out about the grief she was experiencing following her father's death from COVID and "would taunt me, say unkind things, and harass me." [T226:13-24, T246:12-14, 271:1-7 (Gray)]

39. Only a handful of the more than 100 escorts have filed complaints. [T293:9-12 (Taylor)]

11

40. Deciding to press charges is not an easy decision and going to the police is intimidating for many escorts. As Long testified: "We also have to worry about being believed. And we may have to appear in front of and testify against a person you routinely come into contact with. Should we lose in court, that protestor will surely use their win to further harass us on the sidewalk."  [T334:8-16 (Long); Def. Ex. AA (August 26, 2019 nj.com Opinion piece by Andrea Long) at 4)]

41. Escorts are also reluctant to file complaints because of the court proceedings themselves (*e.g.*, the need to take off work and explain to your employer that you volunteer at an abortion clinic, the dragging out of the disposition of complaints ("it's never one hearing")  [T330:17-24 (Long)]

42. Those escorts who have filed complaints have done so generally only in flagrant cases, often in concert with "law enforcement" (the Bergen County Prosecutor's Office)  [T290:19 to 292:16, T292:17-24, T293:9-12 (Taylor) (in six years, Taylor has filed three complaints – one for harassment (*e,g.*, where there is a potential for violence, *e.g.*, hearing a protestor tell an escort that "he could end her if he wanted to") and two for flagrant buffer zone violations (*e.g.,* a protestor standing in the buffer zone preaching or holding a protest sign); T:325:8-12 (Long) (in eight years, Long has filed four complaints for serious buffer zone violations and one for harassment)]

43. Escorts do not call the police for someone walking through the buffer

zone. [T191:11-17) (Taylor)]

## Why the Buffer Zone Ordinance Was Adopted

44. The Buffer Zone Ordinance was adopted for multiple reasons: Medical staff, volunteer escorts, and patients were legitimately afraid to and refused to file complaints. Enforcing an earlier Ordinance that prohibited intentionally blocking a doorway was inadequate where such activity was going on not far from the doorway of the facility. The City believed that de-escalation of the type of unstable and dangerous situations that had developed at the site could best be achieved by creating some degree of separation between Clinic patients and protestors. There was a perceived need by the City for an ordinance that had reasonable and objective criteria. It was anticipated that the Bread of Life protestors would generally respect the buffer zone. The City believed that the interests of all parties could be balanced by creating a buffer zone that would require the maintenance of a limited distance between sidewalk counselors/protestors and clinic patients, and those assisting them, but not a distance too long that it would prevent sidewalk counselors/protestors from speaking with clinic patients.   [Pl. Ex. 3 (the City of Englewood's Answer to plaintiff's Interrogatory No. 9). *See also* T178:20 to 179:2, 179:12 to 180:6 (Dacey)]

45. The City believed that an eight-foot buffer zone was enough to stop close encounters between protagonists in front of the Clinic and keep patients and their companions safe. Fundamentally, the easiest way to diffuse a situation is to separate

the people who are the protagonists. [T116:6-8, T117:11-13) (Algrant)]

46. The City believed that a buffer zone was necessary around the driveway because an abortion provider is a soft target and most of the anti-choice extremist violence has been around doctors and clinical staff. [T116:9 to 117:4 (Algrant); *see also* J-3 (O'Keefe Deposition Excerpt) at T25:12-13]

47. Transitional facilities were included so as not to single out an abortion clinic. Moreover, there is a huge need in Bergen County for transitional housing and the City of Englewood did not want to discourage such housing by making it more difficult for people to live there.  [T124:1-7, 125:11-16 (Algrant)]

## The Buffer Zone Ordinance

48. The Buffer Zone Ordinance was adopted by the Englewood City Council on March 18, 2014 (Def. Ex. E) and reads in pertinent part as follows:

> A. Definitions. As used in this section, the following terms shall have the meanings indicated:
>
> 1. "Health care facility" – as set forth in N.J.S.A. 26:2H 2.
>
> 2. "Transitional facility" – Community residences for the developmentally disabled and community shelters for victims of domestic violence as those terms are defined in N.J.S.A. 40:55D-66.2.
>
> B. Within the City of Englewood, no person shall knowingly enter or remain on a public way or sidewalk adjacent to a health care facility or transitional facility within a radius of eight feet of any portion of an entrance, exit or driveway of such facility or within the area within a rectangle created by extending the outside

14

boundaries of any entrance, exit or driveway of such facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway. This subsection shall not apply to the following:

1. persons entering or leaving such facility;

2. employees or agents of such facility acting within the scope of their employment;

3. law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

4. persons using the public sidewalk or street right of way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

C. The provisions of subsection B shall only take effect during such facility's business hours and if the area contained within the radius and rectangle described in said subsection B is clearly marked and posted.

*Turco,* 935 F.3d at 158-59. [Undisputed Fact]

49. The Buffer Zone Ordinance supplanted an Ordinance adopted by the City of Englewood in February 1990, which prohibited persons from obstructing access to health care facilities by intentionally blocking doorways or driveways of the facility. [Parties' Joint Stipulated Fact No. 41]

50. The 1990 Ordinance was a response to a very different situation that took place at the Clinic the year before. In 1989 protestors came in by busloads to demonstrate outside the Clinic. Hundreds of protestors chained themselves to the

front door and the back doors of the Clinic. They also blocked Engle Street, causing it to be closed. Multiple police agencies were called in to assist, and dozens were arrested.  [J-3 (O'Keefe Deposition Excerpt) at T8:11 to 9:1]

51. Arthur O'Keefe was a police officer in the City of Englewood from 1971 until he retired, as Englewood Chief of Police, in 2013. [Parties' Joint Stipulated Fact No. 28]   At a November 12, 2013 Council meeting, Chief O'Keefe opined that current City ordinances were ambiguous and in need of revision.  [Parties' Joint Stipulated Fact No. 8].  Chief O'Keefe explained: "The ordinances as I understood them were not giving enough clarification to the officers responding." [J-3 (O'Keefe Deposition Excerpt) at T15:13-15; *see also* id. at T1-6 (incorporating O'Keefe August 3, 2015 Certification ¶¶8, 9 (the City needed ordinances that would permit us to more objectively deal with prescribed violations of the law; I "firmly believed, from my decades of experience as a police officer, that what was needed most to deescalate the situation was to be able to create some degree of separation between clinic patients and protestors – that is, a limited buffer zone that would protect everyone's rights")]

### The Effects and Success of the Buffer Zone

52. It was calmer. Sidewalk counselors and protestors could still talk to patients but it also gave anybody needing to go in or out of the Clinic eight feet of space to be unmolested and unharmed physically. Also the door, which opens out,

could now open without obstruction. While there were a couple of flareups from time to time and some testing of the buffer zone, for the most part it was not at all like it had been prior to the buffer zone. [T121:8, T121:18 to 122:11, 123:11-23 (Algrant)]

53. The buffer zone cleared out the overcrowded space in front of the entrance to the Clinic, which was very overcrowded, and helped diffuse the situation. It had been "a safety hazard" and a "really dangerous situation" prior to the buffer zone, as patients had to squeeze in between protestors and sidewalk counselors to go in and out of the Clinic. The buffer zone gave a bit of breathing room in that space. Gray used her name in her 2015 Certification because she believed very strongly that the buffer zone was working and needed to stay. [T241:5-19, T269:20 to 270:5 (Gray)]

54. The buffer zone created space that prevented confrontations that could easily escalate and stopped people from positioning themselves so close to the front door as to be intimidating to patients. It helped the escorts get people in and out of the entrance to the Clinic. Sidewalk counselors and protestors were not following patients all the way up to the front door and then blocking other people behind them who were trying to enter the building. [T323:16 to 324:21 (Long)] Andrea Long has been a volunteer escort at the MMA Clinic since the summer of 2014 and is one of the directors and a team leader of the escort program. [Parties' Joint Stipulated Fact No. 25; T310:10-14 (Long)]

55. Plaintiff admits that the Bread of Life protestors have not violated the

buffer zone so much, maybe occasionally some might go through it, but's it's not an ongoing violation of the buffer zone.   [T58:15-20 (Turco); *see also* T121:15-18 (Algrant) (the Bread of Life protestors actually pretty much abided by the buffer zone); T320:8-10, T321:25 to 322:2 (Long) (the Bread of Life protestors generally observe the buffer zone); T289:12-14 (Taylor) (same)]

### The Situation at the Clinic Without the Buffer Zone

56. After the Buffer Zone Ordinance was invalidated, protestors would congregate within what had been the front door buffer zone and it became difficult for escorts to walk patients into the Clinic without getting pushed around within that space. Protestors would station themselves near the entrance to the Clinic and be within inches of patients at the door. There was also a protestor who would walk up to the front door and just scream. It was very intimidating for patients. The closer the protestors were able to get to patients and their companions, the more likely the risk of violence.  [T319:9 to 320:2; T321:11-15 (Long)]

57. "It was chaos. It was absolute chaos." Protestors on microphones and loudspeakers or with huge signs would stand right next to the door rather than eight feet from the door. You have people chasing patients and walking them right up to the door. "I don't know how many patients I have had hold my hand, grab me, cry on my shoulder, tuck their head into my neck so that they don't have to look at it. *** It was terrible."  [T278:6-7, T287:18 to 289:11 (Taylor)]  Christine Taylor has been a

volunteer escort at the MMA Clinic since the summer of 2016 and is one of the directors and a team leader of the escort program. [Parties' Joint Stipulated Fact No. 32; T278:6-11 (Taylor)]

58. When the buffer zone was invalidated, plaintiff would follow patients up to the front door. Sometimes a companion who was behind plaintiff would not be able to get around her. [T318:3-9 (Long)]

## Plaintiff's Method of Sidewalk Counseling

59. Plaintiff admits that unlike other sidewalk counselors, she does not remain stationary. [Parties' Joint Stipulated Fact No. 67]

60. Plaintiff admits that she will run in all different directions to meet patients and that this is preferable to plaintiff than remaining stationary as she does not believe she can stand in one position and be able to reach and talk to patients. Plaintiff further admits that she could not use her method of sidewalk counseling if she stationed herself next to the buffer zone. [T44:11-21, T47:12-15 (Turco)]

61. Plaintiff was called "the Runner" by the escorts because she would run up to patients when they were arriving and would run after and follow patients when they were leaving -- for more than a block at times. She would also follow patients into the street who were going to their cars that were parked far away. [T240:16 to 241:2 (Gray); *see also* T41:11-17 (Turco) (I was called "the Runner" because "I will approach a girl from anywhere she is coming. And the sooner I get to her, the more

time I have to be able to share literature, share a message"); T314:13-20 (Long) (Turco would often run significant distances to meet patients)]

62. Plaintiff admits that her method of sidewalk counseling is to meet patients at some distance from the buffer zone and walk with them to the perimeter of the buffer zone. She uses this method because she requires about 30 to 45 seconds to convey her message to patients and to hand them literature. [T43:14-25, T45:25 to 46:3, T46:13-15 (Turco); *see also* T283:18 to 284:10 (Taylor) (plaintiff can talk for 30 to 45 seconds to patients and hand them pamphlets when she meets them at a distance); T316:2 to 317:11 (Long) (same)]

63. Plaintiff's method of communicating with patients is the same whether or not there is a buffer zone, and plaintiff so admits.  [T317:12-21 (Long) (in both situations plaintiff communicated with patients by trying to walk a long distance with them); T289:21-25 (Taylor) (absent a buffer zone plaintiff still chased patients a long distance; that behavior did not change); T48:10-16 (Turco) (even after the buffer zone was invalidated, would still run to get that 30 to 45 seconds)]

64. Plaintiff admits that she will try to talk to patients on Engle Street, including when they are crossing Engle Street. It is fairly common for plaintiff to do this; it is not fairly common for others. Engle Street is a busy two-lane one-way street, where cars are moving at least 40 or 50 miles an hour and where ambulances often drive past because of the proximity of Englewood Hospital.  [T44:22-24,

T45:8-9 (Turco); T284:18 to 285:8 (Taylor); T318:11-17) (Long]

65. Plaintiff admits that she can get to the buffer zone on the south side of the Clinic without obstruction. [Parties' Joint Stipulated Fact No. 68]

66. Plaintiff admits that if she sees a patient coming from the south, she will run down Engle Street, in the face of traffic, and meet the patient as far as the next street intersection, if not further, which affords her the time she requires to talk to the patient. Plaintiff admits that when walking with a patient from the south, she can walk right up to the buffer zone and be no more than eight feet from the doorway to the Clinic. [T45:10 to T46:3, T46:9-12 (Turco)]

67. Plaintiff admits that she runs down Engle Street to the north to meet patients and that there would not be any cars parked in front or any snow piled in front of the driveway. [T47:2-3, T69:7-12 (Turco)]

68. Plaintiff admits that she can get into the area between the buffer zone by the entrance to the Clinic and the buffer zone by the driveway by simply crossing Engle Street. [T62:5-24 (Turco)]

69. The buffer zones at the end of the driveway and at the end of the buffer zone extending from the front door of the Clinic to the street are each only about eight feet in width and Turco can walk in the gutter, not into the street, to traverse such areas. [J-1 (diagram of site); T64:9-16 (Turco)]

21

## Plaintiff's Communication with Patients

70. Plaintiff admits that she has talked to patients on some kind of regular basis both before and after adoption of the Buffer Zone Ordinance. [Parties' Joint Stipulated Fact No. 63]

71. Plaintiff admits that she has communicated with "a lot" of patients with her method of reaching out to them, going some considerable distance to meet with them to the south and to the north of the MMA Clinic, and walking with them to the perimeter of the buffer zone; that she has convinced patients to listen to her and to take literature from her when walking with them; and that she has been successful in referring patients to organizations that will help get them jobs. [T47:7-11, T48:1-4, T53:24 to 54:8 (Turco); *see also* T316:7 to 317:7 (Long) (plaintiff will talk to a patient while walking to the front door buffer zone and hand out pamphlets and miniature fetuses during the walk)]

72. Plaintiff admits that the Bread of Life protestors negatively impact her ability to communicate with patients. [Parties' Joint Stipulated Fact No. 64]. Plaintiff says she would be able to sidewalk counsel a lot better if the Bread of Life protestors were not there as they cause patients to run into the Clinic as quickly as possible. [T48:25 to 49:13 (Turco); *see also* T238:6-11 (Gray) (Turco told her that the Bread of Life protestors were inhibiting her from conducting her counseling)]

**Other Sidewalk Counselors' Communication with Patients**

73. Other sidewalk counselors have been able to talk to patients on a regular basis both before and after adoption of the Buffer Zone Ordinance. [Parties' Joint Stipulated Fact No. 64]

74. Rosemary Garrett, who began sidewalk counseling outside of the MMA Clinic in 2013 and counseled both before and after the Buffer Zone Ordinance was adopted, remains stationary. She testified that she was not bothered by the new buffer zone and was able to counsel, that the buffer zone was not going to stop her from helping patients, and that she has been able to help patients even when the buffer zone was there. [Parties' Joint Stipulated Facts Nos. 22, 23; (J-2 (Garrett Deposition Excerpts) at T28:6-12, T28:16-17, T29:7-13] [4]

**COVID / Outdoor Dining**

75. By Executive Order No. 150 dated June 3, 2020, Governor Murphy opened up outdoor dining in New Jersey and authorized and encouraged municipalities to allow outdoor dining both on restaurant property and on municipally-governed areas, including sidewalks.  [Parties' Joint Stipulated Fact No. 70; Def. Ex. V]

76. On June 9, 2020, the City of Englewood passed a Resolution Temporarily Waiving Certain Provisions of the City Code to Assist Local Businesses During the

---

[4] The parties agreed that these and other excerpts from Garrett's January 26, 2016 deposition testimony could be presented at trial.

Covid-19 Pandemic, which authorized City officials to permit restaurants to relocate existing or locate new tables/seating on City sidewalks pursuant to an application process and permitted the utilization of the public right of way of the adjacent property owner for outdoor dining with that owner's consent.   [Parties' Joint Stipulated Fact No. 71; Def. Ex. W]

77. The owner of Sofia, the restaurant immediately to the south of the MMA Clinic at 36 Engle Street, obtained Outdoor Dining Licenses that were ultimately approved by the Zoning Inspector of the City of Englewood. [Parties' Joint Stipulated Facts No. 72-76]

78. Sofia's owns the planters and tables in front of its restaurant and in front of the MMA Clinic.  [T293:18-19 (Taylor); T334:24 to 335:2 (Long)]

79. The planters differ in size and move fairly frequently, as do the tables, sometimes depending on holidays or the season. It is not the same layout all the time. The objects are not permanent. [T293:20-25 (Taylor)]; T335:3-6 (Long)]

80. Plaintiff can walk around the planters by the street. They are set on the edge of the sidewalk by the curb, not in the middle of the sidewalk. [T295:14-24 (Taylor); T343:7-10 (Long)]. The distance from the Clinic building to the street is 11 feet 10 inches, so there is at least 3 feet 10 inches between the end of the semicircular buffer zones and the street.  [Parties' Joint Stipulated Fact No. 44]

## **Walking Through the Buffer Zone**

81. The Buffer Zone Ordinance provides that the buffer zone prohibitions do not apply to "persons using the public sidewalk or street right of way adjacent to such facility solely for the purpose of reaching a destination other than such facility". [Pl. Ex. A at §B.4]

82. After adoption of the Buffer Zone Ordinance, Gray would see Turco walk through the buffer zone from an area south of the buffer zone to an area north of the buffer zone, and vice versa, and Turco admits doing so. Turco stopped walking through the buffer zone immediately after her lawsuit was filed and began walking into the street, and plaintiff admits doing so. Gray, whose relationship with plaintiff was generally cordial and friendly, spoke to Turco about this change in her behavior and told her that based "on the language of the ordinance" this was permissible. Turco persisted nonetheless in running into the street. [T232:15 to 234:1, T247:10 to 248:9 (Gray); T73:25 to 74:18 (Turco)]

83. Plaintiff admits that she has not seen others go into the street to traverse the buffer zone area. [T68:24 to 69:1 (Turco)]

## **Plaintiff**

84. Because Jeryl Turco has recently moved from Wayne, New Jersey to Neptune, New Jersey, she now intends to come to the Clinic site only once a month. [Parties' Joint Stipulated Facts Nos. 36, 38]

## PROPOSED CONCLUSIONS OF LAW

## THE SCOPE AND EFFECT OF THE THIRD CIRCUIT'S DECISION

1.   In a Precedential Opinion, the Third Circuit reversed the grant of summary judgment in favor of plaintiff and remanded the case "for proceedings consistent with this opinion." *Turco v. City of Englewood*, 935 F.3d 155, 172 (3d Cir. 2019).

2.   Where there is a specific remand such as this, a District Court must implement both the letter and spirit of the mandate, and the opinion becomes part of the mandate and must be considered together with it. *In re Chambers Development Company, Inc.*, 148 F.3d 214, 224 (3d Cir. 1998).

3.   The Third Circuit's Opinion sets forth specific guidelines to be followed on remand, relating to such issues as content neutrality, protection of the health and safety of patients, buffer zones, *McCullen v. Coakley*, 573 U.S. 464 (2014), narrow tailoring, and overbreadth.

## Content Neutrality

4.   The Third Circuit determined that any challenge to the content neutrality of the Buffer Zone Ordinance has been waived, and, moreover, is baseless. *Turco*, 935 F.3d at 162. *See also* dkt. 82 (Joint Final Pretrial Order) at 6-7.

## Protection of the Health and Safety of Patients

5.   The state has an interest in protecting health and safety, which may justify a special focus on unimpeded access to health care facilities and the

avoidance of potential trauma to patients associated with confrontational protests. *Turco,* 935 F.3d at 166 (citing *Hill v. Colorado*, 503 U.S. 703, 715 (2000)). The buffer zone adopted by the City of Englewood serves this purpose by creating an unobstructed pathway for patients to enter the MMA Clinic without confrontation.

6. There is a distinction between state restrictions on a speaker's right to address a willing audience and restrictions that protect listeners from unwanted communication. *Turco,* 935 F.3d at 166 (citing *Hill*, 503 U.S. at 715-16). The City of Englewood's Buffer Zone Ordinance protects these interests by shielding patients from unwanted communication while allowing sidewalk counselors and protestors to address a willing audience.

7. An ordinance's prophylactic aspect is justified by the great difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement. *Turco*, 935 F.3d at 166 (citing *Hill*, 503 U.S. at 729). Use of a buffer zone as an objective deterrent here is more feasible than the false, hypothetical assumption that young, vulnerable patients, or others, will bring individual complaints against aggressive and intimidating Bread of Life protestors.

8. Contrary to the Third Circuit's remand (*Turco*, 935 F.3d at 170), plaintiff argues that this Court should disregard the Third Circuit's reliance on *Hill*

and/or distinguish *Hill*. Plaintiff disregards the basic principles enunciated by the Supreme Court in *Hill* and focuses instead on immaterial factual differences. [Pl. Trial Br. 2, 19-20, and n.7]

## Buffer Zones

9.   Buffer zones clearly serve the government interests in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services.  *Turco*, 935 F.3d at 163 (citing *McCullen*, 573 U.S. at 486-87). *See also Bruni v. City of Pittsburgh*, 941 F.3d 73, 88 (3d Cir. 2009) (citing *Turco*) (buffer zones serve such legitimate public interests). The buffer zone in this case, which has been generally observed by all, has served these legitimate public interests and resulted in a demonstrable de-escalation of problems in front of the MMA Clinic.

## *McCullen*

10. As the Third Circuit concluded, this case is distinguishable from *McCullen v. Coakley*, 573 U.S. 464 (2014) as the Massachusetts law in *McCullen* established a thirty-five foot buffer zone whereas the City of Englewood's Buffer Zone Ordinance establishes an eight-foot buffer zone: "This is a substantial distinction." Unlike the City's Buffer Zone Ordinance, the Massachusetts buffer zones carved out a significant portion of the adjacent sidewalks and required the counselors to stand

"well back" from the clinic. *Turco,* 935 F.3d at 163-64 (emphasis added).  Plaintiff does not have to stand well back from the Clinic.

11. Also distinguishing this case from *McCullen* is that in *McCullen* there admittedly were demonstrable alternatives to the 35-foot buffer zone, whereas here there is evidence in the record that explains why hypothetical alternatives posited by plaintiff were not likely to serve the City's interests. *Turco,* 935 F.3d at 163.

12. Contrary to the Third Circuit's remand (*Turco,* 935 F.3d at 170), plaintiff argues that this Court should disregard the Third Circuit's interpretation of *McCullen* and that the Massachusetts ordinance is "effectively the exact same statute as the one at issue in this case."  [Pl. Trial Br. n.8]  Unlike *McCullen*, the size of the buffer zone in this case does not prevent plaintiff from engaging in the one-on-one conversations that are part of her sidewalk counseling.

13. *McCullen* is not instructive on the overbreadth issue because in *McCullen* the Court did not have to consider plaintiffs' overbreadth challenge, as it found that Massachusetts' statute was not narrowly tailored. *Turco,* 935 F.3d at 170.

## Narrow Tailoring

14. Under intermediate scrutiny, the Ordinance must be narrowly tailored to serve a significant governmental interest. *Turco*, 935 F.3d at 162.

15. Narrow tailoring does not require that the regulation be the least restrictive or least intrusive means of achieving the government's legitimate

29

interests.  Rather, the First Amendment prohibits the government from regulating speech in a way where the regulation would allow a substantial burden on speech that does not serve to advance the government's legitimate interests. *Turco*, 935 F.3d at 162 (emphasis added) (citing *McCullen*, 573 U.S. at 486 and *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989)).

16. As reflected in plaintiff's admissions and in the testimony of the volunteer escorts, the Buffer Zone Ordinance does not create a significant burden on plaintiff's speech and does not substantially impair plaintiff's communication with patients.

17. The existence or non-existence of a buffer zone does not affect plaintiff's method of sidewalk counseling. She counsels the same way in both situations.

18. Plaintiff's admitted method of sidewalk counseling involves her running to meet patients at great distance and walking with them for 30 to 45 seconds, communicating with them and handing them literature. If plaintiff is not able to communicate with a patient within this time period before reaching the buffer zone, or convince a patient to stop to talk with her, a few extra seconds walking through the buffer zone is of little moment.

19. On the contrary, in the absence of the buffer zone, the situation in front of the Clinic was completely chaotic and would impair, rather than facilitate,

plaintiff's ability to communicate with patients.

20. Plaintiff's "obstacle course" argument is misleading and inaccurate. Plaintiff's contention that "the zones require that Turco – who usually only has seconds to reach her intended audience – repeatedly interrupt her close conversations to navigate the multitudinous do-not-cross lines painted on the public sidewalk (Pl. Trial Br. 16-17) disregards plaintiff's method of sidewalk counseling. Plaintiff testified that she requires 30 to 45 seconds (not mere seconds) to converse with patients after she runs to meet them far from the Clinic and then walks to the perimeter of the buffer zone with them. She does not have to cross the buffer zones when she is talking with them.

21. Plaintiff admits that she has communicated with patients on a regular basis both before and after adoption of the Buffer Zone Ordinance, that she communicates with "a lot" of patients using her method of counseling, that she has convinced patients to  listen to her and to take literature from her when walking with them, and that she has been successful in referring patients to organizations that will help them get jobs. The Buffer Zone Ordinance has not substantially burdened her communication with patients.

22. If there has been an impediment to plaintiff's communication with patients, it has been the presence of the Bread of Life protestors, not the buffer zone.

31

23. Plaintiff cites *McCullen* for the proposition that where the burden on speech is substantial, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier. [Pl. Trial Br. 22; *McCullen*, 573 U.S. at 496]   Even if that test was applicable, the alternative measures discussed in *McCullen* would fail to  achieve the government's interests, and the City of Englewood did not adopt a buffer zone because it was easier.

24. The alternatives identified in *McCullen* (prohibiting blocking doors and driveways, enacting  a version of the FACE Act, enacting an ordinance prohibiting harassment, using ordinances against obstruction of doors and driveways, using "general criminal statutes", and seeking injunctive relief against persons with a history of obstructing access) [*McCullen*, 573 U.S. at 490-93; Pl. Tr. Br. 23] all suffer the same fundamental infirmities. They all necessarily rely on the filing of complaints and/or are prohibitively expensive. The City and its representatives credibly explained that they had attempted to increase police presence at the Clinic, had considered alternative means of bringing order to the sidewalk, and proffered reasonable explanations for why such means were ineffective (*i.e.*, fear of reprisal and financial restraints).

25. Patients, companions, and escorts were legitimately afraid of filing complaints – for fear of reprisal. Being able to give the Clinic's address did not

materially reduce this fear. Giving one's name on a complaint, as is required in New Jersey, would open the complainant to a broad range of harrowing and disturbing responses by Bread of Life protestors.

26. Given the City's and its Police Department's demonstrated financial restraints, posting police officers at the site indefinitely (perhaps for years) in lieu of their performing other duties would be prohibitively expensive and deleterious to crime enforcement in the City. It is also contrary to long-standing City policy applied equally to all private entities in the City.

27. The Buffer Zone Ordinance was not adopted because it was easy; it reflected the City of Englewood's deliberate and thoughtful balancing of the interests of all involved.

28. The Buffer Zone Ordinance has been a success, as the contrast between the situation when it has been in effect and when it was invalidated reflects. Among other things. it de-escalated the situation in front of the MMA Clinic, it has protected the health and safety of patients by establishing a clear pathway for their entering the Clinic, it has reduced the potential for violence, it has been widely observed by Bread of Life protestors and sidewalk counselors alike, and it has eliminated the chaos in front of the Clinic that existed in its absence.

29. Rules that provide specific guidance to enforcement authorities serve the interest in evenhanded application of the law. *Turco,* 935 F.3d at 166 (citing *Hill,*

503 U.S. at 715). The buffer zone in this case treats all sidewalk counselors and protestors equally, upon the application of objective criteria.

30. An eight-foot restriction leaves ample room to communicate a message through speech, as signs, pictures, and voice itself can cross an 8-foot gap with ease. *Turco*, 935 F.3d at 166-67 (citing *Hill*, 503 U.S. at 729). Plaintiff can access and be within eight feet of a patient when she stands outside a buffer zone.

31. Given the broad deference to be afforded legislative judgments, a legislative body need not meticulously vet every less burdensome alternative. *Turco*, 935 F.3d at 170. The City of Englewood considered the options suggested by plaintiff but found them wanting. The urgency of the situation demanded quick but studied and deliberate action, which the City undertook with success.

32. Plaintiff's "overinclusive" argument [Pl. Trial Br. 29] is based on the erroneous premise that in *McCullen* the Court found the law not to be narrowly tailored because it applied to all reproductive facilities. Rather, the Court said that "creating 35-foot buffer zones" at every clinic across the Commonwealth is hardly a narrowly tailored solution. *McCullen*, 573 U.S. at 493 (emphasis added).

### Overbreadth

33. An ordinance need not precisely target the acts it was passed to remedy; the fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance; and when a buffer zone broadly

applies to health care facilities, the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive. *Turco*, 935 F.3d at 171 (citing *Hill,* 503 U.S. at 731). The Buffer Zone Ordinance broadly, and appropriately, applies to all health care facilities in the City of Englewood. It also apples to transitional facilities because of the particular need for such protected facilities in the City.

34. A regulation's overbreadth must be substantial, not only in an absolute sense but also relative to the statute's plainly legitimate sweep, and a court must consider a regulation's application to real-world conduct, not fanciful hypotheticals (the overbreadth claimant having the burden of demonstrating that substantial overbreadth exists). *Turco*, 935 F.3d at 171-72. Plaintiff has not met her burden of showing that substantial overbreadth exists.

35. Plaintiff erroneously argues that this Court should not follow the Third Circuit on remand because it rejected the argument that the Ordinance must precisely target the acts it was passed to remedy. [Pl. Trial Br. n.11]. But that is precisely what the Supreme Court did in *Hill*, which was decided many years after the cases cited by plaintiff.

## THE THIRD CIRCUIT'S DECISIONS IN *BRUNI* AND *REILLY*

## Narrow Tailoring

36. The fact that a police department has finite resources and a city has

financial restraints are relevant to the narrow tailoring analysis. *Bruni v. City of Pittsburgh*, 941 F.3d at n.21. The City of Englewood has demonstrated the significant financial constraints on both the City and its Police Department which render the provision of on-duty officers to police the Clinic prohibitively expensive.

37. Whether the City tried or seriously considered arrests, prosecutions, or targeted injunctions is not dispositive. Where the burden imposed by a restriction on speech is not significant, the government need demonstrate neither that it has tried or considered every less burdensome alternative nor that it tried or considered every less burdensome alternative discussed in *McCullen*. *Bruni*, 941 F.3d at 91. The City considered such alternatives but determined that they would not be as effective as a buffer zone which created space between protagonists in front of the Clinic and which defused the potential for conflict.

38. Where the burden on speech is de minimis, a regulation may be viewed as narrowly tailored; a less demanding inquiry is called for where the burden on speech is not significant -- whether due to a restriction's scope, the size of the speech-free zone, or some combination of the two. *Bruni*, 941 F.3d at 89; *Reilly v. City of Harrisburg*, 790 Fed. Appx. 468, 473 (3d Cir. October 23, 2019). Any alleged burden on plaintiff's speech because of the Buffer Zone Ordinance is de minimis, given plaintiff's method of sidewalk counseling which was essentially the same whether or not there was a buffer zone.

### *McCullen*

39. The burden a fifteen-foot buffer zone ordinance imposes is different from McCullen both in scope and size; size, while not necessarily in and of itself dispositive, is still a "substantial distinction" that must factor into a court's analysis of the relative burden on speech. *Bruni*, 941 F.3d at 90 (emphasis added). In *McCullen* a protestor could never get closer than 35 feet to the Clinic. That is not so in this case.

### **Overbreadth**

40. The Third Circuit rejected an overbreadth argument by plaintiffs challenging an ordinance because, as here, it authorizes the City of Pittsburgh to create buffer zones at any health facility in the City regardless of whether the City has identified a problem at the location in the past. *Bruni*, 941 F.3d at 91-92.

### **The Doctrine of Constitutional Avoidance**

41. Under the doctrine of constitutional avoidance, in determining a facial challenge to a statute, if it be readily susceptible to a narrowing construction that would make it constitutional, it will be upheld. *Bruni*, 941 F.3d at 85 (citing *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 397 (1988)); *Reilly*, 790 Fed. Appx. at 474. *See also U.S. v. Ali*, 508 F.3d 136, 147 (3d Cir. 2007) (where a statute is susceptible to two constructions, one of which constitutional questions arise thereunder, and by the other construction such questions are avoided, the court should adopt the latter).

37

42. Plaintiff's belated argument, not raised until after the December 2021 Joint Final Pretrial Order in this matter (dkt. #82), that sidewalk counselors are excluded from the Buffer Zone Ordinance is baseless, as the Buffer Zone Ordinance is not susceptible to such a construction.

43. The City of Englewood's argument, raised in the December 2012 Joint Final Pretrial Order (Defendant's Legal Issue (4)), that the Buffer Zone Ordinance permits persons to walk through the buffer zone area to get from the south to the north, and vice versa, is susceptible to such a construction.

44. A court may not rewrite a law to conform it to constitutional requirements. *Bruni,* 41 F.3d at 85 (citing *United States v. Stevens*, 559 U.S. 460, 481 (2010)). The text of the ordinance is the controlling factor. *Bruni,* 941 F.3d at 86; *see also Jennings v. Rodriguez*, 583 U.S., ___, 138 S.Ct. 830 (2018) (while courts must construe a statute to avoid violations of the Constitution, any construction must still be supported by the language of the statute itself). Plaintiff asks this Court to rewrite the Buffer Zone Ordinance. The City of Englewood does not.

45. The Ordinance in *Bruni* provides that "[n]o person or persons shall knowingly congregate, patrol, picket or demonstrate" in the prescribed zone. After analysis of each of these terms, the Third Circuit determined that sidewalk counselors did not fall within any of them and therefore were not covered by the Ordinance. "[T]he Ordinance as written does not prohibit the sidewalk counseling in which

38

Plaintiffs seek to engage within the zone." *Bruni,* 41 F.3d at 79, 84-87; *Reilly*, 790 Fed. Appx. at 470. Plaintiff's constitutional avoidance analysis [Pl. Trial Br, at n.2] is flawed because it is not based on the text of the Ordinance.

46. The Ordinance in this case expressly prohibits entering or remaining in the buffer zone and clearly encompasses sidewalk counselors. *Turco*, 935 F.3d at 158-60. Section B(4) of the Buffer Zone Ordinance provides an exception from the prohibitions of the Ordinance for "persons using the public sidewalk or street right of way adjacent to such facility solely for the purpose of reaching a destination other than such facility." Defendant's Legal Issue (4) does not represent a "changing interpretation" of the City of Englewood's Buffer Zone Ordinance [Pl. Trial Br. at 4-5]; rather, it represents a construction of the Ordinance that this Court can make under the constitutional avoidance doctrine independently of the intent or the interpretation of the drafters of the Ordinance. This Court could reasonably construe such language to mean that plaintiff could traverse the buffer zone area from the south to the north, or vice versa, simply to get from Point A outside of the buffer zone area to Point B outside of the buffer zone area. In such situation, plaintiff would be exempt from the prohibitions of the Buffer Zone Ordinance, whereas when she is sidewalk counseling in the buffer zone area she would not be. 935 F.3d at 158-59.

## COVID

47. Plaintiff ignores why there have been moveable and non-permanent

planters and tables on Engle Street from time to time – *i.e.*, the public policy, at the state and local level, of encouraging outdoor dining for health and safety reasons during COVID. These objects were not there because of "a presumed desire to enhance the ambience of the restaurant's operations." [Pl. Trial Br. at 5]. They are reflective of the prevalence of outdoor dining throughout the City of Englewood during this unique and critical period as a health and safety measure.

48. Given especially plaintiff's method of communicating with patients away from the buffer zone, the planters and tables do not significantly burden plaintiff's ability to communicate with patients at the Clinic.  [Id. at 5-6]

## CONSTITUTIONALITY

49. The City of Englewood's Buffer Zone Ordinance is constitutional on its face and as applied to plaintiff.

## CONCLUSION

Defendant, City of Englewood, respectfully requests that plaintiff's Complaint be dismissed.

WEINER LAW GROUP LLP
Attorneys for Defendant, City of Englewood

By:  */s/ Donald A. Klein*
      Donald A. Klein

Dated: March 25, 2022

2279683_1