<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JERYL TURCO,<br><br>                    Plaintiff,<br><br>v.<br><br>CITY OF ENGLEWOOD, NEW JERSEY,<br><br>                    Defendant. | Civ. Action No. 15-3008 (SDW) (LDW)<br><br>**TRIAL OPINION**<br><br>August 12, 2022 |

**WIGENTON**, District Judge.

This Court held a bench trial for two days in this matter regarding Plaintiff Jeryl Turco's ("Plaintiff" or "Turco") claims against Defendant City of Englewood, New Jersey ("Defendant," "Englewood," or the "City") for alleged violations of her civil rights. This Court has jurisdiction over the matter pursuant to 28 U.S.C § 1331, and venue is proper pursuant to 28 U.S.C. § 1391. Based on the testimony and evidence presented at trial, this Trial Opinion constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons stated below, this Court finds in favor of Defendant on all claims.

## I.     PROCEDURAL HISTORY

Plaintiff brought this action in April 2015, challenging the constitutionality of an ordinance adopted by Englewood in March 2014 (the "Ordinance") to create buffer zones around certain types of health care facilities, including Metropolitan Medical Associates ("MMA"). (D.E. 1.) MMA is an abortion clinic where Plaintiff regularly approaches patients outside to dissuade them from obtaining an abortion. (*See id.* ¶¶ 4, 17–22.) Plaintiff brings this suit pursuant to 42 U.S.C. § 1983 and claims that the Ordinance violates her rights to freedom of speech and freedom of

assembly and association under the First Amendment of the U.S. Constitution, as well as her right to free speech under the New Jersey Constitution.  (*See id.* ¶¶ 2, 69–80.)

On November 14, 2017, this Court issued an Opinion and Order granting Plaintiff's Motion for Summary Judgment and denying Defendant's Cross-Motion for Summary Judgment.  (D.E. 49, 50.)  On appeal, the United States Court of Appeals for the Third Circuit reversed and remanded the case for further proceedings.  *Turco v. City of Englewood, New Jersey*, 935 F.3d 155 (3d Cir. 2019).  Consistent with the Third Circuit's opinion, this Court held a virtual bench trial on February 23–24, 2022, and the parties subsequently submitted post-trial briefs with proposed findings of fact and conclusions of law.  (D.E. 91, 92.)

## II.   <u>FINDINGS OF FACT</u>

This Court, writing primarily for the parties, adopts the Parties' Stipulation of Undisputed Facts ("PSUF"), (Joint Ex. J-4),[1] and makes additional findings of fact as stated below:

### A.   **Defendant's Efforts**

In late 2013, militant activists and aggressive protestors associated with a religious organization called the Bread of Life began to gather outside MMA on Saturday mornings.  (*See* PSUF ¶¶ 2–3, 10.)   The Bread of Life protestors engaged in extremely aggressive, loud, intimidating, and harassing behavior towards patients, their companions, and even other anti-abortion groups.  (*Id.* ¶ 5.)  Following reports and statements to the Englewood City Council from an MMA lawyer and several physicians, as well as news coverage, Lynne Algrant visited the MMA site at 40 Engle Street to observe the situation firsthand.  (*See* PSUF ¶¶ 6–7; Algrant, T1, 86:6 – 90:5, 92:23 – 95:21.)[2]  Ms. Algrant had been a member of the Englewood City Council

---

[1] References to trial exhibits are to Plaintiff's Exhibits, Defendant's Exhibits, and Joint Exhibits.  References to trial transcripts, (D.E. 93, 94), identify the witness, volume ("TI" or "T2"), and page: line.

[2] The activities of the Bread of Life were first brought to the attention of the City Council at its meeting on October 8, 2013.  (PSUF ¶ 6.)  Dr. Bruce Tisch, an MMA physician, read a prepared statement to the Council regarding

since 2010 and was President of the Council in 2014 and 2015.  (PSUF ¶ 20.)  She observed a group of men surround a young woman coming onto Engle Street and scream in her face, until an escort volunteering with the MMA was able to help her push through the crowd and to the clinic. (*See* Algrant, T1, 86:6 – 93:22.)  Ms. Algrant herself was also surrounded by men yelling at her and women trying to push things into her hands.  (*See id.* at 93:23 – 95:6.)

After this experience, Ms. Algrant spoke with other City officials, including Business Manager Tim Dacey, Police Chief Arthur O'Keefe, and Counsel William Bailey, about what could be done to ensure patient safety.  (*See id.* at 96:3–20.)  Ms. Algrant spoke to Chief O'Keefe about hiring volunteer off-duty Englewood police officers to be present at MMA on Saturday mornings (which MMA agreed to pay for in accordance with City policy).  (*Id.* at 97:18 – 98:2.)  However, Chief O'Keefe advised that the City's off-duty police officers did not want the particular work, since there was a substantial difference between being in a squad car while someone paves a street and confronting hostile protestors.  (*See id.* at 98:3–17.)  Ms. Algrant then asked Chief O'Keefe to list the opportunity with the Teaneck and Tenafly Police Departments, but that did not succeed either.  (*See id.* at 98:18–25; *see also* Dacey, T1, 166:13 – 167:2.)

Ms. Algrant also asked Chief O'Keefe to arrange patrol cars to go by the clinic more often on Saturday mornings when the Bread of Life protestors would be there, and either change or speed up the route to create more of a presence.  (*See* PSUF ¶ 53; Algrant, T1, 99:1–7.)  She reached out to Deputy Police Chief Larry Suffern on Wednesdays when she expected a Bread of

---

escalating incidents at 40 Engle Street.  (*Id.*)  The statement was signed by Tisch and other physicians on behalf of "a large group consisting of business owners, employees," and City residents.  (Pl. Ex. N.)  The statement informed the City that a new "group of extremists" was using sound amplification devices, verbal abuse, and threatening actions to impede access to the clinic.  (*See id.*)  The new group was also "intimidat[ing] uninvolved citizens . . . on their way to their local synagogue" and was causing fear among children at the public library across the street.  (*Id.*)  According to Defendant's Chief of Police, Arthur O'Keefe, these activities included such things as physically confronting, screaming at, and intimidating young women and local business employees, causing him to fear that "more people would start to get hurt."  (Joint Ex. J-3 at 21:12 – 22:2.)

Life protest the following Saturday, asking him to create a greater police presence.  (Algrant, T1, 99:23 – 100:6.)  However, because Engle Street was a one-way street, there was plenty of warning time for protestors to see the police coming—they would become temporarily peaceful as a police car drove by and then "heat up again" after the police car passed.  (*Id.* at 100:7–17; *see* Dacey, T1, 167:22 – 168:3.)  Ms. Algrant told Deputy Police Chief Suffern that the police needed to stop and get out of their cars, talk to the protestors, and make their presence known more assertively.  (Algrant, T1, 100:18 – 101:12.)  Nonetheless, while the police presence temporarily eased tensions at MMA, the hostile protests resumed immediately after officers left.  (*See id.* at 101:16–24; PSUF ¶¶ 56–57; Joint Ex. J-3 (O'Keefe Deposition Excerpt) at 14:13-21; Dacey, T1, 168:4–9.)

Ms. Algrant spoke with Chief O'Keefe and Mr. Dacey about having a regular police presence stationed at MMA on Saturday mornings, but the officials concluded that it was financially prohibitive, was contrary to the City's policy against providing off-duty police officers to private businesses without reimbursement, and would negatively impact the City's ability to address crime and rebuild after Hurricane Sandy.  (*See* Algrant, T1, 101:25 – 102:9, 104:6–20; Dacey, T1, 168:10 – 174:4.)  The City was "short on cash," "there were more vacancies [in the police department] than there should have been," and the department was "too strained," as the City "had problems with shootings, drive-by shootings, drug issues, [and] gang issues," unlike most other towns in Bergen County.  (Dacey, T1, 168: 13 – 169:11.)  Mr. Dacey testified that it would have cost "about $100 an hour" per officer to increase the police presence at MMA, but he also stated that he never performed a full calculation of the costs involved because using taxpayer funds to protect a private organization was against City policy.  (*Id.* at 170:9; 183:14 – 186:8.)

In response to the escalating dangers to patients, Ashley Gray co-founded a volunteer escort program at MMA to escort patients to the clinic when they arrived at the area.  (*See* PSUF

¶ 24.)  The volunteers risked their own safety because the Bread of Life protestors took pictures of them, their cars, and their license plates.  (Dacey, T1, 175:10–14.)  To reduce the risk, the escorts were required to avoid using their real names and avoid engaging with the protestors.  (*See* PSUF ¶¶ 51, 52.)  Beginning in December 2013, Ms. Gray sent weekly "escort reports" to Ms. Algrant about the activities of the Bread of Life group.  (*See* Gray, T2, 235:13–24; Pl. Ex. CC.)  Such activities included: "blocking access to the clinic door"; "blocking patients and escorts on the sidewalk"; "shouting into the clinic when the door is opened"; "creating tripping hazards"; "repeated physical assault of escorts"; "screaming directly into [patients'] faces"; and "videotaping [patients]," making them "hysterical."  (Pl. Exs. X, BB.)  Ms. Gray also sent Ms. Algrant photographic and video evidence of these activities.  (Algrant, T1, 139:14–20.)  Bread of Life protestors recorded some of their own activities as well and posted about their activities on YouTube and Facebook.  (*See id.* at 96:24 – 97:11; Gray, T2, 258:19 – 259:3, 266:24 – 267:13; Pl. Ex. DD.)  Using Google and other internet tools, Ms. Gray was able to learn the names of six of the members of the Bread of Life group, as well as the location of their church, and she forwarded this information to Ms. Algrant.  (*See* Gray, T2, 266:8 – 267:13; Pl. Ex. DD.)

Ms. Algrant talked to the escorts about filing complaints against problematic protestors, but the escorts felt unsafe doing so, as did patients, their companions, and MMA staff.  (*See* Algrant, T1, 112:14 – 113:4, 113:10 –114:3, 117:17 – 118:14.)  New Jersey does not permit filing anonymous complaints, and the City concluded that any individual who filed a complaint would be in danger of reprisal from the Bread of Life protestors.  (*See id.*; Dacey, T1, 175:1–20 ("So we talked to the physicians and the employees [about filing a complaint] and they were very reluctant, because we actually also talked to them about possibly getting an injunction against the Bread of Life protestors. And they were very leery about doing it because they were scared of retribution

towards them.").)  In one incident, a young escort became "hysterical" when a police officer insisted that she give her name and home address to file a report about a dangerous encounter with some of the protestors.  (Algrant, T1, 109:5 – 110:2.)  After Ms. Algrant called Deputy Chief Larry Suffern, the escort was eventually permitted to use the clinic's address.  (*Id.* at 110:4–19.)

However, even with the benefit of using the MMA address, there was still risk to individuals who filed complaints, and only "a handful" of "[m]ore than 100" escorts have filed complaints.  (Taylor, T2, 293:9–12.)[3]  For example, when the Bread of Life protestors learned Ashley Gray's name, they targeted her personally, showing her pictures and a video of her that they had found on the internet, which she found "[v]ery intimidating."  (Gray, T2, 244:23 – 245:11.)  Ms. Gray stopped escorting at MMA in 2020, in part because she feared that the protestors would find out about her father's death from COVID and use that information to "taunt [her], say unkind things, and harass" her.  (*Id.* at 226:13–24, 271:1–7.)  Another former volunteer escort, Andrea Long, testified that escorts were also reluctant to file complaints because the subsequent court proceedings required them to attend multiple hearings, take off work, and potentially explain to their employer that they volunteered at an abortion clinic.  (*See* PSUF ¶ 25; Long, T2, 330:17–24.)  The escorts who did file complaints were generally team leaders and did so in the most "flagrant" cases, *i.e.*, when protestors remained in the buffer zone after the Ordinance was enacted and continued to harass or threaten patients or escorts despite requests to stop.  (Taylor, 290:19 – 293:12; Long, 329:2 – 330:13.)[4, 5]

---

[3] Christine Taylor has been a volunteer escort at MMA since 2016.  (PSUF ¶ 32.)

[4] For example, prior to the enactment of the Ordinance, at least four individuals filed complaints with the police about the actions of the Bread of Life group.  (*See* Pl. Exs. BB and CC; Algrant, T1, 109:5 – 110:19.)  Since the enactment of the Ordinance, Ms. Taylor has filed three complaints and Ms. Long has filed five complaints.  (*See* Taylor, T2, 292:17 – 293:6; Long, T2, 325:3 – 329:17.)

[5] While Ms. Gray, Ms. Taylor, and Ms. Long have written about their experiences at MMA online or in published writings, most MMA escorts have not.  (*See* Gray, T2, 260:11 – 261:9; Taylor, T2, 297:4 – 301:10; Long, T2, 332:7 – 333:11.)

Defendant adopted the Ordinance (#14-11) on March 18, 2014, in order to deescalate the situation at MMA by creating a degree of separation between the Bread of Life protestors and MMA patients, doctors, staff, companions, and escorts.  (*See* Pl. Ex. 3 at 13–14 (Defendant's Answer to Plaintiff's Interrogatory No. 9); Dacey, T1, 178:19 – 180:6; Algrant, T1, 116:6 – 117:13; Joint Ex. J-3 (O'Keefe Deposition Excerpt) at 25:8–18.)   "The practical effect of the ordinance was the creation of . . . [t]wo semicircular buffer zones extend[ing] outwards eight feet from either side of the facility's entrance" and driveway, as well as a "third buffer zone spann[ing] the width of the facility's entrance [and driveway] and extend[ing] to the street." *Turco*, 935 F.3d at 159.[6]  "A picture of the buffer zones (shown in yellow) is set forth below:"

---

[6] The Ordinance states, in relevant part:

> A. Definitions. As used in this section, the following terms shall have the meanings indicated:
>> 1. "Health care facility" – as set forth in N.J.S.A. 26:2H 2.
>> 2. "Transitional facility" – Community residences for the developmentally disabled and community shelters for victims of domestic violence as those terms are defined in N.J.S.A. 40:55D-66.2.
>
> B. Within the City of Englewood, no person shall knowingly enter or remain on a public way or sidewalk adjacent to a health care facility or transitional facility within a radius of eight feet of any portion of an entrance, exit or driveway of such facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of such facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway. This subsection shall not apply to the following:
>> 1. persons entering or leaving such facility;
>> 2. employees or agents of such facility acting within the scope of their employment;
>> 3. law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and
>> 4. persons using the public sidewalk or street right of way adjacent to such facility solely for the purpose of reaching a destination other than such facility
>
> C. The provisions of subsection B shall only take effect during such facility's business hours and if the area contained within the radius and rectangle described in said subsection B is clearly marked and posted.

(PSUF ¶ 10.)



*Id.* at 159–60 (image cropped).  The diagram below shows the sidewalk in front of MMA, with yellow lines as painted:



(Joint Ex. J-1 (image cropped) (depicting the south side of Engle Street on the left side of the diagram).)

8

After the Ordinance was enacted, the situation at MMA generally became calmer. (Algrant, T1, 121:8 – 123:25.)  Sidewalk counselors and protestors could still talk to patients, but anyone needing to enter or exit the clinic had eight feet of space to do so without physical harassment.  (*See id.*)  The clinic door could open out without obstruction because the buffer zone cleared out the overcrowded space in front of the entrance.  (*See id.*)  In fact, Ms. Algrant stopped receiving weekly escort reports and escorts reduced the number of shifts they worked.  (*See id.*) Ms. Gray believed so strongly that the buffer zone was working and needed to stay that she used her name in her 2015 certification in this case.  (Gray, T2, 269:20 – 270:5.)  Ms. Gray testified that the buffer zone created space that prevented confrontations that could easily escalate, and stopped people from positioning themselves so close to the front door that they intimidated patients.  (*See id.* at 241:5–19.)  It helped the escorts get people in and out of the clinic entrance more easily.  (*See id.*)  Sidewalk counselors and protestors no longer followed patients all the way up to the front door, blocking other people behind them who were trying to enter the building.  (*See* Long, T2, 323:16 – 324:21.)  Witnesses, including Plaintiff, agreed that the Bread of Life protestors generally respected the buffer zone, perhaps going through it but rarely remaining in it.  (*See* Turco, T1, 58:15–20; Algrant, T1, 121:15–18; Long, T2, 320:8–10, 321:25 – 322:2; Taylor, T2, 289:12–14.)

Nonetheless, some issues still remained.  Ms. Gray explained that "there were bumps in the road. The presence of the protestors really kind of ebbed and flowed.  So for example, when there was something about abortion in the news, a lot more [protestors] would come and that would present additional challenges even with the buffer zone helping the situation."  (Gray, T2, 241:20 – 242:2.)  Months after the Ordinance went into effect, Ms. Algrant received two reports stating that Bread of Life was becoming "louder and more numerous than in a long while," and that "this most intimidating group seems to be growing."  (Algrant, T1, 144:20 – 145:16.)  However, Ms.

Algrant stated that these reports concerning "flare-ups" were "sporadic" and relatively infrequent compared to the situation in the months prior to the Ordinance's enactment, when "they were coming in all the time." (*Id.* at 155:23 – 156:1.) Still, another sidewalk counselor, Rosemary Garrett testified at her deposition that the buffer zones did not reduce the obnoxious behavior of Bread of Life protestors. (*See* Joint Ex. J-2 at 38:17 – 39:9; PSUF ¶¶ 22, 23.)

However, when this Court invalidated the Ordinance in 2017, "[i]t was absolute chaos." (Taylor, T2, 287:18–20.) Protestors on microphones and loudspeakers or with huge signs would stand right next to the door or even chase patients right up to the door. (*See id.* at 288:2–23.) Taylor testified to the impact on patients, stating, "I don't know how many patients I have had hold my hand, grab me, cry on my shoulder, tuck their head into my neck so that they don't have to look at it." (*Id.* at 287:6–8.) One protestor would walk up to the front door and just scream. (Long, T2, 319:9 – 320:4.) Even Plaintiff would follow patients up to the front door. (*Id.* at 318:3–5.) Sometimes a patient's companion who was behind Plaintiff would not be able to get around her to reach the entrance. (*Id.* at 318:6–9.)

### B    Plaintiff's Ministry

Plaintiff is not a hostile or aggressive anti-abortion protestor. (PSUF ¶ 14.) Rather, she refers to herself as a "sidewalk counselor." (*Id.*) Since 2007, her practice has been to calmly approach women entering MMA and attempt to engage in peaceful, nonconfrontational conversations. (*Id.* ¶ 15.) She believes that such conversational interaction is far more effective than the aggressive approach used by the Bread of Life protestors. (*Id.*)

Unlike other sidewalk counselors, however, Plaintiff does not remain stationary. (*Id.* ¶ 67.) She runs in all different directions to meet patients as they approach the clinic. (*See* Turco, T1, 41:11–17 ("I will approach a girl from anywhere that she is coming. And the sooner I get to her,

the more time I have to be able to share literature, share a message . . . ."), 44:11–21.)  In fact, the clinic escorts call Plaintiff "the Runner" because she runs up to patients as they are arriving and runs after and follows patients as they are leaving, for a block or more, even as they are going to their cars, and even as they are crossing Engle Street.  (*See* Gray, T2, 240:14 – 241:2; Long, T2, 314:13–20, 318:11–17; Turco, T1, 44:22–24, 45:8–9; Taylor, T2, 284:18 – 285:8.)  Plaintiff generally meets patients at some distance from the buffer zone and walks with them to the perimeter of the buffer zone because she requires about 30 to 45 seconds to convey her message and hand them literature.  (*See* Turco, T1, 43:14–25, 45:25 – 46:3, 46:13–15; *see also* Taylor, T2, 283:18 – 284:10; Long, T2, 316:2 – 317:11.)  She has used this approach whether or not there is a buffer zone.  (*See* Turco, T1, 48:10–16.)

Prior to the enactment of the Ordinance, Plaintiff was free to approach women on the public sidewalk in front of MMA and accompany them all the way to the clinic door without being hindered by the buffer zones in front of the MMA main entrance and driveway.  (*See* Turco, T1, 13:22 – 15:23.)  Thus, if Plaintiff was standing south of the clinic doorway area and saw a patient approaching from north beyond the driveway, she was free to run up the sidewalk to the patient in a straight line, try to engage in conversation, hand literature to the patient, and walk with the patient all the way back to the clinic door.  (*See id.*)

With the Ordinance in effect, if Plaintiff is standing to the south of the doorway area and sees a patient approaching from north beyond the driveway, she must walk around the radius arc to the left of the doorway, sidestep to the street to avoid the rectangular zone in front of the doorway, hurry to the next rectangular zone by the driveway, and sidestep that zone by going into the street, before she can try to engage the patient.  (*See id.* at 24:25 – 25:14; Joint Ex. J-1.)  While trying to converse with that patient on the way back toward the clinic door, Plaintiff must sidestep

to avoid the driveway radius arcs and rectangular area, and then reconnect with the patient who has likely continued walking in a straight line.  If successful, Plaintiff must then stop at the radius arc to the north of the door or at the doorway rectangular zone.

However, in practice, Plaintiff can easily walk in the street gutter to traverse the rectangular buffer zones, which she does.  (*See* Turco, T1, 64:9–16.)  Plaintiff can also get into the area between the two rectangular buffer zones by crossing Engle Street.  (*See id.* at 62:5–24.)  In fact, if a patient is approaching from the north, Plaintiff sometimes just runs up Engle Street to meet the patient, avoiding the sidewalk entirely.  (*See id.* at 47:2–11.)

When a patient is approaching from the south, Plaintiff's ministry is minimally affected.  (PSUF ¶ 68.)  Plaintiff will run down Engle Street, as she did before the Ordinance, and meet the patient as far as the next intersection so that she will have the time she needs to talk to the patient.  (*See* Turco, T1, 45:10 – 46:12.)  Plaintiff is able get to the buffer zone on the south side of the clinic without obstruction and be no more than eight feet from the MMA doorway.  (*See id.*)[7]

Overall, Plaintiff has talked to patients on some kind of regular basis both before and after Englewood's adoption of the Ordinance, but the Ordinance has resulted in "some obstruction" and "some difficulty" in her ability to do so "at least 50 percent of the time."  (*Id.* at 28:7–11; PSUF ¶ 63.) The difficulty involved with navigating the buffer zones, and being forced to go out into the street, is compounded by the presence of cars, delivery trucks, and sometimes snow.  (*See* Turco,

---

[7] During the COVID-19 pandemic, Sofia, a restaurant adjacent to MMA and south of it on Engle Street, set up tables and planters outside its restaurant and MMA.  (*See* Taylor, T2, 293:18–19; Long, T2, 334:24 – 335:2.)  The planters differ in size and move fairly frequently, as do the tables, sometimes depending on holidays or the season.  (*See* Taylor, T2, 293:20 – 294:25; Long, T2, 335:3–6.)  Plaintiff can walk around the planters; they are set on the edge of the sidewalk by the curb, not in the middle of the sidewalk.  (*See* Taylor, T2, 295:14–24.)  The distance from the MMA building to the street is 11 feet 10 inches, so there is at least 3 feet 10 inches of space between the end of the semicircular buffer zones and the street. (*See* PSUF ¶ 44.)  However, the objects do add to the difficulty of trying to communicate with patients.  Plaintiff estimates that the objects take up "probably half the sidewalk you could use."  (Turco, T1, 39:17–24.)  Even one of Defendant's witnesses, Andrea Long, testified that Sofia's objects narrowed the passageway for walking by "maybe half," but added that Plaintiff could still walk up to the circular buffer zone on the south side of the main entrance.  (Long, T2, at 342:1–8, 343:2–19.)

T1, 63:22 – 64:4.)  However, Plaintiff admits that the Bread of Life protestors have also negatively impacted her ability to communicate with patients, as they cause patients to run into the clinic as quickly as possible.  (*See* PSUF ¶ 65; Turco, T1, 48:25 – 49:13.)

Other sidewalk counselors have been able to talk to patients on a regular basis both before and after the Ordinance went into effect.  (*See* PSUF ¶ 64.)  For example, Rosemary Garrett, who began sidewalk counseling outside of MMA in 2013, remains stationary.  (*See* PSUF ¶¶ 22, 23.) She testified at her deposition that she was not bothered by the new buffer zone and was able to counsel patients even when the buffer zone was there.  (*See* Joint Ex. J-2 at 28:6 – 29:13.)

## III.   CONCLUSIONS OF LAW

### A.   Narrow Tailoring

As the Third Circuit explained on appeal, § 1983 lawsuits that allege a First Amendment violation are analyzed using a three-part test.  *Turco*, 935 F.3d at 161 (citing *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).  The court must (1) "determine whether the First Amendment protects the speech at issue"; (2) "consider the 'nature of the forum'"; and (3) "resolve 'whether the [government's] justifications for exclusion from the relevant forum satisfy the requisite standard.'"  *Id.* at 161–62 (quoting *Cornelius*, 473 U.S. at 797.) "Only the third prong of the test is at issue in this" case, as Defendant "concedes that the First Amendment fully protects the speech at issue here and that the Ordinance clearly regulates speech in a traditional public forum (i.e., the sidewalk)."  *Id.* at 162 (citations omitted).  The parties also agree that the restrictions imposed are content-neutral—the Ordinance impacts the speech of those who support abortion as well as those who oppose it.  *Id.* (citations omitted).  This Court therefore applies intermediate scrutiny.  *Id.* (citation omitted).

13

To withstand intermediate constitutional scrutiny, "the Ordinance must be 'narrowly tailored to serve a significant governmental interest.'" *Id.* (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)). For a content-neutral speech restriction such as the Ordinance "'to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* (quoting *McCullen*, 573 U.S. at 486). "Unlike a content-based speech restriction, the Ordinance 'need not be the least restrictive or least intrusive means of' serving the government's interests." *Id.* (quoting *McCullen*, 573 U.S. at 486). "Rather, the First Amendment prohibits the government from regulating speech in a way that would allow a substantial burden on speech to fall in an area that 'does not serve to advance its goals.'" *Id.* (quoting *McCullen*, 573 U.S. at 486.) With this framework in mind, this Court applies intermediate scrutiny below.

### 1. *Defendant's Legitimate Interests*

As the Third Circuit observed, "the state ha[s] an interest in protecting health and safety, which 'may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests.'" *Id.* at 166 (summarizing and quoting *Hill v. Colorado*, 503 U.S. 703, 715 (2000)). Englewood's Ordinance serves this interest by creating an unobstructed pathway for patients to enter the MMA clinic without confrontation. Furthermore, "the buffer zones 'clearly serve' the 'government interests in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services.'" *Id.* at 163 (citing *McCullen*, 573 U.S. at 486–87); *see also Bruni v. City of Pittsburgh*, 941 F.3d 73, 88 (3d Cir. 2019) (citing *Turco* and holding that buffer zones serve such "legitimate" public interests). The Ordinance's clearly marked buffer zones also "'provide specific guidance to enforcement authorities [and] serve the interest in evenhanded application of the law,'" by avoiding "'the great

14

difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement within the 8-foot boundary.'" *Turco*, 935 F.3d at 166 (quoting *Hill*, 503 U.S. at 715, 729). Because the government's interests here are plainly significant and legitimate, this Court will proceed to evaluate whether the Ordinance is narrowly tailored to further those interests.

### 2. *Burden on Plaintiff's Speech*

To be narrowly tailored, the Ordinance "'must not burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 161 (quoting *McCullen*, 573 U.S. at 486). Upon reviewing the testimony and other evidence in this matter, this Court finds that the burden on Plaintiff's speech is not substantial because the overall impact of the Ordinance on Plaintiff's ministry has been relatively small. Plaintiff is still able to meet patients at some distance from the buffer zones and walk with them to the perimeter of the doorway buffer zone, giving her about 30 to 45 seconds to convey her message and hand them literature. (*See* Turco, T1, 43:14–25, 45:25 – 46:3, 46:13–15; *see also* Taylor, T2, 283:18 – 284:10; Long, T2, 316:2 – 317:11.) Her approach has not changed since the Ordinance was enacted, (*see* Turco, T1, 48:10–16), and the few extra seconds in the buffer zone that she has lost during the walk to the MMA entrance are not substantial if the patient is unwilling to listen. If the patient is willing to stop and listen, then the Ordinance has no impact at all. If anything, the Ordinance may have given Plaintiff more opportunities to engage patients by decreasing the size and aggressiveness of the Bread of Life group, which caused patients to run into the clinic as quickly as possible. (*See* PSUF ¶ 65; Turco, T1, 48:25 – 49:13.)

With respect to her runs *to* the patients, the buffer zones only impact Plaintiff's ministry when a patient is approaching from the north side of Engle Street, preventing her from being able to run to the patient in a straight line on the sidewalk. (*See* Turco, T1, 13:22 – 15:23, 24:25 – 25:14; Joint Ex. J-1.) However, the buffer zones only extend to the end of the sidewalk in front of the MMA entrance and driveway—Plaintiff can otherwise run along the sidewalk or run in the gutter as needed. (*See* Turco, T1, 47:2–11, 64:9–16.) In fact, this has been her practice, as Plaintiff and several escorts testified that she often *crosses* Engle Street to meet patients coming from the other side or walking back to their cars. (*See id.* at 44:22–24, 45:8–9; Gray, T2, 240:14 – 241:2; Long, T2, 314:13–20, 318:11–17; Taylor, T2, 284:18 – 285:8.)[8]

As the Third Circuit concluded, this case is distinguishable from *McCullen v. Coakley*, 573 U.S. 464 (2014), in which the Supreme Court struck down a Massachusetts law establishing a 35-foot buffer zone—Defendant's Ordinance establishes only an eight-foot buffer zone and "[t]his is a substantial distinction." *Turco*, 935 F.3d at 163. The Massachusetts buffer zone carved out a significant portion of the adjacent sidewalks and required counselors to stand "well back" from the clinic, "prohibit[ing] McCullen and her colleagues from effectively engaging in sidewalk counseling either verbally or by handing literature to the patients." *Id.* at 163–64 (citing *McCullen*, 573 U.S. at 487–88). That is not the case here. Although the Ordinance adds "some difficulty" to Plaintiff's efforts to reach patients "at least 50 percent of the time," (Turco, T1, 28:7–11), there was no testimony that the eight-foot buffer zones prohibit Plaintiff from engaging in the one-on-one conversations that are central to her sidewalk counseling. An eight-foot gap is sufficiently

---

[8] To the extent that Sofia's outdoor dining setup has created additional obstacles for Plaintiff when she is running to patients approaching from the south side or walking back with them to the clinic, these obstacles do not prevent her from using the sidewalk or gutter, but only narrow her passage. (*See* Taylor, T2, 295:14–24; Long, T2, 342:1–8, 343:2–19.) Moreover, these obstacles affect Plaintiff and the patients equally. If anything, having to slowly navigate a narrow passage between the restaurant's planters and tables with a pregnant patient would only increase the duration of Plaintiff's conversation with the patient.

narrow for Plaintiff and patients to converse in a normal tone with ease.  *See Hill*, 503 U.S. at 726–27 ("[T]his 8-foot zone allows the speaker to communicate at a 'normal conversational distance.'" (quoting *Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357, 377 (1997))).  It is also narrow enough for Plaintiff to hand literature to willing recipients, who can easily step towards her.  *See Turco*, 935 F.3d at 166 ("[I]t [i]s important to distinguish between 'state restrictions on a speaker's right to address a willing audience and those [restrictions] that protect listeners from unwanted communication.'" (quoting and analyzing *Hill*, 503 U.S. at 715–16)).  As a result, Plaintiff has been able to talk to patients on a regular basis both before and after the Ordinance was enacted, as have other sidewalk counselors such as Rosemary Garrett.  (*See* PSUF ¶¶ 63, 63; Joint Ex. J-2 at 28:6 – 29:13.)

The present case is more akin to *Hill*, in which the Supreme Court upheld another eight-foot buffer zone.[9]  *See* 503 U.S. at 703.   Plaintiff points to several distinctions between this case and *Hill*.  (*See* D.E. 91 at 29–30 ¶¶ 23–26.)  Unlike the Ordinance, the *Hill* statute more accurately created an eight-foot bubble zone—within a 100-foot buffer zone—that prohibited individuals from knowingly approaching another person within eight feet of that person to pass a leaflet, counsel, or hold a sign unless that person consented.  *See Hill*, 530 U.S. at 707–08.  Thus, the bubble zone could be pierced when the listener consented.  *See id*.  In contrast to the operation of

---

[9] On June 27, 2022, Plaintiff submitted a notice of supplemental authority, asking this Court to ignore *Hill's* precedential status in view of the Supreme Court's recent decisions in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), and *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464 (2022).  (D.E. 95.)  This Court declines to do so.  *Dobbs* cites to *Hill* once in more than 200 pages.  *See Dobbs*, 142 S. Ct. 2275–76 ("The Court's abortion cases have . . . distorted First Amendment doctrines." (citing two dissenting opinions in *Hill*)).  This is classic dicta—the instant case and *Hill* concern First Amendment rights, while *Dobbs* concerns the right to an abortion and explicitly "emphasize[s] that our decision concerns the constitutional right to abortion and no other right.  Nothing in this opinion should be understood to cast doubt on precedents that do not concern abortion."  *Id.* at 2277–78.  In *City of Austin*, Justice Thomas castigated *Hill* in his dissent, 142 S. Ct.  at 1481–91, and the majority responded by saying, "[W]e do not . . . 'resuscitat[e]' a decision that we do not cite . . . ."  *Id*. at 1475 (quoting the dissent).  That the majority expressly declined to engage with the dissent's attack on *Hill* (in a case about signage) is not a sufficient basis for this Court to ignore *Hill's* precedential status.

the Colorado law in *Hill*, Plaintiff here cannot cross into a buffer zone imposed by the Ordinance to continue speaking one-on-one with a patient, even if the patient consents.   Although this distinction is meaningful, it does not make Defendant's Ordinance more burdensome than the statute in *Hill*.   Outside the 8-foot buffer zone, Plaintiff is able to approach anyone, without any gap, and regardless of whether they consent.   The *Hill* plaintiffs were unable to do this within 100 feet of health care facilities.   Inside the 8-foot buffer zone, patients can still hear from Plaintiff regardless of whether they consent.   They can also receive literature from Plaintiff if they consent, by stepping towards her.   Accordingly, any burden on Plaintiff's speech caused by Defendant's Ordinance is not substantial, especially in view of Defendant's significant interests.

> 3.   *Less Restrictive Means*

"[W]here the burden on speech is de minimis, a regulation may be viewed as narrowly tailored," because "challengers would struggle to show that alternative measures would burden *substantially* less speech."  *Bruni*, 941 F.3d at 89 (internal quotation marks, citations, and alteration omitted).   While "a rigorous and fact-intensive inquiry will be required where a restriction imposes a significant burden on speech, . . . a less demanding inquiry is called for where the burden on speech is not significant—whether due to a restriction's scope, the size of the speech-free zone, or some combination of the two."  *Id.* (internal quotations marks and citations omitted).

Even assuming that the burden on Plaintiff's speech is substantial, this Court is satisfied that Englewood has "show[n] that it tried or 'seriously considered[ ] substantially less restrictive alternatives.'"  *Reilly v. City of Harrisburg*, 790 F. App'x 468, 473 (3d Cir. 2019) (quoting *Bruni*, 941 F.3d at 89).   In *McCullen*, the Supreme Court identified multiple alternative measures that Massachusetts could have taken instead of enacting a buffer zone ordinance, including: (1) using an unchallenged subsection of that act, which prohibited blocking entrances, without banning

speech; (2) enacting a local version of the federal Freedom of Access to Clinic Entrances Act ("FACE Act"), 18 U.S.C. § 248; (3) enacting an ordinance specifically prohibiting harassment near health care facilities; (4) using existing ordinances against obstruction of driveways; (5) using "generic criminal statutes"; and (6) seeking injunctive relief as necessary against specific persons with a history of obstructing access. *See McCullen*, 573 U.S. at 490–93.

Defendant did not avail itself of any of these less restrictive alternatives,[10] but that alone is not dispositive. *See Bruni*, 941 F.3d at 91. The testimony from City officials credibly showed that they considered some of these alternatives but ran into the same problems that would render all of the *McCullen* alternatives less effective: the City was struggling financially and had multiple vacancies in its already-strained police department; off-duty police officers were not volunteering to monitor MMA; Bread of Life protestors were generally peaceful when they saw police officers arriving; and patients, companions, volunteer escorts, and MMA physicians and staff were all generally afraid of filing complaints against Bread of Life protestors because of the risk of reprisal. *See* discussion *supra* Section II.A.

City officials were entitled to consider these obstacles while crafting a solution, *see Bruni*, 941 F.3d at 91 n.21, and they were not required to "meticulously vet every less burdensome alternative," *Turco*, 935 F.3d at 171 (quotation omitted), particularly where the situation at MMA required urgent action and the chosen solution created a much safer situation for all parties, *see* discussion *supra* Section II.A. Accordingly, this Court finds that the Ordinance is "narrowly

---

[10] Plaintiff specifically faults Defendant for (1) adopting the Ordinance in place of a former ordinance that prohibited blockading, obstructing, and impeding access to health care and transitional facilities; (2) not enacting a local version of the FACE Act or a buffer zone law like Pittsburgh's, which (as eventually interpreted by the Third Circuit) would have addressed the patrolling, picketing, and demonstrating of the Bread of Life group, but allowed sidewalk counselors to engage in one-on-one communications; (3) not prosecuting Bread of Life protestors for violating laws already on the books, such as those prohibiting harassment, disorderly conduct, and simple and aggravated assault; (4) not pursuing injunctive relief against bad actors caught on photo or video; and (5) not ascertaining whether any of the protestors were already subject to an injunction issued against certain MMA protestors in *United States v. Gregg*, 32 F. Supp. 2d 151, 161–62 (D.N.J. 1998). (*See* D.E. 91 at 32–33 ¶¶ 32–36.)

tailored to serve a significant governmental interest," *McCullen*, 573 U.S. at 477 (quotation omitted), and it therefore satisfies intermediate scrutiny.

### B.      Overbreadth

In the alternative, Plaintiff argues that even if the Ordinance is narrowly tailored, it is unconstitutional because it is overbroad. (*See* D.E. 91 at 38–40 ¶¶ 49–56.)  The Ordinance broadly applies to all health care facilities and transitional facilities in Englewood.  (*See* PSUF ¶ 10.) Plaintiff argues that "the Ordinance fails overbreadth because it creates buffer zones at all health care and transitional facilities without any legal justification to apply such a sweeping remedy to address problems at one location."  (D.E. 91 at 38 ¶ 50 (emphases omitted).)  As for the reasons for this inclusion, Ms. Algrant testified that the City did not want protestors making it difficult for people to get in and out of transitional facilities, (Algrant, T1, 125:13–17), and Mr. Dacey testified that the Ordinance was intended to reach all health care and transitional facilities because "protests can pop up any day for any reason anywhere," (Dacey, T1, 179:3–8).  Plaintiff contends that Defendant failed to identify a history or an example of such protests taking place outside transitional facilities in Englewood.  (*See* D.E. 91 at 39 ¶ 52.)  Plaintiff further argues that restricting First Amendment activities in buffer zones outside every health care and transitional facility in Englewood goes far beyond any justification that the City has for attempting to regulate one group of protestors at one location.  (*See id.* at 39 ¶ 54.)

A law is "impermissibly overbroad" when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 n.6 (2008) (internal quotation marks and citation omitted).  "'[T]he overbreadth claimant bears the burden of demonstrating, from the text of [the law], and from actual fact, that substantial overbreadth exists.'"  *Turco*, 935

F.3d at 172 (quoting *United States v. Stevens*, 559 U.S. 460, 485 (2010)). "'In determining whether a statute's overbreadth is substantial, [a court must] consider a statute's application to real-world conduct, not fanciful hypotheticals.'" *Id.* (quoting *Stevens*, 559 U.S. at 485.)

In the Court's view, Plaintiff has not met her burden of showing that substantial overbreadth exists. "'[W]hen a buffer zone broadly applies to health care facilities' to include 'buffer zones at non-abortion related locations,' we may then 'conclude the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive.'" *Bruni*, 941 F.3d at 92 (quoting *Turco*, 935 F.3d at 171). In *Bruni*, the Third Circuit rejected a similar overbreadth argument against an ordinance that "authorizes [Pittsburgh] to create buffer zones at any health facility in the [c]ity, regardless of whether the [c]ity has identified a problem at the location in the past." *Id.* at 91. The Third Circuit explained that "'[t]he fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance.'" *Id.* at 92 (quoting *Hill*, 530 U.S. at 730–31). In fact, Pittsburgh had only enforced its ordinance at "two facilities, both of which [had] suffered from violence and obstruction in the past." *Id.* at 91. Similarly, Englewood's Ordinance has been applied only at the MMA clinic, given the unique history of harassment and violence at that site. As in *Bruni*, the Ordinance only applies when the buffer zones are "clearly marked and posted," (PSUF ¶ 10), and Plaintiff has not submitted evidence of its application at any transitional facilities. The overbreadth doctrine "is to be used sparingly, where the demonstrated overbreadth is considerable," and only where there is "a realistic danger that the [law] will significantly compromise recognized First Amendment protections of parties not before the Court." *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1265 (3d Cir. 1992) (quotation and citations omitted). No

such danger realistically exists here, and this Court therefore finds Defendant's Ordinance to be constitutional, both on its face and as applied to Plaintiff.

## IV.    CONCLUSION

For the reasons set forth above, this Court finds in favor of Defendant on all claims.[11, 12] An appropriate order follows.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:      Clerk
cc:        Hon. Leda D. Wettre, U.S.M.J.
           Parties

---

[11] This Court does not address the parties' arguments regarding the doctrine of constitutional avoidance, (*see* D.E. 91 at 22–24; D.E. 92 at 37–39), because it finds that the Ordinance is constitutional without a narrowing construction.

[12] The parties did not meaningfully brief Plaintiff's First Amendment freedom of assembly and association and state law freedom of speech claims.  Nonetheless, this Court notes that its First Amendment freedom of speech analysis equally applies to Plaintiff's remaining claims.  *See McTernan v. City of York, PA*, 564 F.3d 636, 644 n.3 (3d Cir. 2009) ("[Plaintiff] references his claim of right to assembly but does not set forth a separate argument in his brief. For purposes of our analysis, we conclude that this claim is encompassed in his free speech claim." (internal citation omitted)); *Twp. of Pennsauken v. Schad*, 733 A.2d 1159, 1169 (N.J. 1999) ("Because our State Constitution's free speech clause is generally interpreted as co-extensive with the First Amendment, federal constitutional principles guide the Court's analysis.").